UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DR. RICHARD CARRIER | |
| Plaintiff | Case No. |
| -vs- | Judge: |
| THE ORBIT, *ET AL.* | **AFFIDAVIT OF** |
| Defendants | **DR. RICHARD CARRIER** |

Dr. Richard Carrier being first duly sworn, deposes and states on personal knowledge as follows:

1. Affiant states, I am over the age of eighteen (18) years and I am competent to testify as to all matters set forth herein.

2. Affiant states, my primary occupation is that of author, co-author, teacher, and lecturer.

3. Affiant states, since 2005, I have had professional relationships and valid ongoing business expectancies with various reputable publishing houses and co-authors.

4. Affiant states, since 2005, I have had professional relationships and valid ongoing business expectancies with organizations that include; the Secular Student Alliance (SSA), and the SSA's hundreds of campus affiliates, Camp Quest, and its many regional affiliates, the Center for Inquiry, the Freedom From Religion Foundation, the United Coalition of Reason, American Atheists, Atheist Alliance of America, the American Humanist Association, and the Council for Secular Humanism, FreethoughBlogs.com, Skepticon.org, and hundreds of other local secular community

Plaintiff's Exhibit 25

groups across the entire United States and beyond who cater to humanists, atheists, and skeptics, as well as ethical societies, and churches and religious organizations (who have hired me for interfaith work), which have been my principal source of speaking and direct sales income.

5. Affiant states, I would like to continue writing and lecturing professionally.

6. Affiant states, I am a resident of the State of Ohio.

7. Affiant states, the Secular Student Alliance and Camp Quest are both headquartered in Columbus Ohio.

*Concerning Lauren Lane*

8. Affiant states, I have known Ms. Lauren Lane for approximately eight (8) years. Affiant further states, Ms. Lane is one of the Founders and Executive Director of Skepticon, an annual conference in Springfield Missouri that promotes skepticism, science education, and community building.

9. Affiant states, between 2008 and 2012, Ms. Lane and I exchanged mutual, consensual flirtations, both by electronic communication and in person. A true and correct copy of affiant's e-mail exchange with Ms. Lane is attached hereto marked **Affidavit Exhibit 1**.

10. Affiant further states, during this time I was married. Affiant further states, my ex-wife and I divorced in 2015.

11. Affiant states, in November 2012, I was an official speaker at Skepticon 5, as I had been every year since the first Skepticon in 2008. Affiant further states, for the duration of the conference I shared a hotel room with a longtime friend and fellow attendee, David Fitzgerald.

2

12. Affiant states, while attending Skepticon 5, I spent an evening socializing with Mr. Fitzgerald, Ms. Lane, and *<redacted>*. Affiant further states, throughout the evening, Ms. Lane flirted openly with me, and I reciprocated in kind. Affiant further states, after cocktails and conversation in the hotel lobby, the four of us shared an elevator upstairs.

13. Affiant states, initially, Mr. Fitzgerald and I said 'good night' to Ms. Lane and *<redacted>*, then parted ways for the evening. Affiant further states, soon after walking away, Ms. Lane and *<redacted>* turned and walked back to Mr. Fitzgerald and I, just outside our hotel room door.

14. Affiant states, Ms. Lane and *<redacted>* entered our hotel room wherein Ms. Lane initiated consensual sex with me, and *<redacted>* initiated consensual sex with Mr. Fitzgerald.

15. Affiant states, the following evening, Ms. Lane and I again had sex, in her own hotel room, at her request. Affiant further states, Ms. Lane and I subsequently had sex at another conference, also at her request.

16. Affiant states, at all times the foregoing was consensual and mutual.

17. Affiant states, in or around the Spring of 2013, I ended the affair with Ms. Lane.

18. Affiant states, after ending the affair with Ms. Lane, she persistently attempted to persuade me to resume the relationship, and repeatedly ignored my requests to stop. Affiant further states, I was thereby forced to cut off all communication with Ms. Lane, and to physically avoid her, after which she attempted to continue relaying messages to me through our mutual friend, David Fitzgerald, whom I informed of her persistent refusal to heed my requests to stop.

19. Affiant further states, in or around the Fall of 2013, I confessed the affair to my wife. Affiant further states, at that time, my wife and I attempted an open marriage.

20. Affiant states, in early November 2013, assuming the attraction remained mutual, I text messaged Ms. Lane and pursued a reunion. Affiant further states, regrettably, the tone of my text message was presumptive and awkward.

21. Affiant states, from Ms. Lane's response to my text message, she clearly was angry with me and no longer interested in a relationship. Affiant further states, I immediately apologized to Ms. Lane, and I have respected her wishes ever since, including when we met in person, at her request, to discuss things at the subsequent conference a week or two later, where I continued my sincere apologies, for which she stated her appreciation.

22. Affiant states, for the duration of that next conference, which I attended as an invited speaker (Skepticon 6), I accompanied another woman, which I observed angered Ms. Lane further, who interrogated me about it and expressed evident annoyance.

23. Affiant states, in 2013, after our break-up, Ms. Lane e-mailed to me an invitation to speak at the next Skepticon, and months later e-mailed me again to rescind that invitation, but also stating that I was still welcome to attend the conference and even to lead a workshop at the conference; this e-mail made no mention of any sexual harassment complaint against me, nor of that being the reason behind not having me as a speaker, but stated an entirely different reason instead.

24. Affiant states, I was never informed, by anyone, of any sexual harassment complaint relating to Skepticon, nor of that being the reason behind not being invited as a speaker.

4

25. Affiant states, in 2015 I attended Skepticon 8 on my own, where Ms. Lane briefly interacted with me several times in a polite manner, and I was never informed by her nor anyone that I had been banned from the conference for any reason, much less for sexual harassment, nor did she or anyone state any objection to my presence.

26. Affiant states, I never sexually harassed, nor sexually assaulted Ms. Lane, nor any other person, at any time whenever; nor have I ever pushed against her or anyone else's stated boundaries; nor have I initiated sexual contact with her or anyone without their express permission; nor have I persisted in any sexual or sexualized behavior toward her or anyone after their request to stop; nor have I made overtures toward her or anyone who stated their disinterest in my doing so.

### *Concerning Amy Frank-Skiba*

27. Affiant states, I have known Ms. Amy Frank-Skiba for approximately one (1) year. Affiant further states, Ms. Frank-Skiba is the former president of the Arizona State University (ASU) chapter of the Secular Student Alliance (SSA).

28. Affiant states, in April 2015, I was the invited speaker at a meeting of the ASU affiliate of the SSA.

29. Affiant states, following the SSA affiliate meeting, a large group of attendees, myself included, went to the Salut Kitchen Bar in Tempe, Arizona. Affiant further states, Ms. Frank-Skiba was among the group.

30. Affiant states, someone from the group introduced me to Alex Toenniges, a woman who wanted to discuss with me the subject of polyamory. Affiant further states, while at the Salut Kitchen Bar, I spent the bulk of my time in conversation with Ms. Toenniges.

5

31. Affiant states, later the same evening, I went with some of the fore mentioned group to the Blasted Barley Beer Company in Tempe, Arizona. Affiant further states, Ms. Frank-Skiba was among the group. Affiant further states, I continued to spend the bulk of my time there in conversation with Ms. Toenniges, and I stayed until the bar closed for the night, as did Ms. Frank-Skiba.

32. Affiant states, during all of this time, at both Salut and Blasted Barley, Ms. Frank-Skiba was accompanied by her husband, Phillip Skiba.

33. Affiant states, after the bar closed for the night, a group of people, myself included, retired to the home of Mr. Forrest Schreick, who hosted my visit. Affiant further states, Ms. Frank-Skiba and her husband were among the group, as was Spencer Hawkins and Eric Moss.

34. Affiant states, for the next couple of hours, the group talked over drinks in Mr. Schreick's kitchen. Affiant further states, while I was drinking socially, I was not impaired.

35. Affiant states, Phillip Skiba became especially inebriated and passed out in Mr. Schreick's dining room. Affiant further states, from time to time, Ms. Frank-Skiba went to the dining room to check on her husband.

36. Affiant states, while at Mr. Schreick's home, the group mingled intermittently in the back yard, kitchen, and in the dining room and living room, both adjacent and open to the kitchen area.

37. Affiant states, at one point I complimented Ms. Frank-Skiba on her efforts, as she coordinated the night's earlier speaking engagement and meeting of the ASU SSA. Affiant further states, my comments were made openly, in front of multiple

6

corroborating witnesses. Affiant further states, throughout the entire night I neither approached nor touched Ms. Frank-Skiba at any point, nor whispered anything to her, but remained at a distance, as multiple witnesses can attest.

38. Affiant states, near the end of the night, while in the kitchen and among the group, Eric Moss became physically affectionate and provocative with Ms. Frank-Skiba. Affiant further states, because Ms. Frank-Skiba's husband was asleep in the dining room, I was initially surprised to see Mr. Moss touching her in a suggestive manner. Affiant further states, Ms. Frank-Skiba, however, smiled, appeared cheerful, and otherwise welcomed the attention.

39. Affiant states, I did not know either Ms. Frank-Skiba or Mr. Moss well enough to judge the appropriateness of their interaction. Affiant further states, I casually joked, openly, in front of multiple corroborating witnesses, that I wished I were Mr. Moss, and allowed to touch her in such a way. Affiant further states, Ms. Frank-Skiba smiled, and the incident was not otherwise notable.

40. Affiant states, I recall a group conversation in which the questions posed to me turned sexual in nature, though neither those questions nor my answers were vulgar or offensive. Affiant further states, I recall varied members in the group discussing alcohol's effect on their performance. I commented on my experiences, and mentioned having undergone a vasectomy, which resulted in better stamina during sex. Affiant further states, the foregoing remarks were all made openly, in front of multiple corroborating witnesses, who can likewise attest these remarks were not directed at Ms. Frank-Skiba. Affiant further states, at all times material, Ms. Frank-Skiba continued to happily mingle and converse with the group.

41. Affiant states, at the end of the night, I told everyone that I was tired and needed to go to bed, and I went to the living room to fetch my charging mobile device; Spencer Hawkins was already sleeping on a couch there, beside me at the time.

42. Affiant states, Ms. Frank-Skiba approached me there and initiated a discussion with me, expressing interest in an open marriage. Affiant further states, Ms. Frank-Skiba also indicated, however, an open marriage was not a shared interest with her husband, who was still asleep in the dining room.

43. Affiant states, Ms. Frank-Skiba asked that our discussion be kept in confidence, noting that her husband routinely reads her private communications. Affiant further states, I expressed some sympathy and concern for that situation.

44. Affiant states, before concluding the discussion, I remarked that I found Ms. Frank-Skiba interesting, and extended an open invitation to ask me out anytime in future, should her marital circumstances ever change. Affiant further states, Ms. Frank-Skiba smiled and said she would consider it; she expressed no disapproval to me; and I never pursued the matter further.

45. Affiant states, Ms. Frank-Skiba and I then said 'goodnight' to one another, after which I never saw or communicated with her again, nor had any knowledge of where she then went; I went to sleep in a guest room alone.

46. Affiant states, at no time whatsoever did I make physical contact with Ms. Frank-Skiba, nor cross any ordinary social boundary.

47. Affiant states, for the entirety of the evening, apart from only the single brief interaction, just before going to sleep, all of my interactions with Ms. Frank-Skiba were at a group level, at all times friendly and mutual.

48. Affiant states, I never sexually harassed, nor sexually assaulted Ms. Frank-Skiba, nor any other person, at any time whenever.

49. Affiant states, I had no other intimate communication with Ms. Frank-Skiba, neither before nor since the foregoing exchange.

50. Affiant states, in or around May 2015, I learned that a student complaint against me was filed with the SSA, alleging 'unwanted sexual advances' at a recent SSA event. Affiant further states, the SSA withheld the complainant's name, but according to the SSA's description of the complaint, it did not involve sexual assault, sexual harassment, or any of the alarming details Ms. Frank-Skiba would later publish. Affiant further states, I never would have guessed the complainant was Ms. Frank-Skiba.

51. Affiant states, I assumed the complaint was pursuant to a separate encounter, wherein I misjudged as flirtation a woman's polite conversation, and I awkwardly told her I'd like to make a pass at her. Affiant further states, the woman's discomfort was immediately obvious and I apologized, after which the woman and I continued pleasant conversation for several more hours. Affiant further states, while embarrassing, the encounter was not otherwise notable.

52. Affiant states, I subsequently authored and published an article entitled, "How to Do Wrong Right," in collaboration with staff at the SSA and, according to the SSA, with the approval of the complainant (whom I only later learned was Ms. Frank-Skiba), that chronicled the foregoing encounter.

53. Affiant states, in or around July 2015, I learned the SSA complainant was in fact Ms. Frank-Skiba. Affiant further states, I was perplexed, as Ms. Frank-Skiba's report to

the SSA in no way reflected what took place in Tempe, in April 2015; as Ms. Frank-Skiba had expressed no disapproval of any of my remarks at the time.

54. Affiant states, in or around August 2015, the Secular Student Alliance removed me from the organization's Speaker's Bureau, for violation of its policy against fraternization, not for sexual harassment, a decision with which I agreed, and the SSA informed me by e-mail that I was welcome to continue arranging speaking engagements with them and any of their affiliates, just without the benefits awarded members of the Bureau, as according to their publicly stated policy, the SSA and SSA affiliate speakers were not required to be members of the Bureau, and speakers who were not, were not governed by the fraternization policy.

55. Affiant states, in or around June 2016, an inadvertent note to my Facebook® wall generated a Facebook® life event, erroneously announcing I'd started work for Camp Quest West. Affiant further states, Camp Quest West is a regional affiliate of Camp Quest, an outdoor summer camp for children ages eight (8) through seventeen (17), with an emphasis on science, critical thinking, and the natural world.

56. Affiant states, the Facebook® life event was inaccurate, as I was not working for Camp Quest, nor had any immediate plans to.

### *Concerning Heina Dadabhoy*

57. Affiant states, on information and belief, one of the persons whose claims underly the false and defamatory statements made about me is Heina Dadabhoy.

58. Affiant states, I have known Heina Dadabhoy for approximately five (5) years. Affiant further states, we were friends during that time, corresponding and spending time together on numerous occasions, at events and in bars and hotel rooms. Affiant

further states, Heina Dadabhoy is a blogger, activist, public speaker, and writer, and a member of The Orbit collective (the-orbit.net).

59. Affiant states, in September of 2014 I wrote an e-mail letter to Heina Dadabhoy expressing my interest in a romantic relationship, to which they responded with an angry rejection. Affiant further states, I immediately apologized and never renewed any expression of interest in Heina Dadabhoy, and I never expressed such interest to them on any other occasion before. A true and correct copy of affiant's e-mail exchange with Heina Dadabhoy is attached hereto marked **Affidavit Exhibit 2**.

60. Affiant states, this letter was not sent during any conference or professional event, nor when we were even in the same city, but was a private correspondence with a friend.

61. Affiant states, until that time, Dadabhoy had never avoided me or signaled to me in any clear way that they weren't interested in me or wanted me to stop any behavior, and their interactions with me were always positive and friendly, and always made me feel hopeful that they liked me.

62. Affiant states, before I wrote of my interest, one of our last personal communications was a text message sent to me spontaneously by Heina Dadabhoy, after an intimate hotel room gathering in June of 2014, stating that I was fun to be around. Affiant further states, the context and content of that message sounded positive and flirtatious to me, and not a signal that they wanted to rebuff any interest I may have had, nor change any of my behavior toward them; and all my other interactions with Heina Dadabhoy were similar.

63. Affiant states, in our e-mail correspondence after rejecting my singular advance, Heina Dadabhoy wrote to me that they did not request any of my behavior toward

them to change, did not regard my letter to them as wrong, and admitted I had never expressed sexual interest before, but this had been the first time I'd done so. *Id*.

64. Affiant states, in that same correspondence, Heina Dadabhoy also wrote of Dadabhoy's suspecting my interest and enduring "*months of my wanting to tell you no but not being asked in a direct enough way for me to just say no and get it over with,*" thus demonstrating I had never expressed sexual interest in them before, rather this was the first time. *Id*.

65. Affiant states, I have never repeated any interest in Heina Dadabhoy since, nor did I ever push against any boundary stated to me, before or since.

### *False and Defamatory Statements*

66. Affiant states, on June 15, 2016, Amy Frank-Skiba published statements to Facebook®, accusing me of sexual harassment, sexual assault, and sexual abuse, in Tempe in April 2015, and also accused me of corruption.

67. Affiant states, Ms. Frank-Skiba's statements were addressed to, in part, "Parents, and younger people who may graciously volunteer for Camp Quest, a summer camp for kids:" implying my affiliation with Camp Quest would pose a danger to children.

68. Affiant stattes, Ms. Frank-Skiba's statements included the assertion about me that she was "*not even close to being his only victim,*" implying personal knowledge that I had perpetrated similar acts on other women.

69. Affiant states, Ms. Frank-Skiba's accusations are categorically false, as multiple witnesses will corroborate.

70. Affiant states, on June 20, 2016, Lauren Lane published statements on the Skepticon website, skepticon.org, accusing me of sexual harassment (by implication in 2012),

12

repeated boundary-pushing behavior, and intentional unwanted behavior, allegedly perpetrated upon multiple women, including "*someone involved at Skepticon.*"

71. Affiant states, Ms. Lane's statements included the assertion that I had been disinvited from subsequent Skepticon events owing to this alleged harassment, in particular that "*we stopped inviting him to speak partly because*" of this.

72. Affiant states, Ms. Lane's accusations are categorically false, as multiple witnesses and e-mail correspondence will corroborate. *Id.*

73. Affiant states, on June 20, 2016, Stephanie Zvan published statements on The Orbit's website, the-orbit.net, accusing me of sexual harassment, a 'pattern of pushing a staffer's boundaries,' multiple allegations of 'flatly unacceptable behavior,' and 'problem behavior,' allegedly perpetrated upon no fewer than five women.

74. Affiant states, Ms. Zvan's accusations are categorically false, as multiple witnesses and e-mail correspondence will corroborate. *Id.*

75. Affiant states, on June 21, 2016, Paul Z. Myers, Ph.D. published statements on the FreethoughtBlogs website, freethoughtblogs.com, accusing me of sexual harassment, 'repeated boundary-pushing behavior,' and 'persistent, obnoxious sexual behavior in defiance of specific requests that he cease.'

76. Affiant states, Dr. Myers' accusations are categorically false, as multiple witnesses and e-mail correspondence will corroborate. *Id.*

77. Affiant states, after publishing those defamatory statements about me, Dr. Myers proposed to investigate his claims only after the fact, but informed me, in a phone conversation on June 21, 2016, that he and the ethics committee at FreethoughtBlogs would not at any point tell me for the purposes of that investigation who was accusing

13

me or what specifically they were accusing me of, nor where or when. Affiant further states, I believe, and I believe reasonable professionals will agree, Dr. Myers' approach rendered impossible an investigation's ability to ascertain the truth.

78. Affiant states, on or about June 21, 2016, FreethoughtBlogs blocked me from access to my blog, and from publishing content, severely disrupting search engine visibility to market my body of work. Affiant further states, for the foregoing reason, and because I believed it impossible an investigation would establish the truth as to Dr. Myers' claims, I had no choice but to leave the FreethoughtBlogs network, and I relocated my blog to a domain of my own, as the only possible way to regain control of my promotion and publishing platform from FreethoughtBlogs' interference.

FURTHER AFFIANT SAYETH NAUGHT.

_____
DR. RICHARD CARRIER

SWORN TO BEFORE ME and subscribed in my presence this 14'th day of September, 2016.

_____
NOTARY PUBLIC

My commission expires: ___My Commission Has No Expiration___



JEFFREY T. PERRY
Attorney At Law
NOTARY PUBLIC
STATE OF OHIO
My Commission Has
No Expiration Date
Section 147.03 O.R.C.

14