UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

*   *   *

DR. RICHARD CARRIER,

          Plaintiff,

    vs.                Case No. 22:16-CV-00906

FREETHOUGHTBLOGS NETWORK,
PAUL Z. MYERS, PH.D., THE ORBIT,
STEPHANIE ZVAN, SKEPTICON, INC.,
LAUREN LANE, AND AMY FRANK SKIBA,

          Defendants.

*   *   *

        Deposition of DR. RICHARD CARRIER,
Plaintiff herein, called by the Defendants for
direct examination pursuant to the Rules of Civil
Procedure, taken before me, Wqueana N. George, a
Notary Public in and for the State of Ohio, at the
offices of Campbell, Perry, LLC, 7240 Muirfield
Drive, Suite 120, Dublin, Ohio, on Tuesday, January
23, 2018, at 10:50 o'clock a.m.

*   *   *

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 2

1                    EXAMINATIONS CONDUCTED          Page

2    BY MR. RANDAZZA:...............................4

3    BY MR. PERRY:.................................98

4    BY MR. RANDAZZA:.............................115

5    BY MR. PERRY:................................124

6    BY MR. RANDAZZA:.............................125

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3             Campbell, Perry, LLC

 4        By:  Jeffrey T. Perry
               Attorney at Law
 5             7240 Muirfield Drive
               Suite 120
 6             Dublin, Ohio  43017

 7        On behalf of the Defendants:

 8             Randazza Law Group

 9        By:  Marc J. Randazza
               and
10             Lateigra C. Cahill
               Attorneys at Law
11             4035 S. El Capitan Way
               Las Vegas, Nevada  89147

12                     *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                    DR. RICHARD CARRIER

2    of lawful age, Plaintiff herein, having been first

3    duly cautioned and sworn, as hereinafter certified,

4    was examined and said as follows:

5                    DIRECT EXAMINATION

6    BY MR. RANDAZZA:

7        Q    All right.  Dr. Carrier, I'm going to ask

8    you a few preliminary questions that might seem a

9    little weird, but there is a reason for it.

10       A    Okay.

11       Q    He can hand signal to you if I'm full of

12   bologna.

13       A    All right.

14       Q    Have you ever had your deposition taken

15   before?

16       A    No.

17       Q    Have you ever seen it done on TV?

18       A    Done on TV, no.  The only thing close to

19   that is I saw a training video on it.

20       Q    So, it's an interrogation, but there won't

21   be any extreme conditions or any torture or

22   anything.  You just have to answer under penalty of

23   perjury.  Do you know what that means?

24       A    Yes.

25       Q    What does it mean to you?

Page 5

1    A    That it's a crime to say a falsehood in

2  this proceeding.

3    Q    Okay.  So we don't expect that's going to

4  happen?

5    A    Correct.

6    Q    There is a line though that you can wind

7  up at and I want to make sure that we stay away from

8  it and we all understand what it is.  If you don't

9  know, tell me that you don't know.  There may be

10  some situations here where I ask you to give me an

11  estimate, you know, so if I asked you to guess how

12  big this table is, you probably wouldn't be able to

13  do that, but you can estimate it.  If we come into a

14  situation like that, let's make sure it's clear what

15  you're doing.

16    A    All right.

17    Q    Is there any reason you can't give a good

18  deposition today?  For example, did you take LSD

19  last night?

20    A    No.

21    Q    Under the influence of any drugs or

22  medication?

23    A    No.

24    Q    The reason I'm asking you that is

25  obviously if we have a perjury situation later and

Page 6

1  **you say I had taken ten Vicodin that morning, you**

2  **know, I didn't know what I was saying.  So is there**

3  **any reason -- you got a good sleep last night?**

4      A    Yes.

5      Q    **Had a healthy breakfast?**

6      A    Yes.

7      Q    **So you are doing better than me then.  All**

8  **right.  Why don't we get into it?  So tell me about**

9  **your education.  Let's start with that.**

10     A    I got my bachelor of arts at UC Berkeley

11 in history with a minor in classical civilizations.

12 I went on to get several graduate degrees at

13 Columbia University, a master of arts, a master of

14 philosophy and a Ph.D. in ancient history

15 specializing in ancient intellectual history.

16     Q    **What does that mean?**

17     A    It means a history of Greco-Roman

18 particularly Roman philosophy, religion, science and

19 related fields like technology.  I have also

20 received training that gave me college credits in

21 the military.

22     Q    **What branch of the military were you in?**

23     A    United States Coast Guard.

24     Q    **How long?**

25     A    Two years.

Page 7

1      Q      **What was your discharge status?**

2      A      Honorable.

3      Q      **Did they call it an MOS?**

4      A      They are called rates, but yeah, the

5      equivalent of a MOS.  I was a sonar technician.  I

6      left service as an E-4, officer third class.

7      Q      **That was before or after college?**

8      A      That was before college.

9      Q      **Where were you stationed?**

10     A      Well, various places.  Boot camp in Cape

11     May, New Jersey.  I stayed at Cape May for awhile

12     working in intelligence doing security clearances

13     and then I went to San Diego for my training.

14     That's where I received twelve college units of

15     electronics engineering amongst other military

16     training and sonar and torpedoes and related

17     technologies and then I served a year at sea on the

18     Sherman, which is a cutter that is ported out of

19     Coast Guard Island in the Bay area of California,

20     but our tours took us all around the Pacific.

21     Q      **Tell me about your Ph.D. program.**

22     A      Can you be more specific?

23     Q      **Sure.  What was your thesis?**

24     A      It was Attitudes Towards the Phyikos, P H

25     Y I K O S, which means natural philosopher in the

Page 8

1   early Roman Empire 100 BC to 315 AD.  That was the

2   title of my dissertation.

3       **Q      Did it get published?**

4       A    Yeah, I published it in the form of two

5   books, both in academic and general market.

6       **Q      How well did it do?**

7       A    It's too early to tell.  For an obscure

8   academic monograph with footnotes and whatnot, my

9   books do surprisingly well for those kind of things.

10      **Q      But not quite as lonely as the law review**

11  **publications?**

12      A    I wouldn't know actually.

13      **Q      Quite lonely writing.  When people say**

14  **they've read your law review article, I think they**

15  **are usually lying.  So after you finished your Ph.D.**

16  **program, what did you do after that?**

17      A    So that was 2008.  The economy collapsed,

18  so there was a freeze on hires in humanities

19  departments and I couldn't get a position.  I had

20  also soured on the whole idea of becoming a

21  professor, so I went to my fans at the time, my

22  readers and fans and asked them to get together a

23  post-op research grant and they decided basically to

24  fund research.  I said any subject they wanted and

25  they said the historicity of Jesus.

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 9

1        **Q      Historicity?**

2        A      Yes, whether he existed or not.  So I did

3    a six-year project on that resulting in multiple

4    books and journal articles.

5        **Q      What's your conclusion?**

6        A      A one in three chance.

7        **Q      That he existed at all?**

8        A      Right.

9        **Q      Let's talk about your relationship with**

10   **some of the plaintiffs (sic) here.  Actually, let's**

11   **talk about Skepticon first.  You spoke at Skepticon**

12   **1?**

13       A      Yes.

14       **Q      And who are the other speakers?**

15       A      Skepticon 1 I believe was only PZ Myers

16   and myself.

17       **Q      Do you remember what your talk was on?**

18       A      My first talk -- I have done so many talks

19   for Skepticon now.  I don't remember the order of

20   them.  Wikipedia has an article so does YouTube.

21       **Q      You said you soured on academia.  Can you**

22   **tell me what that means?**

23       A      I didn't like the entry departmental

24   politics and I didn't like all the work they give

25   you apart from just research and teaching.  If it

Page 10

1    was just research and teaching and you didn't have

2    all the back stabbing and other whatnot that goes on

3    behind the scenes, it would be the pleasant romantic

4    occupation that I thought going in, but by the time

5    I finished my Ph.D. I saw what the job was really

6    like and I would rather be a self-employed writer as

7    I am.

8        **Q    At Skepticon 1, is that where you met**

9    **Lauren Lane?**

10       A    I think so, but I'm not sure.  Certainly

11   by then.

12       **Q    Okay.  If not then do you recall meeting**

13   **her before that?**

14       A    No, I don't.  It was so many years ago.

15       **Q    What is your relationship with her like?**

16       A    Very friendly and flirtatious.  We got

17   along well.

18       **Q    Anything beyond flirtation?**

19       A    Over the years, yes.

20       **Q    Can you be more specific?**

21       A    Let's see.  Can you ask more specific

22   questions?

23       **Q    Did you ever have sex with her?**

24       A    Eventually, yes.  That would have been

25   2012, the Skepticon of that year.

Page 11

1       Q     You met her in 2008 and closed the deal as

2    it were in 2012?

3       A     It was more the other way around.  In 2011

4    she is the one who asked to close the deal.  I held

5    off.  Eventually she essentially just stripped and

6    jumped into my bed in 2012 unasked.

7       Q     What did you do?

8       A     I participated enthusiastically at the

9    time.  It wasn't me pursuing her.

10       Q     Do you believe that's her perception as

11    well?

12       A     I have no idea at this point.

13       Q     Aside from Skepticon 1, had you met Myers

14    before that?

15       A     I think so, but again we are talking

16    seven -- well, almost ten years ago.  Gosh.  Yeah.

17    Wow.  I don't remember when I first met Myers.

18       Q     What about Stephanie Zvan, how do you know

19    her?

20       A     I knew her originally as a fellow blogger

21    at Freethought Blogs before she moved to the Orbit.

22    I met her I think at a Skepticon.  I'm not sure what

23    year.  I knew her as a blogger and I may have

24    communicated with her on occasion as well.  I don't

25    recall exactly.  For many years in any case.

Page 12

1     Q     Do you remember where the venue was at

2  Skepticon 1?

3     A     No, I don't remember the name of the

4  place.

5     Q     Do you remember if it was at a university

6  or Knights of Columbus Hall?

7     A     That I don't recall.  It was in

8  Springfield, Missouri.

9     Q     How many Skepticons have you spoken at?

10    A     I think six.  I'm not sure.  At least six.

11    Q     Do you remember the locations of any of

12  them?

13    A     I don't remember the exact venues.  They

14  change from year to year.  Some are private venues.

15  Some are hotel venues.  I don't remember off the top

16  of my head.  I write them down so I can check my

17  notes.

18    Q     Do you have notes on that?

19    A     Not here.

20    Q     But you do have notes on that?

21    A     Yeah, somewhere.

22    Q     What else do you put in those notes?

23    A     I'm just referring to regular

24  documentation that I have of where I have stayed and

25  things like that.  I don't have a specific list of

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 13

```
 1   where all the Skepticons have been.  I have

 2   documents throughout my career of various things.

 3   If I go through them I can probably find out the

 4   venues.

 5        Q    It's not like a journal that you keep?

 6        A    No.  And frankly I'd probably Google it.

 7        Q    To find out where they were?

 8        A    Yes.

 9        Q    Who sponsors them?

10        A    You mean who pays for them?

11        Q    Um-hmm.

12        A    That I don't know.  A variety of donors.

13   They run fundraisers.

14        Q    They are not academically sponsored?

15        A    No, not to my knowledge.

16        Q    Do you know where each of the defendants

17   reside?

18        A    I think I do now.  Yeah.

19        Q    Do you call him PZ or Paul Myers?

20        A    PZ.

21        Q    Do you know where he lives?

22        A    Minnesota.

23        Q    You didn't know that before this?

24        A    I think I did, yes.

25        Q    Stephanie Zvan, did you know where she was
```

Page 14

```
 1   before this case?

 2        A    No, but it turns out to be Minnesota.

 3        Q    How about Lauren Lane?

 4        A    I was never sure.  I just assumed

 5   Missouri, various places.

 6        Q    What about Amy Frank-Skiba?

 7        A    That I assumed was Arizona somewhere.

 8        Q    What made you assume it was Arizona?

 9        A    Because that's where I met her and she was

10   going to school there at the time.

11        Q    And the same with Lauren Lane in Missouri?

12        A    Yes.  For example, there was one year, I

13   can't remember which year, where I visited her and I

14   think I saw one of the places that she lived.  She

15   moves around, so I'm not sure where she lives now or

16   has lived in the past prior to that and that was I

17   think in St. Louis.

18        Q    You've had sexual relations with Lauren

19   Lane?

20        A    Yes.

21        Q    What about Amy?

22        A    No.

23        Q    Myers?

24        A    No.

25        Q    So none of the other defendants in this
```

Page 15

1    case just Lauren Lane?

2         A    Correct.  I have not had sex with any of

3    the other defendants in this case.

4         Q    And by sex we are not using the Clintonian

5    definition?

6         A    Gotcha.  Right.  Yeah.  No sexual --

7         Q    Handies count.

8         A    Right.  No.

9         Q    Handies are better.

10        A    Right.

11        Q    I don't know how else to put that.  I've

12   had more weird questions in depositions, but thank

13   you for your dignity in your response.  You taught a

14   number of courses, online courses?

15        A    I do teach online courses.

16        Q    Do they ever have in-person meetings?

17        A    No.

18        Q    Let's go back to your relationship with

19   Lane.  You said she hopped into bed with you at?

20        A    Skepticon 2012.

21        Q    And does Skepticon -- and I'm not trying

22   to trip you up.  I don't remember.  Does Skepticon

23   have a code of conduct prohibiting that kind of

24   relationship?

25        A    Not prohibiting that kind of a

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 16

1    relationship, no.

2        Q    **What is your understanding about their**

3    **policies?**

4        A    Policy may have changed over the years,

5    but in 2012 the policy did allow consensual sexual

6    relations.

7        Q    **Between any attendees?**

8        A    Yes, as far as I can recall.

9        Q    **You don't know if it has changed yet?**

10       A    Correct.  I don't know what their policy

11   is now.

12       Q    **When is the last time that you spoke at a**

13   **Skepticon?**

14       A    It would have been 2013.

15       Q    **Have you attended them since then?**

16       A    I attended the one in 2015, yes.

17       Q    **So when you -- you had relations with**

18   **Lane, was it just the one time?**

19       A    No.

20       Q    **How many times, if you can recall?  I**

21   **don't mean how many times you engaged in coitus.**

22   **How many meetings?**

23       A    At least two different occasions at that

24   Skepticon and one or two times at a subsequent

25   conference in Austin, Texas.

Page 17

1      **Q     Do you know when the last time was?**

2      A     The Austin conference.

3      **Q     What year was that?**

4      A     That was -- it would have been early 2013.

5      **Q     Why did this relationship break off?**

6      A     Well, at the time I was having this

7      relationship with her I was cheating on my wife and

8      started to have anxiety over that and wasn't sure

9      about what I should be doing with my life in terms

10     of should I just admit that I can't be monogamous or

11     should I stop this relationship.  I basically told

12     her I'm freaking out over our relationship.  I want

13     to cool it off and think about things for awhile and

14     I didn't want to see her anymore, and then she kept

15     trying to opportune me to reignite the relationship

16     to the point I had to basically cut off all

17     communication with her.

18     **Q     You are openly vocal about being a**

19     **swinger, yes?**

20     A     Yeah, I'm poly amorous ethically

21     nonmonogamous.  That started after.  It's that

22     incident that led me to start thinking about what I

23     should be doing with my life, so eventually I

24     confessed to my wife that I didn't want to do

25     monogamy anymore and I understood if she wanted to

Page 18

1    get a divorce and she decided to try an open

2    marriage for a little while and we did.  Eventually

3    we divorced amicably because that wasn't her

4    lifestyle either, but it was the lifestyle that I

5    wanted, but that happened in the midst of 2013.

6        **Q    That was Skepticon 6?**

7        A    I don't remember what the number is.

8        **Q    Did you have sex with anybody else at that**

9    **Skepticon?**

10       A    Yes.

11       **Q    Who was that?**

12       A    I had sex -- do we want to have her name

13   on the record?

14            MR. RANDAZZA:  Let's go off the record.

15            (Thereupon, an off-the-record discussion

16   was had.)

17   BY MR. RANDAZZA:

18       **Q    Off the record we had a discussion about**

19   **the name of somebody that the deponent had sex with.**

20   **In order to not likely violate her privacy, we've**

21   **agreed that we will not use her name without further**

22   **discussion.  Should that become necessary, we will,**

23   **but for now we will refer to her as Ms. B.  We all**

24   **understand who Ms. B. is?**

25       A    Yes, we do.

Page 19

    1        Q     Okay.  Has Ms. B. ever revisited you?

    2        A     Yeah, we continued friendly flirtatious

    3    relationship for years after.

    4        Q     No further sexual relations?

    5        A     No.

    6        Q     Did she ever, to the best of your

    7    knowledge, complain about any of your conduct with

    8    each other?

    9        A     No, not at all.

   10        Q     So where did you live when all of this

   11    took place?

   12        A     California.

   13        Q     Where in California?

   14        A     That would have been various places.  What

   15    years exactly are you talking about?

   16        Q     What was your last residence in

   17    California?

   18        A     Stockton, California.

   19        Q     And when did you leave Stockton,

   20    California?

   21        A     When I moved to Ohio.

   22        Q     Do you have a date?

   23        A     It was in May that I moved.

   24        Q     May of what year?

   25        A     2016.

Page 20

1       Q       Why did you pick Columbus?

2       A       A variety of reasons.  Primary of which is

3    that I could no longer afford to live in California.

4    To be an independent artist like myself you need to

5    keep your overhead really low, but I can work from

6    anywhere.  I was trying to pick a place I can go

7    where the living expenses were low enough that I

8    could survive and do well with my business and I had

9    more girlfriends in or near Ohio and Ohio was well

10   positioned for -- there's a lot more major cities I

11   can get to from Ohio by driving with a much bigger

12   demand for my work.

13      Q       Don't you make more money in California?

14      A       Not now.

15      Q       I'm saying like the cost of living and --

16      A       Yeah, no --

17      Q       For example, a lawyer out here --

18      A       The cost of living out pays income in

19   California.  Whereas I make better income on the

20   east coast or on the east side of the country with

21   much lower living expenses.  The difference is

22   better.  It's much more survivable there.

23      Q       So maybe your line of work is different

24   from mine.  I know when I have a case, for example,

25   in California and we can seek attorney's fees, the

Page 21

1    judges don't even look at us funny when we ask for

2    7- or $800 an hour.  If I tried to do that in a

3    place like Wyoming, they would probably look at me

4    and say around here we charge $150 an hour.  Is that

5    kind of the differential knot existent in your line

6    of work?

7         A    Not really, no.  It doesn't work that way.

8         Q    So you make the same no matter where you

9    work?

10        A    Pretty much, yes.

11        Q    Now it's coming into focus for me.  Your

12   income is fixed?

13        A    Fixed is the wrong word.

14        Q    What is the right word?

15        A    It's highly variable, but it does not

16   respond to geography.  Other than in terms of

17   demand, which is actually higher in more religious

18   states than in lower religious states like

19   California.

20        Q    Why is that?

21        A    I have been speculating on this so I

22   really don't know for sure, but based on

23   conversations that I've had with people all over

24   North America, organizations and groups in states

25   that are beleaguered by religious oppression are

Page 22

```
 1   much more excited and interested in hearing the kind

 2   of work that I do and they are more excited about

 3   meeting me and they are more likely to hire me.  In

 4   California there's a lot more -- it's more secular

 5   there, so people are more apathetic and less

 6   interested, so turn out is not as good in California

 7   events as it is in other states.

 8        Q    Not much use for you in Boston?

 9        A    I haven't tried Boston yet.  But Boston is

10   surrounded by problematic areas in that regard, so

11   people will come to Boston possibly.

12        Q    What do you mean a problematic area?

13        A    Well, in terms of there's a lot of rural

14   religious communities in that state and that state

15   is small enough for people to get to Boston.  I

16   haven't tried, so I don't know.

17        Q    How is Mississippi, is that like happy

18   hunting ground for you?

19        A    It would be.  I haven't tried it yet.  I

20   have done other southern states.

21        Q    Florida?

22        A    Florida, good turnouts there.  Arkansas,

23   Alabama.

24        Q    I know this is probably a difficult --

25        A    Oh, I meant Tennessee not Arkansas.
```

Page 23

```
 1        Q    I understand what I'm about to ask is

 2   probably going to be difficult for you to understand

 3   and explain with perfect accuracy without your notes

 4   and your planner before you, but this is where we

 5   get into the estimate and not guess --

 6        A    Before we do that, can we take a brief

 7   break so I can get some water?

 8             MR. PERRY:  Sure.  Absolutely.

 9             (Thereupon, an off-the-record discussion

10   was had.)

11   BY MR. RANDAZZA:

12        Q    So you allege in your complaint and I will

13   read from the complaint, through and the result of

14   his accomplishments in a career spanning more than a

15   decade Dr. Carrier has become well-known to the

16   public throughout the United States as a

17   professional writer, lecturer and teacher.  He has

18   created a unique public personality and image.  Do

19   you stand by that statement?

20        A    Yes.

21        Q    So I guess I would ask, how famous are

22   you?

23        A    Well, let's see.  I'm trying to think of

24   ways to measure it.

25             MR. PERRY:  Don't guess.
```

Page 24

1            THE WITNESS:  Can you be more specific.

2    How would I measure it?

3    BY MR. RANDAZZA:

4        **Q    Let's put it this way, let's role play.**

5    **You are hitting on a girl at a conference and she**

6    **hasn't heard of you.  Now, Ron Burgundy would say**

7    **I'm kind of a big deal and I have many leather bound**

8    **books.  Pretend you find me attractive and you are**

9    **trying to swoon me with how famous you are.**

10       A    That would be a terrible way to do it.  I

11   don't understand the question.  Can you be more

12   specific to what your question is?

13           MR. RANDAZZA:  I will throw the card on

14   the table.  Do we agree that he is a public figure?

15           MR. PERRY:  I think so.  We've alleged

16   that in our complaint.  In other words, we will

17   stipulate.

18   BY MR. RANDAZZA:

19       **Q    So then I don't need to walk you through**

20   **that.**

21       A    For sure.

22       **Q    So before you took your break you were**

23   **talking about different geographic areas where you**

24   **find your services are most in demand.  We talked**

25   **about some areas that you haven't tried speaking at**

Page 25

1  yet.  What I want to do is create a mental map here

2  of where we would stick some thumb tacks of where

3  you have spoken.  What is your most popular state?

4      A    I couldn't say now.  The best benchmark

5  that I have before your clients' defamation altered

6  the nature of my business, which would be 2015 -- I

7  have good records for that.  In that year I made

8  more money in Ohio than in any other state except

9  California because I was living in California, so it

10  was easier to develop business in California.  I

11  made -- well, yeah, that's -- all the other states

12  substantially less state by state.

13      Q    How about Florida?

14      A    I don't remember the precise amounts.  We

15  have supplied you with documents that have those

16  numbers though.

17      Q    You provided us with some federal income

18  tax?

19      A    And spreadsheets concerning my speaking

20  and direct sales business, which was the most

21  impacted by your clients' claims.

22      Q    Who made those spreadsheets?

23      A    I did.

24      Q    And what about for like the three years

25  prior to this, so do you --

Page 26

1        A    Prior to which year?

2        **Q    The three years prior to my clients'**

3   **alleged defamation, were you often commuting from**

4   **California to Ohio?**

5        A    No, I started developing my Ohio business

6   in 2015.  I had spoken in Ohio in previous years.

7   That was so many years ago.  Without consulting

8   notes I don't know where and when.  Before 2014 I

9   was only conducting my business part time.  I was

10  actually a full-time homemaker.  Basically I was

11  taking care of my wife in terms of the domestic

12  business and she was bringing home the income.  It

13  was like Ozzie and Harriet, gender reverse.  I would

14  cook dinner for her when she got home.  I made sure

15  she had no duties at the house.  I did all the

16  cleaning and laundry and all of that stuff.  Taking

17  care of the pets and taking them to the vet and all

18  of those things.  Therefore, I was only part-timing

19  my business at that point.  I only full-timed my

20  business in the beginning of 2015 once I separated.

21       **Q    I want to make sure that you didn't make a**

22  **mistake when you said you moved to Ohio in June of**

23  **2016.**

24       A    May of 2016.

25       **Q    We have prior statements from you saying**

Page 27

```
 1    June.  I realize those two things --

 2        A    Well --

 3        Q    I don't think you are committing perjury.

 4        A    I took residence on May 31, but I had

 5    already signed a lease a month or two before that.

 6    Actually, I think in our subsequent fulfilling of

 7    discovery requests there is more on that, but

 8    records and things like that would be delivered to

 9    you eventually.  It definitely was in May and that's

10    actually quite public knowledge.  It's all over the

11    Internet.

12        Q    Did you file Ohio State income taxes in

13    2016?

14        A    Did I file in 2016?  I did -- no, I did

15    not because my income in Ohio -- actually, my income

16    federally was zero owing to legal expenses fighting

17    this case.

18        Q    In 2016?

19        A    Correct.  You are talking about the tax

20    year 2016?

21        Q    Yes.

22        A    Which would have been paid in 2017, right?

23        Q    Yes.  What was your tax domicile for the

24    year 2016?

25        A    When I filed taxes in 2017 I did split
```

Page 28

1  California and Ohio.  I didn't have to file in

2  either state because my income was zero.

3      **Q    So you are deducting your legal expenses**

4  **as a business expense?**

5      A    Correct.  That is shown in the documents

6  that we have sent you.

7      **Q    Now, don't tell me what this person said.**

8  **I will ask you a question that could implicate**

9  **attorney/client privilege.  Sometimes a person will**

10 **utter out the answer and then the attorney says oh,**

11 **wait.  Objection.  I like to say hey, I'm about to**

12 **ask something that might get near it and if it does**

13 **I want him ready to object.  Did you consult anyone**

14 **prior to claiming your legal expenses as a business**

15 **expense?**

16          MR. PERRY:  I will object to form.

17 BY MR. RANDAZZA:

18     **Q    Did you consult an attorney?**

19          THE WITNESS:  May I answer the question?

20          MR. RANDAZZA:  I don't want to know what

21 the attorney said.

22          MR. PERRY:  I will object to form.

23          THE WITNESS:  It's a statement of fact.

24 Do you want me to answer?

25          MR. PERRY:  You can answer, yes.

Page 29

```
 1              THE WITNESS:  No.
 2    BY MR. RANDAZZA:
 3        Q    Did you consult with a CPA?
 4        A    No.
 5        Q    So on what basis did you form the opinion
 6    that those were deductible business expenses?
 7        A    I have always been my own accountant and I
 8    read the IRS documents carefully and defamation of
 9    my business falls under the allowable deductions for
10    that year.
11        Q    Did you have any income that you did not
12    report in 2016, 2017?
13        A    No.
14        Q    Do you receive alimony from your ex?
15        A    No.
16        Q    Did you ever?
17        A    No.
18        Q    Did you seek it?
19        A    No.
20        Q    If we can go back, there was an answer
21    before, you said it was widely known that you moved
22    to Ohio.  That's of course at issue in this
23    deposition.  You remember I asked you describe how
24    you are famous.  That was a difficult thing to nail
25    down really.  Would it be equally difficult to nail
```

Page 30

1    **down why it's common knowledge that you moved to**

2    **Ohio?**

3         A    Can you ask the question more

4    specifically?

5         **Q    You said widely known.  Can you define**

6    **widely known?**

7         A    Yes.  So I blogged about it multiple times

8    on my blog.  My blog has a readership in the

9    community -- in the vicinity of a hundred thousand

10   and I also announced it on Facebook, which has

11   somewhere between 5- and 10,000 readers also

12   associated with the community and Twitter.  I'm not

13   sure what my Twitter audience is, but it is growing.

14   It's also in the thousands.  Within the secular

15   community that hits a lot of people.

16        **Q    So your blog, do you have like an**

17   **analytics of readership on that blog?**

18        A    Yes.  Of course back at the time I would

19   have been using Freethought Blogs analytics.  They

20   deleted all of those records.  I don't have access

21   to them anymore.  I do know from what I had been

22   reading at the time looking at the analytics that my

23   readership was in the vicinity of a hundred

24   thousand.

25        **Q    Did it track IP addresses?**

Page 31

 1      A    It may have.  I never looked at that.

 2      **Q    So your independent blog now, when did you**

 3 **start writing on that instead?**

 4      A    When Freethought Blogs blocked access to

 5 my blog and made it clear that there was not going

 6 to be a fair investigation for me to get it back.  I

 7 was forced essentially to relaunch my blog

 8 elsewhere.  That was difficult rebuilding the blog

 9 business because all of the IP addresses, all of the

10 Google search results and everything were pointing

11 to Freethought Blogs.  It took a whole year to

12 rebuild the ability for people to find my new blog

13 location.  Analytics on that is all problematic

14 because of that.  Now I'm back up to about the same

15 readership.

16      **Q    You do your own analytics now?**

17      A    Yes.

18      **Q    Can you tell me about how they work?  Is**

19 **it like a Google analytics?  Is it a dashboard?**

20 **What platform is it on?**

21      A    It's through WordPress Jetpack.  It

22 provides those kind of data.

23      **Q    I'm slightly familiar with it.  Probably**

24 **not enough to ask you the most intelligent questions**

25 **here.  Do you know if it tracks IP addresses?**

```
                                                         Page 32

  1        A     If it tracks every IP address that hits my

  2   website; is that what you're asking?

  3        Q     Yes.

  4        A     I don't know.  I haven't checked that.

  5        Q     You couldn't tell me if you knew the IP

  6   address that I was logged onto right now if I read

  7   your blog, you wouldn't be able to tell it had been

  8   me?

  9        A     Not sitting here right now.

 10        Q     Have you ever tried to track a single

 11   person reading your blog?

 12        A     A single person?

 13        Q     Or a single IP address?

 14        A     The only time that I recall doing that is

 15   when I have had attempted to hack my site and I

 16   would research where the IP address is and then

 17   block it if it looks suspicious.  That is the only

 18   occasion that I can think of.  Definitely not on

 19   every occasion have I done things like that.

 20        Q     So you can drill down to the individual IP

 21   address?

 22        A     Those are for attempts to hack the site.

 23   That's a security function.  That's a different

 24   location.  I haven't checked to see if I can dig in

 25   to look at everyone that comes to my site.  I might
```

Page 33

1    have that availability.  I don't know.

2        Q    I want to know if this would be possible,

3    you meet a hot girl from Anchorage, she goes home,

4    you tell her what a big deal you are, you go back

5    and look at the analytics, can you tell if someone

6    from Anchorage looked at your site?

7        A    I don't know.

8        Q    You never used it that way?

9        A    No.

10       Q    Do you like my idea?

11       A    No.

12       Q    Why not?

13       A    That's kind of invasive.  I don't approach

14   people by spying on them.  That's not a device I

15   would use.

16       Q    You would consider it spying on them to

17   see if a certain city --

18       A    Yeah, looking at the site to -- other than

19   just asking them hey, did you look at my website?

20       Q    Ethically, it's something that even if you

21   could do it, you wouldn't do it because it violates

22   your ethics?

23       A    I would need a valid reason.  There may be

24   ethical reasons to do it, but it's not something

25   that would occur to me to do.  It seems a little

Page 34

1    weird.

2        **Q    Someone says I read your site every day**

3    **and you know they are from Billings, Montana, you**

4    **suspect they might be lying to you, you wouldn't**

5    **look into that?**

6        A    I wouldn't even do that.  Possibly you can

7    construct a scenario where I might think it would be

8    valid to do that, but that's something that I have

9    never done or would think of doing.

10       **Q    Have you looked at it to see which states**

11   **might be where your largest readership is coming**

12   **from?**

13       A    No, I haven't looked into that data.  I'm

14   not sure it does the math on that.  It doesn't

15   matter since my current blog is the one that I

16   created after the defamatory statements.  I don't

17   have access to the data for the blog that I was

18   using when I was announcing my move.

19       **Q    As far as today, you don't know where your**

20   **strongest readership comes from?**

21       A    Not sitting here, no.

22       **Q    You haven't researched that since leaving**

23   **Freethought Blogs network?**

24       A    No.

25       **Q    It's safe to say even you don't know where**

Page 35

1    your largest readership comes from?

2         A    On my blog presently, no.

3         Q    Does Facebook have the ability to analyze

4    that data?

5         A    Not that I'm aware of.

6         Q    Does Twitter?

7         A    Not that I'm aware of.

8         Q    Neither sitting here today nor at any

9    point would you be able to tell me where at least

10   your strongest publication market is?

11        A    I don't know.

12        Q    In June of 2016 Amy Skiba posted an

13   article or blog post, whatever you want to call it,

14   posted statements that you considered to be

15   defamatory?

16        A    Yes.

17        Q    Accusing you of sexually harassing her and

18   touching her?

19        A    Yes.

20        Q    What is your response to that factually?

21        A    I did neither of those things.

22        Q    You've never touched her?

23        A    No.  I was actually quite paranoid about

24   touching people without their permission back then

25   and even more so now.

Page 36

```
 1        Q    So it's your position that she has made
 2   all of this out of thin air?
 3        A    Yes, she is definitely lying.
 4        Q    It wasn't like maybe it was consensual,
 5   maybe it wasn't, this is it never happened, black
 6   and white?
 7        A    Correct.
 8        Q    Did you have any arguments with her before
 9   that?
10        A    No.
11        Q    Have you ever had a dispute with her?
12        A    No.
13        Q    Can you imagine why she would make that
14   up?
15        A    I'm completely bewildered.
16        Q    Have you ever rejected her advances?
17        A    No.
18        Q    She's never made advances towards you?
19        A    No, not in clear terms anyway.
20        Q    I don't know if that's funny or just
21   confusing.
22        A    You need to ask a different kind of
23   question.
24        Q    I guess, she's never openly flirted with
25   you that you could tell?
```

Page 37

```
 1      A      No.  She has not indicated that she is
 2   interested in dating me, if that's what you mean.
 3      Q      I'm not a hundred percent clear on some of
 4   your sexual activities.  I don't disapprove.  Who am
 5   I to disapprove?  But I don't understand.  Is dating
 6   the only verb we should be using here?
 7      A      I don't know how to answer that question.
 8      Q      Dating and fucking are two different
 9   things, right?
10      A      I would definitely put fucking under a
11   subcategory of dating.
12      Q      So when we say dating we are also talking
13   --
14      A      Yes, in the Venn diagram dating and then
15   fucking is entirely inside the dating margin.
16      Q      It's great deposing you.  That's
17   exactly -- yes, it makes it very easy when we are
18   clear.  If only you can give lessons to women I want
19   to date.  Here is the Venn diagram.  I might hire
20   you after this to come hang out at my date for like
21   the first ten minutes.  It wouldn't be a conflict
22   after this is over, right?  Tell me about some of
23   your other income sources.  You have speaking
24   engagements?
25      A      Um-hmm -- yes.
```

Page 38

```
 1        Q     Camp Quest, what is Camp Quest?

 2        A     Camp Quest, the national organization of

 3   Camp Quest is a support organization that licenses

 4   and supports basically summer camps for nonreligious

 5   people.  It's basically like Christian summer camp

 6   except for seculars.  They have camps in multiple

 7   states.  The national organization basically

 8   supports all of them.

 9        Q     Do they have any in Florida?

10        A     They might now.  I'm not sure.

11        Q     Which of their camps have you visited?

12        A     The only camp I visited was Camp Quest

13   West in California and that was 2005, plus or minus

14   a year or two.

15        Q     The only Camp Quest you've been to is this

16   one in 2005?

17        A     Yeah, somewhere around that date or year.

18        Q     What city in California is that in?

19        A     North of Sacramento is where the camp site

20   is.  I don't remember the exact location.

21        Q     That's precise enough for me.  Do you know

22   the locations of any other Camp Quests in

23   California?

24        A     Yes.  They just opened a new one on

25   Catalina Island.  I don't remember when they opened
```

Page 39

1    it, but there's on in California in the mountains.

2        **Q      There is only three in California?**

3        A      As far as I know.

4        **Q      Do you know of any others?**

5        A      They opened several in the south.  I know

6    there is one in Ohio.  Normally this is a question

7    where I would go to the website and look at the

8    list.  I know there are many other states.

9        **Q      You only know of one in Ohio?**

10       A      Yes.

11       **Q      Do you know where it is?**

12       A      No.

13       **Q      I don't mean precisely.  With precision of**

14   **the one you told me in California, is it outside of**

15   **Steubenville?**

16       A      I never looked at the actual location of

17   it.

18       **Q      You said that when Freethought Blogs**

19   **suspended you, you were under the impression that**

20   **you wouldn't get a fair investigation?**

21       A      Yes.

22       **Q      Why did they suspend you?**

23       A      Because of the statements made by the

24   other defendants.

25       **Q      And what specifically do you understand to**

Page 40

1    **be the statements made that got you suspended?**

2        A    The ones we've included in our complaint.

3        **Q    Can you give me the general genre of them?**

4        A    Yes, Amy Frank's accusations that we

5    discussed earlier in this deposition.  Stephanie

6    Zvan also wrote some things around the same time

7    they decided to suspend me at Freethought Blogs and

8    Skepticon.  Those happened on the same day.

9    Skepticon's publication of accusations of sexual

10   harassment were also false.

11       **Q    How much did Freethought Blogs pay you?**

12       A    I chose not to be paid by Freethought

13   Blogs, so I could have ad free content.  I was

14   looking to develop patron support instead.

15       **Q    You said you were also suspended from**

16   **Skepticon?**

17       A    Yes, they issued a ban not allowing me to

18   attend or speak.

19       **Q    You couldn't even attend?**

20       A    That was my understanding, yes.

21       **Q    How much did Skepticon pay you?**

22       A    I worked Skepticon for free, but I earned

23   upwards of between 500 and $1,000 per event on book

24   sales and the promotional value of speaking at

25   Skepticon is huge.

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

1        Q      But Skepticon never paid you?

2        A      No, Skepticon takes its speakers without

3    pay.

4        Q      So there is a statement that Ms. Zvan made

5    where she is talking about this after party at a pub

6    where she was quoting you, do you recall this?

7        A      Yes.

8        Q      She said at an after party at a pub after

9    a sponsored event that had an event policy against

10   making sexual advances you misread someone's

11   fascination with the subject matter as flirtation?

12       A      There are some errors in that statement.

13       Q      But those are your words?

14       A      Those are not my exact words.

15              MR. RANDAZZA:  Can you pull that post?

16              THE WITNESS:  Do you have my post?

17   BY MR. RANDAZZA:

18       Q      Yes, I'll have her pull it up.

19       A      It would be more helpful to read my post.

20       Q      At some point you guys would want lunch.

21   What I will do is put a pin in that idea.

22       A      Okay.

23       Q      Is it true you didn't fight the Secular

24   Student Alliance Speakers Bureau?

25       A      Yes.

Page 42

1      Q    And why didn't you object to that?

2      A    Because that was their fraternization

3  policy that only applied to speakers bureau and not

4  to other speakers.  So speakers could speak at SSA

5  events who were not on the bureau and it just made

6  more sense not to be on the bureau.

7      Q    And you also didn't object to being banned

8  from Freethought Blogs?

9      A    No, I did object to being banned from

10  Freethought Blogs and I tried to get control back,

11  but when Myers made it clear that I wasn't going to

12  get a fair process, I clearly had no way forward on

13  that.

14      Q    How did he make that clear?

15      A    In the phone conversation we had he

16  refused to tell me -- he insisted that I defend

17  myself so they could do their investigation before

18  releasing control of my blog.  On the phone he told

19  me he would not tell me who was accusing me, what

20  they were accusing me of, where or when and I told

21  him I can't defend myself if you are not going to

22  give me that information and he said he didn't care.

23  He said you should just admit it and apologize.  I

24  said but the claims are false.  I told him if you

25  are not going to let me defend myself and if you're

Page 43

1  going to do this, I will have to sue you to get you

2  to stop and he said go ahead.

3      **Q    Did they have, as far as you know, an**

4  **established policy for this?**

5      A    No.

6      **Q    You know they didn't have one or you**

7  **don't?**

8      A    I was unaware of any established policy

9  and I'm pretty sure they still don't have one.

10     **Q    So how would you describe sitting here**

11  **today that interaction?**

12     A    Which one?

13     **Q    The one we just talked about where it was**

14  **somebody seemed to have misunderstood.  You seem to**

15  **have misunderstood someone's --**

16     A    You are talking about --

17     **Q    -- interest.**

18     A    It would be easier if we started that with

19  you reading my statements from the blog.

20     **Q    What do you recall about the incident**

21  **sitting here today?  We can refresh your**

22  **recollection later.  I'm looking for what you**

23  **remember now, if you have any detail on it.**

24     A    There were a number of inaccurate

25  statements in the statement that you read earlier,

Page 44

1  so I don't want you to assume that I'm acknowledging

2  that those things are true.

3      **Q**    **We will not acknowledge that.**

4      A    Can you be more specific about what you

5  want to know about that incident?

6      **Q**    **First of all, do you remember the name of**

7  **the person?**

8      A    Only her first name.

9      **Q**    **What was her first name?**

10     A    Can we do that off the record too?

11     **Q**    **Is it an unusual name?**

12     A    Enough.

13     MR. RANDAZZA:  Let's go off the record.

14     (Thereupon, an off-the-record discussion

15 was had.)

16 BY MR. RANDAZZA:

17     **Q**    **So during off the record discussion we**

18 **have identified a woman with whom there was some**

19 **interaction.  Given the fact that her name is less**

20 **than very common, we will refer to her as Ms. F.  We**

21 **have an agreement off the record of who this person**

22 **is?**

23     A    Yes.

24     **Q**    **So, when you spoke with Ms. F, can you**

25 **describe when you first spoke to her?**

Page 45

```
 1        A     When I first spoke to her was during the

 2    event before I spoke and Q and A after and chatting

 3    afterwards, that's when I first spoke to her.

 4        Q     So tell me a bit more about your

 5    interactions with her?  What do you remember?

 6        A     She was really fascinating, had a lot of

 7    really interesting ideas in aesthetic theory and

 8    literary analysis of the Star Wars trilogy and I was

 9    really fascinated in that subject and various other

10    things she was talking about at the time and really

11    liked conversing with her.  When we all sort of

12    informally retired to a pub afterwards we continued

13    talking for an hour or two hours I think with

14    various people present.  In the midst of that at one

15    point I said I would like to ask you out and her

16    visible reaction to that suggested to me that she

17    didn't like that, so I apologized immediately and

18    didn't renew that during that conversation.  That's

19    how that interaction went that I was writing about

20    that you are talking about.

21        Q     So there was no physical contact?

22        A     No.

23        Q     You mentioned earlier that you publicized

24    your move on Facebook, Twitter and your blog?

25        A     Yes.
```

Page 46

1      **Q      Do you have any evidence that any of the**
2  **defendants read about it on Facebook?**

3      A      Whether they read about it on Facebook, I
4  do not know.

5      **Q      So you have no evidence to prove that?**

6      A      Not that they themselves read it on
7  Facebook except for Amy Frank, she actually almost
8  certainly did.

9      **Q      What do you mean by almost certainly did?**

10      A      Well, we know now from discovery documents
11  that she was regularly searching my name, Richard
12  Carrier, on Facebook.  She was looking specifically
13  for speaking engagements and particularly speaking
14  engagements involving universities.  Any search she
15  did of that nature would have resulted in her seeing
16  my announcements of moving.

17      **Q      Why do you know it would have resulted in**
18  **that?**

19      A      She even noticed really obscure
20  announcements that had nothing to do with speaking
21  events or university events.  For example, the Camp
22  Quest announcement that even I didn't see on my wall
23  she saw on my wall, so if she has seen even events
24  like that, there's no possible way that she could
25  not have seen my announcements about moving across

Page 47

1    the country.  They were even more prominent than

2    that one and it included one speaking engagement at

3    a university.

4         Q    Would that be an estimate or a guess?

5         A    I don't understand the question.

6         Q    Well, you don't know for a fact that she

7    saw it, you find it probable?

8         A    Well, we can get into the theory of

9    knowledge on this.  But given the facts available to

10   me, the probability of her having read that is as

11   near to a hundred percent as makes all odds.

12        Q    Back to my question.  You have no evidence

13   that she read it?

14        A    Other than the evidence that I just told

15   you about.

16        Q    And that evidence is that she saw other

17   things on your Facebook wall?

18        A    She reported she was regularly searching

19   my wall and searching using the name Richard Carrier

20   specifically searching for events where I was

21   speaking at a university and demonstrated that she

22   was also noticing even the most obscure things

23   announced on my wall.

24        Q    In fact, she had read something on your

25   wall that you had not read?

Page 48

1      A    Correct.

2      **Q    So if you had not read an announcement on**

3  **your wall, is it not a bit of a logical fallacy to**

4  **say that somebody else must have read everything on**

5  **your wall?**

6      A    Not at all because I wasn't doing what she

7  was doing.

8      **Q    You weren't reading your own Facebook**

9  **wall?**

10     A    No, I wasn't searching someone's name on

11  their website specifically looking through every

12  single announcement to see where I might be speaking

13  and in the result of that demonstrating that they

14  are noticing every single thing on my wall including

15  that announcement.

16     **Q    Would the search turn up different results**

17  **if you searched for Richard Carrier in quotes or**

18  **without them?**

19     A    I don't know.

20     **Q    Have you searched Facebook that way one**

21  **way and then the other?**

22     A    No, not that I can recall.

23     **Q    How about on Google, have you ever done**

24  **that?**

25     A    Yeah.

Page 49

1      **Q      Self Googling?**

2      A      I have used Google with quotes and without

3  quotes to see if there is a difference in effect on

4  other things, yeah.

5      **Q      But not in searching your own name?**

6      A      Not that I recall.

7      **Q      Do you know the existence of any other**

8  **Richard Carrier's in the United States?**

9      A      Yes.  In fact, that may be something we

10  will include in the discovery materials.  We already

11  included some for you that we sent to you.  Once you

12  started making statements in your motions, I started

13  researching that and I discovered there's a Richard

14  Carrier Trucking in Maine.  I was able to do a

15  comparison of how often people were searching for

16  that guy versus me and generated a lot of material

17  related to that, which will be submitted to you.

18      **Q      How were you able to tell that they were**

19  **looking for him and not you?**

20      A      Because you can look for how often the

21  search term Richard Carrier Trucking is being

22  searched versus just Richard Carrier and then

23  compare that with when you do search Richard Carrier

24  how many pages in the results you have to go before

25  you find Richard Carrier Trucking, because they are

Page 50

1   ranked by how many people are looking at those

2   sites.

3       Q    What do you mean they are ranked by?

4       A    When you do a search on Google and Google

5   pages can explain this.  This is public knowledge.

6   When you do a search on Google and you see the hits,

7   it will give you ten links per page if you keep

8   going page after page after page.  We went ten pages

9   in and recorded everything on one search recently.

10  It ranks those by how many people are clicking

11  through those links.  If you do a Richard Carrier

12  search the top link is the one that most people are

13  looking at.  It assumes that's the one you want to

14  see and then it starts ranking them below that.  The

15  further deeper into the number of pages means the

16  fewer people are clicking through the site.

17      Q    Is it the same if you use a Mac or a PC?

18      A    I don't think there's a difference.

19      Q    Did you do it from a Mac or a PC?

20      A    From a Mac.

21      Q    Whose Mac was it?

22      A    Mine.

23      Q    Do you remember which browser you used?

24      A    I'm assuming it would have been Firefox,

25  but I can't recall if I used different browsers on

Page 51

1    different occasions.

2        **Q    Do you ever worry about people doing what**

3    **I suggested before as tracking your IP address if**

4    **you go to their website?**

5        A    I don't understand the question.

6        **Q    Remember before you said it would be**

7    **invasive of your reader's privacy to look at their**

8    **IP addresses?**

9        A    Unless you had an ethical reason to do

10   that, yeah.

11       **Q    By ethical you mean personal ethical**

12   **reasons?  What code of ethics are we talking about?**

13       A    You need a valid reason.  To just go

14   spying on someone I consider unethical, but if you

15   have a particular ethical reason that's driving you

16   that you actually need this information to pursue

17   something for a valid reason --

18       **Q    Do you worry that other people might do**

19   **that to you?**

20       A    How?

21       **Q    Well, just the way I described.  Do you**

22   **worry about, you know, just as you are saying it**

23   **would be unethical of you to do that to a reader,**

24   **are you concerned that other people may not share**

25   **your high ethics?**

Page 52

```
 1      A    I know for a fact they don't, but I don't

 2  worry about it because of the way I've organized my

 3  life.  I can't think of any way that would harm me,

 4  but my life doesn't work the same way as everyone

 5  else's.

 6      Q    You don't take precautions to keep that

 7  from happening?

 8      A    I don't even know how to keep that from

 9  happening.

10      Q    Do you know what a VPN is?

11      A    Yes, I do know about VPNs.  Good point.

12      Q    Do you use them?

13      A    I've only used VPN one time when I visited

14  England.  There was a reason I needed to do that

15  there.  I don't use VPNs in any other occasions.

16      Q    What e-mail platform do you use?

17      A    Apple's innate iMail.

18      Q    So your e-mail address is -- what is after

19  the at?

20      A    I have a number of e-mail address.  Which

21  one are you asking about?

22      Q    All of them.

23      A    All of my e-mail addresses all reflect

24  back to my iCloud account.  Every single one of the

25  e-mail addresses direct e-mails to the same account,
```

Page 53

1   which is Richard.Carrier@iCloud.com.

2       **Q    They are e-mail forwards, not separate**

3   **accounts?**

4       A    I'm not sure I understand the question.

5       **Q    Give me one of your other e-mail**

6   **addresses.**

7       A    For example, I don't remember the exact

8   address, but I have an iMail address with my

9   Columbus alumni association.

10      **Q    Columbus or Columbia?**

11      A    Columbia.  Thank you.  Columbia University

12  Alumni Association.  That e-mail does collect

13  somewhere on the web independently like you can read

14  it as if it was an e-mail, but I never do.  It's

15  connected to my iCloud account.

16      **Q    Do you have Gmail account?**

17      A    Yes, I do.  Same thing.

18      **Q    Your Gmails get forwarded to Apple?**

19      A    Yes.

20      **Q    Do you use them for separate reasons?**

21      A    Sometimes -- I would rather just have my

22  RCarrier@infedels.org account, but that was retired

23  when I left secular web.  It's now just a reflect or

24  it doesn't collect anywhere.  I have to have an

25  iCloud.com account to use my Apple mail account.

Page 54

1    The others are things that were given to me and are

2    out there, so I just have to keep monitoring them,

3    so I just have them all reflect to my main account.

4        **Q    What calendaring system do you use?**

5        A    Two different calendaring systems.  Google

6    calendar and the innate Apple iOS calendar.

7        **Q    They reflect to one another?**

8        A    No, they aren't linked.

9        **Q    Do you have two-factor authentication**

10   **enabled in your Google account?**

11       A    Yes.

12       **Q    Is it through your cell phone, they send**

13   **you a text message?**

14       A    I have two-factor on so many things.  I

15   don't remember which methods are available from

16   which ones.  I don't recall right now.

17       **Q    Is it that you don't log in and out of it**

18   **much?**

19       A    I almost never use Google.

20       **Q    Do you remember the last time that you**

21   **logged in?**

22       A    No, I don't.

23       **Q    Did you log out or did you just close the**

24   **browser?**

25       A    I honestly don't remember.

Page 55

1      Q      You don't have your computer with you

2    today, do you?

3      A      No.

4      Q      So if we were to log into it, you might

5    still be logged into your Google account?

6      A      It's theoretically possible, yes.

7      Q      You don't recall logging out?

8      A      I don't recall logging out.

9      Q      How often do you delete all cookies on

10   your computer?

11     A      I usually don't do that for any reason

12   unless it crashes, which has happened multiple times

13   since my computer is pretty old.  Sometimes in order

14   to access my credit card accounts I have to get rid

15   of the cookies in order to be able to log back in.

16   That has happened probably four or five times in the

17   last two years.

18     Q      When was the last time?

19     A      The last time that happened I honestly

20   don't remember.  It was more than four months ago, I

21   think.

22     Q      Do you remember when before that?

23     A      No, I don't.  It's multiple times.

24     Q      As a matter of practice you don't clear

25   your cookies?

Page 56

```
 1      A    No.

 2      Q    I consider it to be a good practice to

 3  have somebody assigned to clear my entire browser

 4  cache if I die.  Do you have anyone like that?

 5      A    I do not.

 6      Q    So is it because you never thought of the

 7  idea?

 8      A    No.  Generally -- first of all, I'm a

 9  historian, so I dislike destruction of records.

10  Secondly, I'm very much an open person and I believe

11  very highly in the value of truth, so there's really

12  nothing that I have to hide.  The only things I'm

13  concerned to hide are things that are someone else's

14  secrets or private information that I don't want to

15  disclose to harm them.  Everything about myself I'm

16  not too concerned about other than obviously the

17  things I want to prevent the public from getting or

18  even hacking like my Social Security numbers and

19  stuff like that.

20      Q    You've never cleared your browser history?

21      A    Yeah, I've cleared browser history for

22  functional reasons, but not out of a desire to get

23  rid of the history.

24      Q    When is the last time that you cleared it?

25      A    I honestly don't remember.  It's been a
```

Page 57

```
 1   long time since I've done that.
 2        Q    More than a year?
 3        A    Maybe less than a year, but close.
 4   Something in that vicinity.
 5        Q    You can't recall when you did it?
 6        A    I can't recall.
 7        Q    You said Ms. Zvan's article -- in your
 8   complaint it says the article garnered 45 comments.
 9        A    Um-hmm.
10        Q    Did you make a list of people who
11   commented?
12        A    Did I write down their names?
13        Q    Yes.
14        A    No, I did not.
15        Q    Did you record them in any other way?
16        A    I think we took a screen capture.
17        Q    Do you know where those people live?
18        A    I didn't check.
19        Q    You don't know if any of them live in
20   Ohio?
21        A    No.  There was one -- we confirmed one
22   person, Marie Mogilevsky liked I think a Facebook
23   post, I can't remember exactly, related to this.  We
24   did record that.  That's because I knew she lived in
25   Ohio.
```

Page 58

1      Q    **How do you know she lived in Ohio?**

2      A    She was a friend of mine.

3      Q    **Other than her the other 44 could all be**

4    **in Guam for all you know?**

5      A    I didn't research that.  Correct.

6      Q    **So when Skepticon posted that they were**

7    **banning you, do you remember where you were when you**

8    **read that post?**

9      A    Yes.  I was in Columbus, Ohio at the time.

10     Q    **Were you living here?**

11     A    Yes, I was living in Columbus and also

12   hanging out with one of my girlfriends in Columbus.

13   Yeah, that's what I remember about that.

14     Q    **Did you show her the post?**

15     A    Yes, we talked about it.

16     Q    **What did she think about it?**

17     A    She was as outraged as I was.

18     Q    **How long had you known her?**

19     A    We are talking about Amanda Metskas.  That

20   is already on the public record.

21     Q    **I didn't need her, but okay.**

22     A    I have known her many years, but we had

23   been dating probably two years at that point.

24     Q    **Did you show anyone else?**

25     A    I may have.  I don't recall.

Page 59

1      Q    Did she believe it?

2      A    No.  When you asked if I had shown anyone

3  else, did you mean on the day?

4      Q    No, at any time.  I understand that your

5  answer was on the day, so we are not playing gotcha

6  with you.

7      A    You mean at any time?

8      Q    Yes.

9      A    All of my friends and girlfriends have

10  seen it by now.

11      Q    You showed it to them?

12      A    Yes.

13      Q    How did you pick who you would show it to?

14      A    People who would ask and people I'm in

15  close relationships that I think deserve to be aware

16  of it so we can discuss it.

17      Q    Did any of these people see it and believe

18  it instead of you?

19      A    No, none of the people that I was dating.

20  Certain people who were my friends did and aren't my

21  friends anymore.

22      Q    How do you know they believed it?

23      A    They told me.

24      Q    Can you tell me some of the friendships

25  you've lost over it?

Page 60

1    A    Again, we want to put these names in the

2  record?

3    **Q    I don't think this reveals anything**

4  **embarrassing about them.**

5    A    Neil Wehneman.

6    **Q    Anybody else that you had a falling out**

7  **with?**

8    A    Marie Mogilevsky.

9    **Q    Anyone else?**

10   A    Let's see, friends in Ohio.  Those are the

11 two that I can recall have made clear that they have

12 believed it.  There may have been others that

13 stopped talking to me that I don't know about

14 because they haven't communicated that to me.  There

15 are other people in the community professionally not

16 friends per se, but are colleagues.

17   **Q    How are you doing on hunger at all?  Do**

18 **you need a break?**

19        MR. PERRY:  It's up to you.

20        MR. RANDAZZA:  I don't want you to feel

21 that I'm pushing you through it.

22        THE WITNESS:  Understood.  I'm fine.

23 BY MR. RANDAZZA:

24   **Q    Your blog is now at RichadCarrier.info?**

25   A    Yes.

Page 61

 1     Q     And do you recall writing a statement or
 2  an article called How To Do Wrong Right?

 3     A     Yup.

 4     Q     And the version that is on
 5  RichardCarrier.info right now, has that ever been
 6  edited since its publication?

 7     A     It may have been.  I don't recall exactly
 8  if I did or not.

 9     Q     So would you have a record of that?

10     A     Yes.  It's checkable if you go to the
11  Internet archive and see the previous versions of
12  it.  That's true for any web page, actually.

13     Q     You are sure that your website is
14  archived?

15     A     Yes, I check it multiple times.

16     Q     When you checked it, did you enter the URL
17  directly on the Internet archive page or did you
18  search for it on the Internet archive page?  Did you
19  use the search function?

20     A     I always use the URL.

21     Q     And does the archive leave a cookie on
22  your computer?

23     A     I do not know the answer to that.

24     Q     You don't know if there is any meta data
25  left by the Internet archive on your computer?

Page 62

```
 1        A     Correct, I do not know.

 2        Q     How many other Richard Carriers live in

 3   Ohio?

 4        A     I don't know.

 5        Q     Have you ever tried to find out?

 6        A     I wouldn't know how to find out exactly.

 7   Oh, actually, there's one way I tried when you

 8   brought it up in motions.  I think I checked the

 9   voter registry in Ohio and it came up with I think

10   two other Richard Carriers.  I can't remember the

11   exact count.

12        Q     Did you ever look at Ancestry.com?

13        A     No.

14        Q     You have two registered voters named

15   Richard Carrier in Ohio?

16        A     Yeah, that's what I recall.

17        Q     You don't know how many others may have

18   lived here, may have died recently?

19        A     No.

20        Q     You don't recall if you searched for your

21   name with quotes or without quotes when you Googled

22   your own name?

23        A     I don't recall.

24        Q     Do you have any formal training in Google

25   analytics?
```

Page 63

1        A     Formal training, I do not.  Can you hold

2    on for just a moment?

3        **Q     Yeah.**

4        A     Go ahead.

5        **Q     Any formal training in Google trends?**

6        A     No formal training.

7        **Q     How did you learn to use it?**

8        A     I read the tutorials and instructions on

9    the web page itself.

10        **Q     Any training in SCO?**

11        A     No formal training.

12        **Q     Have you done anything on your blogs to**

13    **optimize search engine results?**

14        A     I'm not sure what that means.

15        **Q     How often do you log into your own blog**

16    **now?**

17        A     What do you mean by log in?  Are you

18    talking about the back end or the front end?

19        **Q     Yes, the back end.**

20        A     Probably once every other day would be the

21    average.

22        **Q     I'm going to refer to something in the**

23    **file.  This would be document number ten.  Since**

24    **we've previously filed it, I don't know if you need**

25    **to read the whole thing.  At this point you would've**

Page 64

 1    objected if it was a falsified copy, but for the

 2    sake of formality it was Exhibit 1 to our ECF No.

 3    10.  Look at that and tell me if you think there is

 4    any reason that that would not be a true and

 5    accurate copy of what was published on the date

 6    stated above.  The publication date is June 5th,

 7    2015.  This copy was printed on 12/1/2016.  Do you

 8    have any reason to believe that you edited it

 9    between the date it was published and the date we

10    printed it?

11         A    I don't recall.

12         Q    Is it your habit to adjust things once

13    you've already published them?

14         A    I will on occasion if I think there's an

15    error in it.

16         Q    Do you note that?

17         A    I usually do in some fashion.

18         Q    So you are transparent about edits?

19         A    Usually.  If it's a typo or something, no,

20    but usually I will put a comment or I will indicate

21    it using brackets or something that indicates a

22    difference from the text.

23         Q    So can we stipulate that Exhibit 1 is a

24    true and accurate copy of this post and you have no

25    indication that it's been altered?

Page 65

 1      A    Yeah.

 2      **Q    I think it's just easier than entering it**

 3  **as an exhibit to the deposition since it's already**

 4  **in the record.  Why add more paper to the record?**

 5            MR. PERRY:  That's fine.

 6            THE WITNESS:  Yeah.

 7  BY MR. RANDAZZA:

 8      **Q    Have there been any exhibits that we have**

 9  **provided that you believe to have been altered or**

10  **inauthentic?  Can we stipulate to all of them?**

11            MR. PERRY:  I think we would have talked

12  about it.

13            THE WITNESS:  Yeah.

14            MR. RANDAZZA:  Let's go off the record.

15            (Thereupon, an off-the-record discussion

16  was had.)

17            MR. RANDAZZA:  While we were off the

18  record the parties came to an agreement that we all

19  stipulate that any exhibits that have been filed to

20  date are authenticated whether submitted by the

21  plaintiff or the defendant and now we will go back

22  off the record so I can also enjoy the restroom.

23            (Thereupon, an off-the-record discussion

24  was had.)

25  BY MR. RANDAZZA:

Page 66

1        Q     Have you ever been to the headquarters of

2    the Secular Student Alliance?

3        A     Yes.

4        Q     Where is it?

5        A     At that time it was -- no, I don't

6    remember the address.  It was in Columbus.

7        Q     You went there in Columbus?

8        A     Yes.

9        Q     That is an Ohio only organization?

10       A     I don't understand the question.

11       Q     The Secular Student Alliance, where do

12   they have chapters?

13       A     All over the country.

14       Q     So it's not an Ohio focused organization?

15       A     The national office is in Ohio based in

16   Columbus and then it has affiliates, which are at

17   universities and college campuses all over the

18   United States.  Those affiliates get support and

19   licensing and other things through the national

20   organization in Ohio.

21       Q     So when I say Secular Student Alliance, do

22   you understand me to be saying the Ohio headquarters

23   or all affiliates together with that?

24       A     I would assume both of those things.

25       Q     If I ask have you ever been to a Secular

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

1    **Student Alliance meeting, we are talking about**

2    **nationwide?**

3        A    Yes, if you ask me that question I would

4    ask you to be more specific as to what you mean.

5        **Q    More specific than if you had been to a**

6    **Secular Student Alliance meeting?**

7        A    Yes, because that can mean a lot of

8    different things.

9        **Q    An event that any Secular Student Alliance**

10   **affiliate or national has sponsored?**

11       A    Now I have lost track of the question.

12       **Q    Have you ever been to one?**

13       A    Yes.

14       **Q    Have you ever been to an SSA -- can I say**

15   **SSA?**

16       A    Yes, absolutely.  Many, many.  More than I

17   can remember.

18       **Q    When was the last one?**

19       A    It is now 2018.  The last one would have

20   been late 2017, and I think there was only one in

21   2017, if I recall correctly.  I'm not entirely sure,

22   but I think so, in Logan, Utah.

23       **Q    So you went to one in Logan, Utah.  Did**

24   **you speak at it?**

25       A    Yes.

Page 68

```
 1      Q    Did they pay you?

 2      A    Yes.

 3      Q    Am I remembering incorrectly, you were

 4  banned for a period of time from SSA meetings?

 5      A    No.

 6      Q    You've never been banned from SSA?

 7      A    No, not officially.

 8      Q    What about before the Logan, Utah?

 9      A    What do you mean?

10      Q    Were there any other events before Logan,

11  Utah or is there the only one that you've spoken at?

12      A    There were many before, but that was the

13  only one in 2017.

14      Q    What about 2016?

15      A    None in the second half of 2016.  Your

16  clients' statements have made that difficult.

17      Q    Is that a fact, an opinion, a guess?

18      A    It's a prediction based on data trends.

19      Q    Is it because you tried to attend and they

20  told you you can't come?

21      A    So before 2016 I used to get gigs at SSA

22  affiliate events and SSA national quite frequently.

23  I can't remember exact counts but many times in any

24  given year.

25      Q    Would you apply to go or would they
```

Page 69

1    approach you?

2         A    A lot of times they would approach me.

3    That was fairly reliably the case.  I would count on

4    business coming to me by people just asking me to

5    come.  I would also go and ask groups can I speak

6    and it's usually enthusiastically a yes.  That had

7    been my experience all through 2015.  Starting mid

8    2016 and beyond it's completely the opposite.

9         Q    So in the second half of 2016, do you

10   recall any specific circumstances that you asked a

11   local affiliate of SSA or the national headquarters

12   of SSA if you could come speak and they said no?

13        A    No.

14        Q    2017?

15        A    No, not exactly like that.

16        Q    Nobody ever refused your request?

17        A    No one asked me and I can't recall if I

18   asked other people.  Usually what happens and has

19   been happening in the last few years is I send a

20   request and I get no reply.  They don't say anything

21   or they say something that's vague.  People don't

22   usually tell me why.  When I compare past behavior

23   with current behavior the difference is quite

24   obvious.

25        Q    But to answer my question, specifically no

Page 70

1    one has told you no?

2        A    Not SSA affiliates.  Well, they have not

3    said no, because of the defamation.  A lot of them

4    just ghost me.  They just don't answer at all or

5    they say no, but they don't say why.

6        Q    Do you use something to tell if the

7    e-mails have been opened?

8        A    I don't understand the question.

9        Q    Do you know what read notify is?  Do you

10   use return receipts on e-mails?

11       A    No, I don't use return receipts on

12   e-mails.  No, I don't check that that I can recall

13   anyway.

14       Q    That's how you would ask or would you

15   call?

16       A    That's a good question.  Sometimes I do

17   send requests by Facebook and that I can confirm

18   whether someone has seen the message or not.

19   Oftentimes it's e-mail and oftentimes it's meet up

20   communications.  Sometimes it's web form

21   communications that an affiliate operates.  It's a

22   variety of communications depending on how they run

23   their contact.

24       Q    Who would receive the request?

25       A    It would vary.  Each affiliate club has

Page 71

 1   its own officers and its own structure, so each one

 2   would have its own policy as to who is getting the

 3   communications.  All I can do is compare past

 4   behavior with current behavior of what usually

 5   happens.

 6       **Q      Are they employees?**

 7       A    No.  You mean like paid employees?

 8       **Q      Sure.**

 9       A    Not in the SSA.

10       **Q      Independent contractors?**

11       A    I have no idea what their legal relation

12   is to the SSA other than the fact that they organize

13   their own clubs and enter some sort of an agreement

14   with the national organization.  I don't know the

15   details of that agreement.

16       **Q      You've never talked to anyone at one of**

17   **the chapters and said who gets the requests?**

18       A    Before 2016 I used to communicate with

19   these people, so I would find out because they would

20   answer.

21       **Q      Do you know which SSA chapter is the**

22   **largest?**

23       A    No, I do not know.

24       **Q      Do you know any that are particularly**

25   **large?**

Page 72

```
 1       A    No, I don't have those numbers.

 2       Q    Is there any one that is more well known

 3  or successful?  Do any of them stand out?

 4       A    I've never looked into that.  Not to me,

 5  anyway.

 6       Q    Have you sent requests to national for

 7  speaking engagements?

 8       A    Are you talking about ever or when?

 9       Q    How about since January of 2016.

10       A    January of 2016 I was planning to go to

11  the Columbus SSA national conference.  I had

12  arranged a bunch of meetings with people who were

13  coming in from other affiliates.  I was going to

14  engage in networking and try to get working gigs

15  through other affiliate organizations through

16  working a conference.

17       Q    Hold on.  There is a lot of terms in there

18  that I would like clarification.  So you were hoping

19  to go to a meeting?

20       A    I was arranging private meetings myself.

21       Q    With whom?

22       A    With many people all over the United

23  States who come to the conference representing

24  various SSA affiliates.  My plan was to attend that

25  conference and hob knob essentially and network
```

Page 73

1   basically try to develop other working

2   opportunities, but I was defamed almost immediately

3   before that and my meetings didn't happen and it was

4   made clear to me that I wouldn't be welcome at the

5   SSA conference.

6        Q    Who told you that?

7        A    That was communicated to me by -- well,

8   Amanda Metskas that she was relaying that to me from

9   persons at the SSA.

10       Q    Who?

11       A    It would have been --

12       Q    Do you know?  Were you privy to the

13  conversation?

14       A    Was I privy to the conversation?

15       Q    Yes.

16       A    No, I only know what Amanda Metskas

17  communicated to me.

18       Q    It's your testimony that Amanda told you

19  that you weren't welcome at the meeting?

20       A    Right.

21       Q    But you had arranged with other people to

22  meet you with at that meeting?

23       A    I had done so prior, yes.

24       Q    They were all coming to Columbus for the

25  conference?

Page 74

```
 1      A    Right.

 2      Q    What is Amanda's position at SSA?

 3      A    She is not affiliated with the SSA.  She

 4  runs Camp Quest.  She's married to who at the time

 5  was president of SSA.

 6      Q    So she has no affiliation with the SSA?

 7      A    No, she just knows people who work there.

 8      Q    A person unaffiliated with SSA --

 9      A    Yes.  At the time they shared an office,

10  so they actually worked in the same office.

11      Q    But she told you that you are not welcome,

12  but the organization never said you are not welcome?

13      A    She said the atmosphere was that everybody

14  thought it would cause a great deal of problems and

15  not go well if I attended the conference.

16      Q    That was her opinion?

17      A    Yes.

18      Q    But to be very clear here, to be very

19  precise, nobody who worked for the SSA, nobody who

20  is an officer or director, et cetera in the SSA told

21  you that you weren't welcome?

22      A    August Brunsman might have done so.  I

23  don't recall specifically.  He was the president of

24  the SSA at the time.  He was recusing himself from

25  the investigation that was ongoing at the time.  I
```

Page 75

1   had a lot of conversations with him, but I don't

2   remember exactly how much information I got from him

3   about this.

4       Q    So you have no recollection of him telling

5   you that you weren't welcome?

6       A    No, but this is the sort of thing we can

7   just ask them.

8       Q    Are they chapters or affiliates?  What is

9   the correct term?

10      A    I've always used the term affiliates.

11      Q    Did anybody from any of the affiliates

12  tell you you weren't welcome at their meetings?

13      A    I can't recall.  I know community groups

14  has said so.

15      Q    What is community groups?

16      A    Non SSA related organizations, secular

17  groups.  I don't think I essentially got a fuck you

18  from SSA.

19      Q    The people you said you were going to meet

20  with, did you meet with any of them?

21      A    No, none of them are talking to me

22  anymore.

23      Q    What about back then?

24      A    No, they stopped all communications with

25  me as soon as the defamation was published.

Page 76

1      Q      They previously arranged to meet with you?

2      A      Yes.

3      Q      How many people were there?

4      A      I don't recall.  A handful.

5      Q      More than ten, more than twenty?

6      A      More than four, less than ten.  I don't

7   recall the exact number.  At the conference I was

8   planning on meeting more people without a planned

9   meeting.  I was planning to hob knob.  I was

10  intending to cultivate meetings at the conference.

11     Q      Had you bought a ticket?

12     A      I don't even know if they sell those for

13  people attending.  I was going to.  That was the

14  plan.  As soon as I realized this wasn't going to

15  transpire I did not.

16     Q      That what wasn't going to transpire?

17     A      As soon as the defamation was published

18  and all the shit hit the fan.

19     Q      Which specific defamation?

20     A      That would have been Amy Frank's

21  publication is the first start of it.  All of it

22  really hit on June 20, I think, when the other

23  publications went out, Skepticon, Lauren Lane.  When

24  they all published.  That really had the impact.

25  Not that the Amy Frank thing helped either.

Page 77

1      Q    You have no specific evidence of that, you

2    are just extrapolating that these people talked to

3    you before and they don't talk to you now?

4      A    Right.

5      Q    No one has said it was because of this

6    publication?

7      A    No, but I'm sure if we ask them we can get

8    that information from them.

9      Q    You don't think any of your publications

10    could have had anything to do with it?

11      A    No, none of my publications contain

12    defamatory material like this.

13      Q    Did you provide any of the names -- and

14    maybe your attorney can answer this, did you provide

15    any of the names of the people you were planning on

16    meeting with in your disclosures?

17      A    No.

18           MR. RANDAZZA:  You want to supplement

19    those in a short period of time?  I don't think we

20    know any of those names.

21    BY MR. RANDAZZA:

22      Q    Have you ever been formally accused of

23    sexual assault?

24      A    No.

25      Q    By formally I don't mean just by the

Page 78

1    police, but has any person ever?

2         A    No, not before Amy Frank.

3         Q    Harassment?

4         A    No.

5         Q    I know you don't like this term after

6    reading your blog, but being creepy toward anyone?

7         A    What's the question?

8         Q    Well, there's sexual assault.  I think we

9    know what that is.

10        A    Um-hmm.

11        Q    There is rape, maybe sexual assault is

12   also rape.  Descending we have sexual harassment and

13   then maybe we just have creepy, which is sort of the

14   male equivalent -- you've written it's the male

15   equivalent of slut shaming.

16        A    Formulate your question.  I don't know

17   what you're asking.

18        Q    Has anyone ever described your behavior at

19   any of these conferences as creepy?

20        A    I don't recall if or when.

21        Q    Do you recall ever sexualizing a

22   conversation that was about something else at any of

23   these conferences?

24        A    I'm not sure I understand the question.

25        Q    Well, I'm reading from your words.  This

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 79

1   is creepy.  One you sexualized a conversation that

2   was about something else.  This alone justifies the

3   label creepy.  What did you mean when you wrote

4   that?

5        A    I mean someone who -- a conversation about

6   something else and then suddenly just start

7   interjecting discussions of sex that the other party

8   hasn't raised.

9        Q    Did you ever sexualize a conversation with

10   a proposition at one of these events?

11        A    You mean like just asking if someone wants

12   to go out with you?

13        Q    Again, I'm reading from your list of

14   what's creepy.  If you don't know what you meant

15   when you wrote it --

16        A    I need the context of what you're asking.

17   I'm not quite clear on what the question is.

18        Q    You sexualized a conversation with a

19   proposition, you didn't just bring up sex out of the

20   blue.  You did it in the form of an unwelcomed

21   sexual advance.

22        A    Wait.  Read that again.

23        Q    On June 5th, 2015 on page 22 of 47 of

24   the aforementioned Exhibit 1 to our Document 10, you

25   write a list.  It looks like you are doing a list of

Page 80

1    **things that you would say are creepy.  One thing you**

2    **say is two, worst, this is worse than sexualizing a**

3    **conversation the thing we just talked about.  You**

4    **sexualize the conversation with a, italics,**

5    **proposition.  You didn't just bring up sex out of**

6    **the blue, you did it in the form of an unwelcomed**

7    **sexual advance.**

8        A    Are you sure you are reading my words?

9        **Q    I am.**

10       A    Can I see that?

11       **Q    You may.**

12       A    Where is it?

13       **Q    Read from there and then the next page.**

14       A    This is someone else's words.  It's Hyatt

15   (phonetic) girl June 5, 2015.  These are not my

16   words.  This is someone else accusing me of being

17   creepy.

18       **Q    So you disagree with her list there?**

19       A    It would be one of those things I would

20   have to engage in a conversation about what exactly

21   she means.  I would not choose any of that wording.

22       **Q    How often do you talk about sex with the**

23   **students that attend the SSA meetings?**

24       A    Say again.

25       **Q    Do you ever talk about sex with the**

Page 81

1   students that attend SSA meetings?

2       A    Yes, if they bring it up.

3       Q    **Only if they bring it up?**

4       A    Generally, yeah.  There has to be a reason

5   for that to come into conversation.

6       Q    **Can you recall how many times that has**

7   **happened?**

8       A    No, I can't recall how many times that's

9   happened.

10      Q    **Did you say before or did I read before**

11  **that you asked Amy Skiba if she would date you?**

12      A    No.

13      Q    **I know there was a time we were talking**

14  **about what verb, right?**

15      A    Yeah.  Right.

16      Q    **You propositioned sex to her?**

17      A    I did not.

18      Q    **She propositioned you?**

19      A    She did not.

20      Q    **So there was nothing that happened there?**

21      A    You just --

22      Q    **I'm trying to keep these women --**

23      A    You left out a huge category of things.

24      Q    **So what happened there?**

25      A    She spoke to me and said she wanted to

Page 82

1   open her relationship.  She was having difficulty

2   because her husband wasn't agreeing to it and was

3   also monitoring her communications.  He was spying

4   on her e-mail and things like that.

5        **Q    She wanted to open her relationship with**

6   **him or you?**

7        A    She didn't specify.  She was I guess

8   asking me for advice about what to do.  I told her

9   it's a difficult situation.  I don't know how she

10  could deal with a partner who is spying on her.  In

11  the course of that conversation I mentioned that if

12  her situation ever does change, you have an open

13  relationship and you solve this problem and you are

14  interested in me, you are welcome to ask me out in

15  the future sometime.

16       **Q    This was on the phone?**

17       A    No, in person.

18       **Q    Where?**

19       A    In the living room of the house of Forest

20  Schrike (phonetic) I think is where I was staying.

21  This was the morning after I spoke for her

22  organization and it was a private conversation she

23  initiated with me.  It's discussed in my affidavit

24  with the complaint.

25       **Q    Did you or did you not announce at one of**

Page 83

1  **these SSA events that you had a vasectomy?**

2      A    So the night before that we were in a

3  group conversation and -- this you can confirm from

4  Spencer Hawkins who was there.  His affidavit is in

5  the complaint.  Everybody there that was talking was

6  bringing up the subject of sexual stamina and the

7  role of alcohol on it and I brought up the effect of

8  my vasectomy on this.  This conversation was

9  entirely with the men who were discussing this.  It

10  was not directed at Amy Frank.  It was not

11  whispered.  It was openly discussed and then we

12  moved on to another subject after that.

13      **Q    Amy Frank wasn't there?**

14      A    Amy Frank was there and seemed to be

15  enjoying the conversation and didn't issue any

16  objections or leave.

17      **Q    You said you were only speaking to the**

18  **men?**

19      A    They were the ones who were having this

20  conversation with me of sexual stamina and what

21  affects it.

22      **Q    How many women were there?**

23      A    Just her.

24      **Q    But she didn't participate in the**

25  **conversation?**

Page 84

```
 1      A    I don't recall.

 2           MR. RANDAZZA:  Off the record.

 3           (Thereupon, an off-the-record discussion

 4   was had.)

 5           (Brief recess.)

 6   BY MR. RANDAZZA:

 7      Q    Sir, you wrote a blog post where you said

 8   that you were never employed by SSA or Camp Quest;

 9   is that correct?

10      A    Yes, by which I meant I was never a

11   salaried employee.

12      Q    Okay.  And you were dating the executive

13   director of Camp Quest?

14      A    Correct.

15      Q    Amanda?

16      A    Yes.

17      Q    What is Amanda's last name?

18      A    Metskas.

19      Q    And Amanda is married to?

20      A    August Brunsman.

21      Q    And August is the executive director of

22   the Secular Student Alliance?

23      A    I should say he was at the time.

24      Q    There was an incident where somebody

25   complained to the Secular Student Alliance about you
```

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 85

1    and the Secular Student Alliance contacted you?

2         A    Yes.

3         Q    Who did you think it was that complained

4    about you?

5         A    The pub case that we talked about earlier.

6    That was the only instance in which I had asked a

7    woman out at any event that had anything to do with

8    a college group.

9         Q    It turned out it wasn't her?

10        A    Yeah.

11        Q    So it turned out it was Amy?

12        A    Yes, which surprised me immensely.

13        Q    It might have been a little bit

14   embarrassing to say somebody complained about you

15   and you say -- who did you think it was?

16        A    Ms. F.

17        Q    But that's not the incident we were

18   talking about?

19        A    Yes, and that was like falling down a

20   rabbit hole.  It was really perplexing to me.

21        Q    You then went to another SSA event?

22        A    Give me specifics.

23        Q    Did you go to another SSA event after that

24   phone call?

25        A    Yes.

Page 86

1      Q      Were you aware that Amy Skiba was there?

2      A      You are talking about a specific event?

3      Q      How many SSA events did you go to after

4   this?

5      A      I can't recall, but it may have been more

6   than one.

7      Q      Do you recall going to one Amy was at?

8      A      Yes, although I didn't know she was at

9   that until they told me.

10      Q      They told you.  Who is they?

11      A      I don't remember the exact name of the

12   exact person who told me, but a staff member of the

13   SSA contacted me and this is actually the first time

14   that I found out that it was Amy who had complained

15   about me as they said, you know, Amy Skiba is here

16   and she is uncomfortable that you are here as well.

17   Could you please just avoid her.  I had to ask like

18   who is Amy Skiba?  I don't know who you are talking

19   about and they said oh, yes, that's the person who

20   complained about you.  I'm like okay, I'm not going

21   to get into this conversation because I have no idea

22   what on earth she was complaining about, but I have

23   no problem.  If anybody wants me to stay away from

24   them, that's easily done, so I said yeah, that's no

25   problem.  I complied with their wishes.

Page 87

1      Q     And this is before the allegedly

2   defamatory publications?

3      A     Correct.  This was 2015.

4      Q     When you were taken off the speakers

5   bureau for SSA, was that before the alleged

6   defamatory publication?

7      A     Yes.

8      Q     Did anyone say why you were taken off the

9   speakers bureau?

10     A     To me or to the public?

11     Q     To either one.

12     A     They told me that they wanted to have a

13  zero tolerance policy on the fraternization policy,

14  so they said we have decided -- they didn't decide

15  this originally, but they eventually decided you

16  probably shouldn't be on the bureau and I said yeah,

17  I probably shouldn't be on the bureau.

18     Q     So you agreed that due to fraternization

19  issues it's better to be --

20     A     Yes, I would rather not have a restriction

21  on fraternization.

22     Q     Do you still have anything in storage in

23  California?

24     A     No.

25     Q     What did you get in the divorce?

Page 88

1     A     Full ownership of my business and $20,000.

2     **Q     Is that a California divorce or an Ohio**

3   **divorce?**

4     A     California.

5     **Q     When was the final decree entered?**

6     A     Sometime in 2015.

7     **Q     Now, this may indicate attorney/client**

8   **privilege.  Did you consult with any California**

9   **lawyers prior to filing this case?**

10          MR. PERRY:  Object to form.  You can

11   answer.

12          THE WITNESS:  No.

13   BY MR. RANDAZZA:

14     **Q     In some of your writings online, is it**

15   **true that you wrote a post discussing gang bangs?**

16     A     Yes.

17     **Q     That God likes gang bangs?**

18     A     Yes.

19     **Q     Do you recall when you published that?**

20     A     I don't remember.  It was a few years ago.

21     **Q     Discussed semen play online?**

22     A     I have done, yes.

23     **Q     Violence in porn?**

24     A     Yup.

25     **Q     You submitted attached to your complaint**

Page 89

1    **Exhibit 27 an e-mail to a woman named -- can you**

2    **tell me how to pronounce her name?**

3         A    Heina Dadabhoy.

4         **Q    Tell me about that e-mail.**

5         A    It was a whole e-mail exchange.  I don't

6    know which one you mean.

7         **Q    This is one where there was some**

8    **discussion of you wanting to have sex with her.**

9         A    Yeah.

10        **Q    Essentially calling it are you down to**

11   **fuck?**

12        A    That's not what I called it.

13        **Q    Who called it that?**

14        A    Her.

15        **Q    Who is Heina?**

16        A    Heina Dadabhoy is a blogger and activist

17   in the secular community.

18        **Q    Has she complained to anybody about your**

19   **conduct?**

20        A    I'm sure she has in the same respect that

21   she does in the e-mails that we included in the

22   complaint.

23        **Q    Back to the gang bang article.  The title**

24   **was God Thoroughly Enjoys Getting Gang Banged?**

25        A    Correct.

Page 90

1        Q    **Did anyone express concerns about this**
2   **article?**
3        A    I don't recall.
4        Q    **No one ever complained?**
5        A    They may have.  If they did, it was pretty
6   minor and I didn't think much of it.
7        Q    **There is an article that you published**
8   **regarding accusations by Amy Frank; do you recall**
9   **that?**
10       A    There may have been more than one.
11       Q    **Was there a woman named Shelley that**
12  **complained about you?**
13       A    No.
14       Q    **Do you know anyone named Shelley?**
15       A    I do.
16       Q    **Tell me about your relationship with her.**
17       A    The person that I know whose name is
18  Shelley?
19       Q    **Yes.**
20       A    Can we put the last name off the record?
21       Q    **Sure.**
22            **(Thereupon, an off-the-record discussion**
23  **was had.)**
24  BY MR. RANDAZZA:
25       Q    **Did you ever have an incident involving**

Page 91

1   her?

2        A    No.

3        Q    What is your relationship with her?

4        A    We are good friends.

5        Q    Is that all?

6        A    Oh, yes.

7        Q    No sexual contact with her?

8        A    No.

9        Q    In your article on June 15th regarding the

10   accusations made by Amy Frank --

11       A    Which article?

12       Q    Here is the beginning of it.

13       A    Got it.

14       Q    This one was attached to document 23-1.

15   This is the one where you say I'm not an employee of

16   either Camp Quest or SSA or any of their affiliates

17   and you say nor am I on their board of directors or

18   their speaker bureaus?

19       A    Correct.

20       Q    I rarely even volunteer for them?

21       A    Correct.

22       Q    Do you have anything else specifically

23   except for, you know, I think we talked before the

24   break about the fact that you are essentially

25   extrapolating that one of the defendants should have

Page 92

1    **known that you moved to Ohio because she looked at**

2    **other things on your Facebook wall that would**

3    **have -- you think she saw one thing, she would have**

4    **seen everything?**

5         A    Yes.

6         **Q    Do you have any other specific information**

7    **about any of the other defendants as to why they**

8    **might know?**

9         A    Yes.

10        **Q    Why don't we go through them one by one?**

11        A    So Zvan and the Orbit have both admitted

12   on discovery that they knew before I filed suit.

13   Myers, I told him personally on a phone call that I

14   had moved to Ohio and he being the CEO of

15   Freethought Blogs --

16        **Q    When was that conversation with Myers?**

17        A    The 21st of June.  I have that in a

18   record.  Very soon to that, though.  Myers being the

19   CEO of Freethought Blogs, I consider that informing

20   Freethought Blogs.  Normally if you tell the CEO of

21   a company something, that's telling the company.

22   Who is left?

23        **Q    Skepticon?**

24        A    Skepticon and Lane through counsel sent a

25   letter to my lawyer in Ohio.  I would expect a

Page 93

1  competent lawyer to advise them on the potential

2  jurisdictional issues.

3       **Q      Your lawyer --**

4       A     Received a letter from Lane and Skepticon

5  through counsel.

6       **Q      That letter came to you before -- well,**

7  **after the publications, correct?**

8       A     Yes, it was a response to our desist

9  letters before we sued.

10      **Q      Any information that Skepticon was aware**

11 **of your location prior to receiving the demand**

12 **letter from your lawyer?**

13      A     Rephrase that question.

14      **Q      Your lawyer sent a letter to Skepticon?**

15      A     Correct.

16      **Q      At that moment it is at least your belief**

17 **that everybody is on notice that you are an Ohioan**

18 **and thus if they defame you, they'll come to court**

19 **in Ohio?**

20      A     It's certainly a risk.

21      **Q      However that letter from your lawyer was**

22 **after the date of publication?**

23      A     Correct.

24      **Q      As far as prepublication, do you have**

25 **anything as far as Skepticon knowing that you were**

Page 94

1    **in Ohio?**

2        A    For Lane and Skepticon, no.

3        **Q    What about Amy Frank-Skiba?**

4        A    Amy Frank was searching for events and

5    stuff on my Facebook page before.  In fact, it was

6    that searching that resulted in her posting her

7    defamation when she saw the Camp Quest notice.  The

8    fact that she saw the Camp Quest notice means that

9    she had to have seen other things that she was

10   looking for.  Specifically the thing she said she

11   was looking for, which means she would have seen the

12   notice.

13       **Q    We asked you in discovery and you**

14   **mentioned that you are going to supplement for**

15   **things like credit card statements?**

16       A    Yeah.

17       **Q    Would you generally pay cash or credit?**

18       A    I almost always use ATM or credit.

19       **Q    Your bank statements and credit card**

20   **statements would reflect a reasonable picture of**

21   **your whereabouts on any given day?**

22       A    Probably, yeah, to within the extent I am

23   using them on particular dates and you can figure

24   out where the charges are.

25       **Q    Do you intend to produce those to us?**

Page 95

```
 1        A    It's super arduous.  It's going to cost a
 2   lot of time.  Do you really need them?
 3        Q    We do.
 4             MR. RANDAZZA:  Off the record.
 5             (Thereupon, an off-the-record discussion
 6   was had.)
 7             MR. RANDAZZA:  We had an off the record
 8   discussion about one discovery dispute that we
 9   appear to have resolved, that is to produce the
10   bank records and credit card records for the past
11   36 months, at least 36 months preceding the
12   lawsuit.  We have agreed that the defense will not
13   put any of the account numbers in the record.  The
14   defense will also endeavor to put the least amount
15   of that information in the record.  At this point
16   our intent is to simply verify locations through
17   it.  I don't foresee any other use for it.  If
18   there's anything that appears like it might be a
19   privacy issue, we would like to know.  You can
20   probably let us know when you produce it.  If there
21   is a charge to a sensitive purchase, please feel
22   free to highlight it.
23   BY MR. RANDAZZA:
24        Q    There was a statement that you discussed
25   online where somebody was accusing you of misconduct
```

Page 96

1  and hitting on younger students.  You consider that

2  ageism?

3      A    Can you --

4      Q    I'll get back to that.  Was there an SSA

5  policy against hitting on students?

6      A    The SSA fraternization policy essentially

7  said that, yes, for people on the speakers bureau.

8      Q    Did you violate that policy?

9      A    I did.

10      Q    Do you recall when the phone call was with

11  PZ Myers where you told him that you were moving to

12  Ohio?

13      A    Not offhand.  I think in some of the

14  materials or briefs that we filed we entered that

15  information and I base that information off of my

16  cell phone records.

17      Q    So was it pre or post allegedly defamatory

18  articles?

19      A    Post because it was a phone call about

20  that.

21      Q    So you called Myers after the publication?

22      A    He called me, actually.

23      Q    He called you?

24      A    He called me to discuss Freethought Blogs'

25  investigation of me for the claims made and that's

Page 97

1    the conversation I referenced earlier.  That

2    conversation started with him apologizing for

3    calling so early.  He thought I was in California

4    hours ahead of him.  I said no, I actually moved to

5    Ohio.  I'm actually hours later than you or an hour

6    or two later than you.

7        **Q    He definitely believed at that point you**

8    **lived in California?**

9        A    Certainly.

10       **Q    But the publication had already happened?**

11       A    Correct.  And that was the conversation

12   where I explained to him that if he didn't retract I

13   would have to sue.  That was before the desist

14   letters.  I hadn't even spoken to a lawyer yet.

15       **Q    So none of the events discussed in these**

16   **written statements took place in Ohio?**

17       A    None of the events?

18       **Q    Your violation of the SSA policy, for**

19   **example?**

20       A    One of them did.

21       **Q    Which sexual harassment took place in**

22   **Ohio?**

23       A    It wasn't sexual harassment.

24       **Q    What was it?**

25       A    Ms. F, that encounter occurred at Case

Page 98

 1   Western University in northern Ohio.

 2            MR. RANDAZZA:  All right.  I can turn

 3   this over to your lawyer for cross.

 4            THE WITNESS:  One thing, we kind of left

 5   that one hanging.  There were a certain number of

 6   factual issues in there.  Do we want to go over

 7   those in this deposition or is there some other way

 8   to handle that?

 9            MR. PERRY:  Let's do that now.

10                 CROSS-EXAMINATION

11   BY MR. PERRY:

12       **Q    Because I'm going second, if I jump around**

13   **or if I ask a poorly worded question, let me know**

14   **and I'll rephrase the question.  Why don't we cover**

15   **that now and I will ask you to explain the factually**

16   **accurate version of that story.**

17       A    Well, the facts that have been

18   inaccurately reported and some of these were

19   inaccurately reported by me originally is that when

20   I wrote the article that we are talking, How To Do

21   Wrong Right or whatever that title was, at the time

22   that I wrote that and at the time that the SSA

23   contacted me, and I believe that was the incident

24   that I was being accused of, which turned out not to

25   be, I thought that was an SSA event.  Once the legal

Page 99

1    case started and I started researching and fact

2    checking the information I realized that it wasn't

3    an SSA event and it was not covered by the SSA

4    fraternization policy.  I think that's the only

5    thing.

6         **Q    Are there any other factual inaccuracies**

7    **in that story?**

8         A    I can't remember the line that was read.

9    There may be other factual inaccuracies.

10        **Q    I want to ask you a couple of questions**

11   **relative to the nature of the defendants'**

12   **statements.  Earlier you discussed, but I want you**

13   **to be specific here, is there any truth to the**

14   **defendants' allegations of sexual assault?**

15        A    No.

16        **Q    Is there any truth to the defendants'**

17   **allegations of sexual harassment?**

18        A    No.

19        **Q    Specific to Ms. Frank-Skiba's statements,**

20   **she claimed that her accusations were all personal**

21   **knowledge?**

22        A    Yes.

23        **Q    And what did she accuse you of?**

24        A    She accused me of sexual harassment and

25   sexual assault and also said that she had personal

Page 100

1    knowledge of, quote unquote, other victims.

2        **Q    Is there any way that Ms. Frank-Skiba**

3    **could have personal knowledge of such things?**

4        A    No.

5        **Q    Why not?**

6        A    Because no such things occurred.

7        **Q    And then specific to Ms. Lane, she also**

8    **alleged personal knowledge of wrongful conduct?**

9        A    Yes.

10       **Q    Is there any way that she could have**

11   **personal knowledge of such conduct?**

12       A    No, not such that would violate the sexual

13   harassment policy at Skepticon.

14       **Q    What did Ms. Lane accuse you of that was**

15   **false and damaging to you?**

16       A    Violating a sexual harassment policy at

17   Skepticon.

18       **Q    Is there any way she could have personal**

19   **knowledge of such a thing?**

20       A    No.

21       **Q    Why not?**

22       A    Because no such thing occurred.

23       **Q    Did anyone acting on Ms. Lane's behalf**

24   **contact you for your version of the story?**

25       A    No.

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 101

1      Q    How about anyone representing Skepticon,

2   did they contact you for your side of the version of

3   the events?

4      A    No.

5      Q    Moving on.  Similar line of questions as

6   to Ms. Zvan.  She claimed to have personal knowledge

7   of at least one other incident.  Can you describe

8   what she claimed?

9      A    She has alleged now six incidents, so it

10  would depend on which one you are talking about and

11  in every single case she reported is not true.

12     Q    No way she could have personal knowledge?

13     A    No.

14     Q    Do you know who told her about those

15  incidents that she alleges?

16     A    No.

17     Q    She claims to have heard about at least

18  one alleged incident from a third party?

19     A    Right.  Yes.

20     Q    How could she have personal knowledge of

21  such a thing?

22     A    I don't know.  It's not possible.

23     Q    And did Ms. Zvan contact you to get your

24  side of the story.

25     A    No.

Page 102

1    **Q    Did anyone representing the Orbit ever**

2    **contact you to get your side of the story?**

3    A    No.

4    **Q    Did any of the defendants ever reach out**

5    **to you before they published false statements about**

6    **you?**

7    A    No.  The only exception would be Myers who

8    phone called me after their first article, but then

9    we discussed that conversation already.

10    **Q    With respect to your business, writing,**

11    **speaking, teaching as a source of income, do you**

12    **know the approximate size of that market?  I**

13    **apologize for referring to it as the market.  The**

14    **community.  The ecosystem to which you earn your**

15    **living, tell me about that.**

16                MR. RANDAZZA:  Object to form.

17                THE WITNESS:  Yeah.  My blog reaches over

18    a hundred thousand readers and my financials for

19    the year 2015 is a good example of sales.

20    BY MR. PERRY:

21    **Q    What I'm asking is not just what your**

22    **footprint is, but how big is this market?**

23    A    Nationwide or worldwide?

24    **Q    Nationwide for right now.**

25    A    Nationwide it's well over a hundred

Page 103

1    thousand individuals who are within my market.

2        **Q    Do you know how many conventions are held**

3    **each year that are a part of that?**

4        A    It varies by year but it's about ten to

5    twenty conventions related to the secular community

6    in one form or another.

7        **Q    Tell me one or two of the most prominent**

8    **conventions.**

9        A    Skepticon is one of the larger ones.  It

10   often draws audiences in the vicinity of a thousand

11   people.  American Atheist, their conferences are

12   about comparable in size.  I don't know if it's

13   still going on this year, but in previous years

14   there was ReAsoncon, Apostacon, many others.

15   Atheist Alliance America has one.  These have

16   attendances usually 3- to 600.  There's a variety of

17   other smaller conferences that have 2- or 300

18   attendees.

19       **Q    The attendees for all of these conferences**

20   **that you just mentioned, they are people that you**

21   **would consider your audience or potential audience?**

22       A    Yeah, it's market access.  Only a fraction

23   of the market can attend these conventions.  When I

24   go to these conventions and speak at them, I'm not

25   only exposing my work to the attendees but also they

Page 104

 1  go out and talk about it.

 2      **Q    Let's start with Freethought Blogs**

 3  **Network, how influential would you say that**

 4  **organization is within the community?**

 5      A    It is almost certainly the most read blog

 6  network in the secular community that is devoted

 7  solely to the secular community.  Its readership is

 8  approximately 1.4 million.

 9      **Q    Orbit, do they have a sizeable reach in**

10  **this community?**

11      A    Yes.  Average reach I think is 200- to

12  400,000 readers.  They are probably the second most

13  secular website that's devoted specifically to that.

14          MR. RANDAZZA:  Objection.  Foundation.

15  BY MR. PERRY:

16      **Q    How about Skepticon, can you describe how**

17  **influential their role is in this community?**

18          MR. RANDAZZA:  Objection to form.

19          THE WITNESS:  They are a much admired

20  conference.  They are a conference leader in terms

21  of what other conferences look to.

22  BY MR. PERRY:

23      **Q    Mr. Randazza asked you earlier questions**

24  **relative to your professional relationships and**

25  **business expectances within Ohio.  How long did you**

Page 105

1    **say you were affiliated with Secular Student**

2    **Alliance?**

3         A     For more years than I can remember.

4         **Q     Before 2016?**

5         A     Absolutely.

6         **Q     At the time of the defendants' false**

7    **statements, do you know whether the defendants were**

8    **aware of your affiliation with SSA?**

9         A     Yes.

10        **Q     All of them?**

11        A     Yes.

12        **Q     How do you know that?**

13        A     Because either I've spoken to all of them

14   about events that I've done for the SSA or they've

15   been well aware of it and talked about it

16   themselves.

17        **Q     Did you personally know each of the**

18   **defendants before June of 2016 when their statements**

19   **were first published?**

20        A     I don't know how to answer that for

21   Freethought Blogs.

22        **Q     How about Myers?**

23        A     Yes, Myers for sure, many years.  Zvan,

24   many years I personally knew her.  Amy Frank for the

25   one SSA event that I did.

Page 106

```
 1        Q    You know she knew you?

 2        A    She knew me from before not personally,

 3   but professionally she knew me as a figure in the

 4   community.  That's why she had me come out to speak

 5   for her organization.

 6        Q    Lane?

 7        A    Yes, I knew Lane.

 8        Q    These are all prior to 2016?

 9        A    Yes.

10        Q    Was it common knowledge that the SSA was

11   in Ohio?

12        A    Yes.

13             MR. RANDAZZA:  Objection.  Form.

14   BY MR. PERRY:

15        Q    How long have you been affiliated with

16   Camp Quest?

17        A    Longer than I can remember.

18        Q    Before 2016?

19        A    Yes.

20        Q    At the time of the statements alleged in

21   this lawsuit, do you know whether the defendants

22   were aware of your affiliation with Camp Quest?

23        A    Yeah -- wait.  At what time?

24        Q    Previous to their statements, so previous

25   to mid 2016, each of the defendants, would they have
```

Page 107

1    **known that you had an affiliation with Camp Quest?**

2        A    Lane would have known because we spoke of

3    it many times before.

4        **Q    Frank-Skiba?**

5        A    I don't know about the other defendants if

6    they knew before the statements.

7        **Q    Zvan?**

8        A    I don't know.

9        **Q    Myers?**

10       A    I don't know.

11       **Q    Okay.  Was it common knowledge that Camp**

12   **Quest was in Ohio?**

13       A    It was fairly common knowledge.

14       **Q    Around the time just previous to these**

15   **damaging statements, tell me -- just explain briefly**

16   **about your livelihood and the business that you were**

17   **building in Ohio?**

18       A    Right.  So I started building my business

19   in Ohio in 2015.  That shows in the financial

20   documents we have given on discovery.  I started

21   developing business relationships with numerous

22   organizations that hired me to speak and sell my

23   books there and promote my work.  Those are the

24   three prongs of my in-person business, which is

25   getting the promotion opportunities and being able

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 108

 1  to sell books and get speaking fees, if that's the

 2  case, so I did that in 2015 and I was all ready to

 3  do that in 2016.  I didn't book any gigs in Ohio in

 4  the first half because I knew I was moving.  I knew

 5  it would be a waste of expense if I were to get

 6  events in Ohio before I moved, so I planned to build

 7  all of my 2016 events in the second half of 2016

 8  after I moved, but that's unfortunately the moment I

 9  moved right after that that the defendants'

10  statements came out and that prevented that from

11  happening.

12      **Q    Earlier today we discussed how your move**

13  **to Ohio was publicized ahead of time.  I want to**

14  **clarify, before moving, did you ever discuss your**

15  **move with any of the defendants and if so which**

16  **ones, which group of friends?**

17      A    Owners and operators I think were Greta

18  Christina and Marie Mogilevsky were both informed of

19  my move before I moved.

20      **Q    Before the move did you directly speak to**

21  **the defendants about your intentions to move to**

22  **Ohio?**

23      A    Just those members of the Orbit.

24      **Q    Did you publicize the reason for your move**

25  **to Ohio?**

Page 109

```
 1      A    Yes -- oh, wait.  Actually, I'm not sure

 2   if I wrote about the reason.  I can't remember.

 3   It's been so long since I wrote my move blogs.

 4      Q    Before the statements were published, did

 5   you ever discuss the reason for your move to Ohio

 6   directly with any of the defendants?

 7      A    I don't remember.

 8      Q    How did the defendants specifically target

 9   your affiliation with Secular Student Alliance

10   and/or Camp Quest?

11      A    Frank's post which started the whole

12   thing, she basically essentially says I will be a

13   threat to children and if there was anyone working

14   with Camp Quest who would want to be affiliated with

15   me and therefore Camp Quest couldn't suffer the

16   ignominy of being affiliated with me and

17   specifically said the same thing that SSA should be

18   boycotted until all of this.

19      Q    So she did call for a boycott?

20      A    Yeah.

21      Q    She called for a boycott with --

22      A    She wanted the entire leadership of the

23   SSA to be dismantled.  I think it's quite clear the

24   reason for that is she wanted people like me to be

25   no longer able to speak at those things.  That's
```

Page 110

1  kind of the reason why she wanted management gone.

2      **Q      At that time she would have known that**

3  **these organizations were in Ohio?**

4      A     Yes.

5      **Q      At that time do we know whether she knew**

6  **that you were living in Ohio?**

7      A     At the time she wrote --

8              MR. RANDAZZA:  Objection.  Foundation.

9              THE WITNESS:  She had to have known based

10  on the arguments and the points that I made

11  earlier.

12  BY MR. PERRY:

13      **Q      How do you know that she knew you were**

14  **living in Ohio?**

15      A     Because she has admitted that she was

16  constantly searching my Facebook wall for

17  announcements of events and things that I was

18  attending and she was watching the results so

19  closely that she saw even nonevent announcements, so

20  she can't have failed to see the move posts,

21  especially because she was looking at university

22  event announcements and one of move posts are about

23  a university event announcement.

24      **Q      This is before she called for a boycott?**

25      A     Exactly.

Page 111

1     **Q      I think you already testified about Camp**

2  **Quest and Secular Student Alliance suspending**

3  **promotional and business projects.  Were there any**

4  **other business projects that you were developing**

5  **with either of those two organizations before they**

6  **were canceled?**

7     A    Yes, I was in negotiations with Camp Quest

8  to run a nationwide science experiment through the

9  national office in Ohio.  That would have resulted

10  in research paper and publicity and prestige.

11     **Q      And that was canceled?**

12     A    Yes, Camp Quest could no longer associate

13  with me once I had this stigma.

14     **Q      Before the defendants' statements, were**

15  **there any other Ohio-related business opportunities**

16  **that were underway or in development at the time?**

17     A    Not underway, but I had suspected to do

18  what I usually do in my home state which was to

19  start developing more gigs at all the organizations

20  but since then several members of those

21  organizations have published clearly that they had

22  no interest in hiring me because of the defamation.

23     **Q      Tell us about how the defendants'**

24  **statements have affected your professional**

25  **reputation?**

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                     Dr. Richard Carrier

1      A    I run into problems all the time where

2   oftentimes even my scholarship will be questioned.

3   People will say who wants to listen to a sexual

4   harasser.  I have to deal with those kind of insults

5   a lot.  I'm mocked for this especially since I want

6   to try and write about feminism and social justice.

7   I'm mocked and insulted because I'm accused of being

8   a hypocrite.  Other effects on my reputation in

9   terms of being a threat to children and women.

10  People don't want to hire me at events.  And I often

11  have to deal with a double edge sword on this, if I

12  try to build a contract to work for an organization

13  usually what will happen is someone will come along

14  and point out the defamation to the organization and

15  I'd get disinvited or there's a big fight on the

16  board of directors and so I have to deal with the

17  stress of that and that makes it more difficult for

18  them to hire me in the future and that's just the

19  few that I can think of right now.

20      **Q    Could you explain how the defendants'**

21  **conduct in this case has affected you emotionally?**

22      A    Yeah.  Extraordinary stress and anxiety.

23  I feel like being gas lighted about it.  I lost

24  ten pounds in the first six -- less than six months

25  after the defamation started.  It's difficult in

Page 113

1    personal relationships because I have to deal with

2    the difficult conversations and it's hard to date

3    because how do you date someone and have to tell

4    them about this.  If you don't tell them about it,

5    they find out about it later and then you're like

6    are they going to hate you for it.  There's a lot of

7    anxiety and worry because of that.  There's tons

8    more in terms of this.  The anxiety and worry is

9    constant.  Even having to fight the case.  Every

10   time that I have to respond to defense motion I have

11   to revisit these lies that were said about me and

12   that's painful.

13         **Q    After they published their statements you**

14   **served each of the defendants with a cease and**

15   **desist letter, right?**

16         A    Yes.

17         **Q    Each of the defendants received a cease**

18   **and desist letter?**

19         A    They each received it.  Lane keeps saying

20   that she didn't, but Skepticon did, but we sent it

21   to her as an officer of Skepticon to the Skepticon

22   address, so I would count that as her having

23   received it.

24         **Q    Any of your letters returned as**

25   **undeliverable?**

Page 114

1      A    I don't think so.

2      Q    So cease and desist letters were sent from

3   Ohio, right?

4      A    Yes.

5      Q    And you demanded a retraction, correct?

6      A    Yes.

7      Q    After the defendants received these

8   letters did any of them retract their statements or

9   did they double down?

10     A    They double downed or didn't retract.

11     Q    Did any of the defendants make public a

12   copy of your cease and desist letter?

13     A    Amy Frank did.

14     Q    I think we've already discussed a little

15   bit that Skepticon and Lane replied to the cease and

16   desist letter, right?

17     A    Yes.

18     Q    And that should cover whether or not Lane

19   received a copy of the cease and desist letter?

20     A    Right.

21     Q    They mailed that reply to Ohio?

22     A    Yes.

23     Q    Did that reply allege a breach of

24   contract?

25     A    Yes.

Page 115

1      Q    Did the reply from Lane and Skepticon

2    threaten litigation?

3      A    Yes.

4      Q    If you had to litigate this suit in a

5    state other than Ohio, would that pose a financial

6    burden?

7      A    Tremendously.

8      Q    A significant financial burden?

9      A    Yes.

10     Q    As a practical matter, if you were

11   required to litigate this somewhere other than Ohio,

12   would you have to abandon your claim?

13     A    I might have to.  I'd have to review it at

14   that time.

15          MR. PERRY:  I think those are all the

16   questions that I have for you.

17                   REDIRECT EXAMINATION

18   BY MR. RANDAZZA:

19     Q    Why would you have to abandon your claims

20   if you couldn't litigate them in Ohio?

21     A    I wouldn't be able to afford it.

22     Q    How do you know that?

23     A    Because it's already been extraordinarily

24   expensive.  It's very difficult to keep funding

25   this.

Page 116

1       Q     Which lawyers have you asked for a pricing

2    on this in the defendants' home states?

3       A     I haven't yet, but I know what lawyers

4    cost on average.

5       Q     But you have no frame of reference

6    factually you are just speculating?

7       A     I'm fairly certain that California lawyers

8    are not going to be cheaper than my lawyer.

9       Q     But the fact is you have no frame of

10   reference except for your own guess?

11      A     The frame of reference is the data that I

12   have available, which is what lawyers cost.

13      Q     So you haven't talked to a lawyer and

14   asked about contingency?

15      A     I have not.

16      Q     That would not cost you anything unless

17   you won?

18      A     Yes.  I don't know of anyone that would

19   think of doing that.

20      Q     Why not?

21      A     Why would they?

22      Q     Why do you think no lawyer would take it

23   on contingency?

24      A     I have no idea why lawyers would take a

25   case like this because -- well, I haven't asked

Page 117

 1   them.  I don't think it's the kind of thing they do.

 2       Q    **You have no frame of reference?**

 3       A    On that I do not know.

 4       Q    **Isn't most of this case built on that same**

 5   **kind of speculation?**

 6       A    No.

 7       Q    **You are not speculating that someone may**

 8   **have seen something on your Facebook page, for**

 9   **example?**

10       A    That's not speculation.  That's a

11   reasonable argument from facts.

12       Q    **You have no facts to say that?**

13       A    Facts to say what?

14       Q    **You have no direct evidence of anyone**

15   **having read any of this as far as your move to Ohio?**

16       A    You mean before --

17       Q    **You are only extrapolating from -- yes,**

18   **before the alleged defamation.**

19       A    You have to ask a more specific question.

20       Q    **Do you know what the word evidence means?**

21       A    Yeah.

22       Q    **You have direct evidence of something.**

23   **For example, if you had an IP address that hit your**

24   **blog, you would have direct evidence that somebody**

25   **at that IP address read your blog?**

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 118

 1      A     That's direct evidence.

 2      **Q     If you have what you are calling**

 3  **circumstantial evidence or speculation or a guess**

 4  **based on what you have, that is something different,**

 5  **right?**

 6      A     Indirect evidence is far better than

 7  speculation.

 8      **Q     When did you take evidence class in law**

 9  **school?**

10      A     I'm a philosopher.

11      **Q     Did you ever see the Mel Brooks movie**

12  **where the guy says what is your occupation?**

13      A     No.

14      **Q     He says I'm a philosopher.**

15          MR. RANDAZZA:  Have you seen it?

16          MR. PERRY:  Yeah, recently.

17  BY MR. RANDAZZA:

18      **Q     So you're a bullshit artist.  Mel Brooks**

19  **script is not an issue in this case, so we will not**

20  **introduce that.  I'm glad you took that in humor as**

21  **it was the intent.  You ended your affiliation with**

22  **Camp Quest in 2009; is that true?**

23      A     In 2009?

24      **Q     Do you have any affiliation with Camp**

25  **Quest now?**

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 119

     1      A     I never had any formal affiliation.  I

     2   don't know what you are quite asking about.

     3      **Q     You said before you never violated a**

     4   **Skepticon policy; is that true?**

     5      A     Yes.  I never violated Skepticon policy at

     6   Skepticon.

     7      **Q     You never violated the policy or you never**

     8   **violated it at Skepticon?**

     9      A     Their policy only applies at Skepticon.

    10      **Q     It was SSA where you violated policy?**

    11      A     Their fraternization policy, yes.

    12      **Q     You said your blog has over a hundred**

    13   **thousand readers?**

    14      A     Yes.

    15      **Q     Where are you getting that information**

    16   **from?**

    17      A     My statistics in my WordPress Jetpack.

    18      **Q     Is that individual unique hits?**

    19      A     Correct.

    20      **Q     So it's more hits than that.  It's a**

    21   **hundred thousand unique IP addresses?**

    22      A     I don't know.

    23      **Q     What is that a hundred thousand?  It's a**

    24   **hundred thousand what?**

    25      A     A hundred thousand unique visitors who

Page 120

1  have read articles on my website per month.

2      Q    So that's not counting any repeat visitors

3  or is that factoring in from multiple IP addresses?

4  How are they breaking that down to uniques?

5      A    I'm not sure.  I have to check the data

6  bank.

7      Q    So you don't know how many readers it is?

8      A    It has to be within that vicinity.

9      Q    Why?

10     A    It would be weird if thousands of people

11  were pinning the website multiple times.  If you do

12  the math, I'd still have to have 90,000 readers or

13  80,000 readers.

14     Q    Can you tell me the equation you are

15  forming in your head to do that math?

16     A    No.

17     Q    When you say do the math you immediately

18  put me off balance because I'm not a mathematician.

19     A    I'm trying to think in my head and it's

20  hard to do figures in my head.  For that I'd have to

21  look at how the statistics were being generated.

22  It's usual in the community to talk about how many

23  readers you have based on your unique visitors

24  count.

25     Q    Which community?

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 121

```
 1      A    The Internet.  The blogging community in
 2  general.
 3      Q    So the Earth?
 4      A    I guess.  Not everybody on the planet is a
 5  blogger.
 6      Q    But on the Internet?
 7      A    Correct.
 8      Q    We are talking about the majority of the
 9  planet.
10      A    I'm talking about the blogging community.
11  When bloggers, websites, corporations talk about
12  what their readership is, they are talking about
13  unique visitors.  It's a standard count.
14      Q    You haven't come up with that data, you're
15  interpreting something that WordPress gave you?
16      A    Yes, which is standard in the industry.
17      Q    You used to blog at Freethought blogs?
18      A    Yes.
19      Q    Part of the issue is they banned you?
20      A    Yes.
21      Q    Before when you posted there, how much
22  editorial control did they exercise over you?
23      A    Not a lot.  There were other bloggers that
24  they exhibited editorial control on.  They were
25  pretty lax.  You had to do something pretty
```

Page 122

1    egregious for them to exercise.

2        **Q      Tell me the process of posting an article**

3    **there.**

4        A     What do you --

5        **Q      First you open your computer and you log**

6    on to Freethoughtblogs.org?

7        A     Yes.

8        **Q      You put in your username and password?**

9        A     Yes.

10       **Q      What happens after you enter your username**

11   **and password?**

12       A     I can write an article and hit publish.

13       **Q      And then it goes to an editor to approve**

14   **or not approve it?**

15       A     No, it goes live and if there's any issues

16   with it Myers or someone at Freethought Blogs brings

17   up the issue on the back channel after the fact and

18   asks for a correction if need be or they take action

19   and ban you, which they have done before.

20       **Q      You publish it on your own.  It's like**

21   **automated, but then if somebody is mad at you, they**

22   **will yell at you?**

23       A     Yeah.  They will exercise control if an

24   issue is brought up.  I'm certain that if someone

25   defamed someone on Freethought Blogs, Freethought

Page 123

1    Blogs would shut them down and not support them and

2    got rid of their blog and apologized and so on.

3            MR. RANDAZZA:  No further questions.

4                  RECROSS-EXAMINATION

5    BY MR. PERRY:

6        **Q    You just described the editorial control,**

7    **the protocol when you compose and publish an article**

8    **on Freethought Blogs.  Are you familiar with that**

9    **same protocol on say the Orbit?**

10       A    I don't know directly, but I believe it's

11   the same process there.

12       **Q    Do you think the Orbit exercises any**

13   **editorial control over their contact providers?**

14       A    A part of the reason the Orbit was formed

15   was actually so that the people who owned the

16   different blogs would be more involved in that

17   process than was the case at Freethought Blogs.

18   Freethought Blogs had before me already kicked

19   bloggers off for misconduct.  Someone published

20   violent threats, so they eliminated him.  They

21   eliminated someone for plagiarism.  They posted

22   plagiarized text on the blog and they got rid of his

23   blog and issued basically a denunciation, so they

24   didn't affiliate themselves with them anymore.  Some

25   of the complaints of other people who joined the

Page 124

1   Orbit was that they wanted more collective control

2   over things like that.  I'm fairly certain that

3   Orbit would have done the same thing if someone was

4   caught plagiarizing there, for instance.

5        **Q    What is the managerial hierarchy at Orbit,**

6   **is it a coop?**

7        A    It's a coop, yeah.

8        **Q    Can you explain that?**

9        A    According to them they are a collective

10  that operates democratically.

11       **Q    So does that mean there is some senior**

12  **editor that can sensor somebody?**

13       A    From the way they described it, it's if

14  they democratically decide to sensor someone they

15  are acting collectively as the editor of the site.

16            MR. PERRY:  That's all the questions that

17  I have.

18            REDIRECT EXAMINATION (Continued)

19  BY MR. RANDAZZA:

20       **Q    Your statements about the Orbit, so they**

21  **can exercise control after it's published but not**

22  **before?**

23       A    As far as I know I don't actually know.

24       **Q    That's how it worked at Freethought Blogs?**

25       A    That's how it worked at Freethought Blogs.

Page 125

 1    I don't know how they are running it at Orbit, but

 2    from their behavior, I'm assuming it runs the same.

 3              MR. RANDAZZA:  That's it.

 4              MR. PERRY:  He will waive.

 5              COURT REPORTER:  Would you like a

 6    transcript?

 7              MR. RANDAZZA:  E-mail a dirty in advance

 8    and an e-tran.

 9              COURT REPORTER:  Do you want an e-tran?

10              MR. PERRY:  Send me a quote.

11              (Thereupon, the deposition was concluded

12    at 2:56 o'clock p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1   STATE OF OHIO          )

2   COUNTY OF MONTGOMERY )   SS:  CERTIFICATE

3           I, Wqueana N. George, a Notary Public

4   within and for the State of Ohio, duly commissioned

5   and qualified,

6           DO HEREBY CERTIFY that the above-named DR.

7   RICHARD CARRIER, was by me first duly sworn to

8   testify the truth, the whole truth and nothing but

9   the truth.

10          Said testimony was reduced to writing by

11  me stenographically in the presence of the witness

12  and thereafter reduced to typewriting.

13          I FURTHER CERTIFY that I am not a relative

14  or Attorney of either party, in any manner

15  interested in the event of this action, nor am I, or

16  the court reporting firm with which I am affiliated,

17  under a contract as defined in Civil Rule 28(D).

18

19

20

21

22

23

24

25

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 127

1            IN WITNESS WHEREOF, I have hereunto set my

2    hand and seal of office at Dayton, Ohio, on this 6th

3    day of February, 2018.

4

5

6

7    _____

8    WQUEANA N. GEORGE
     NOTARY PUBLIC, STATE OF OHIO
9    My commission expires 03-05-2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.         Dr. Richard Carrier

Page 1

**A**

**a.m** 1:19
**abandon** 115:12,19
**ability** 31:12 35:3
**able** 5:12 32:7 35:9
  49:14,18 55:15
  107:25 109:25
  115:21
**above-named** 126:6
**absolutely** 23:8
  67:16 105:5
**academia** 9:21
**academic** 8:5,8
**academically** 13:14
**access** 30:20 31:4
  34:17 55:14
  103:22
**accomplishments**
  23:14
**account** 52:24,25
  53:15,16,22,25,25
  54:3,10 55:5
  95:13
**accountant** 29:7
**accounts** 53:3 55:14
**accuracy** 23:3
**accurate** 64:5,24
  98:16
**accusations** 40:4,9
  90:8 91:10 99:20
**accuse** 99:23 100:14
**accused** 77:22 98:24
  99:24 112:7
**accusing** 35:17
  42:19,20 80:16
  95:25
**acknowledge** 44:3
**acknowledging** 44:1
**acting** 100:23
  124:15
**action** 122:18
  126:15
**activist** 89:16
**activities** 37:4
**actual** 39:16
**ad** 8:1 40:13
**add** 65:4
**address** 32:1,6,13
  32:16,21 51:3
  52:18,20 53:8,8
  66:6 113:22
  117:23,25
**addresses** 30:25
  31:9,25 51:8
  52:23,25 53:6
  119:21 120:3

**adjust** 64:12
**admired** 104:19
**admit** 17:10 42:23
**admitted** 92:11
  110:15
**advance** 79:21 80:7
  125:7
**advances** 36:16,18
  41:10
**advice** 82:8
**advise** 93:1
**aesthetic** 45:7
**affidavit** 82:23 83:4
**affiliate** 67:10 68:22
  69:11 70:21,25
  72:15 123:24
**affiliated** 74:3 105:1
  106:15 109:14,16
  126:16
**affiliates** 66:16,18
  66:23 70:2 72:13
  72:24 75:8,10,11
  91:16
**affiliation** 74:6
  105:8 106:22
  107:1 109:9
  118:21,24 119:1
**afford** 20:3 115:21
**aforementioned**
  79:24
**age** 4:2
**ageism** 96:2
**ago** 10:14 11:16
  26:7 55:20 88:20
**agree** 24:14
**agreed** 18:21 87:18
  95:12
**agreeing** 82:2
**agreement** 44:21
  65:18 71:13,15
**ahead** 43:2 63:4
  97:4 108:13
**air** 36:2
**Alabama** 22:23
**alcohol** 83:7
**alimony** 29:14
**allegations** 99:14,17
**allege** 23:12 114:23
**alleged** 24:15 26:3
  87:5 100:8 101:9
  101:18 106:20
  117:18
**allegedly** 87:1 96:17
**alleges** 101:15
**Alliance** 41:24 66:2
  66:11,21 67:1,6,9
  84:22,25 85:1

103:15 105:2
  109:9 111:2
**allow** 16:5
**allowable** 29:9
**allowing** 40:17
**altered** 25:5 64:25
  65:9
**alumni** 53:9,12
**Amanda** 58:19 73:8
  73:16,18 84:15,19
**Amanda's** 74:2
  84:17
**America** 21:24
  103:15
**American** 103:11
**amicably** 18:3
**amorous** 17:20
**amount** 95:14
**amounts** 25:14
**Amy** 1:9 14:6,21
  35:12 40:4 46:7
  76:20,25 78:2
  81:11 83:10,13,14
  85:11 86:1,7,14
  86:15,18 90:8
  91:10 94:3,4
  105:24 114:13
**analysis** 45:8
**analytics** 30:17,19
  30:22 31:13,16,19
  33:5 62:25
**analyze** 35:3
**Ancestry.com** 62:12
**Anchorage** 33:3,6
**ancient** 6:14,15
**and/or** 109:10
**announce** 82:5
**announced** 30:10
  47:23
**announcement**
  46:22 48:2,12,15
  110:23
**announcements**
  46:16,20,25
  110:17,19,22
**announcing** 34:18
**answer** 4:22 28:10
  28:19,24,25 29:20
  37:7 59:5 61:23
  69:25 70:4 71:20
  77:14 88:11
  105:20
**anxiety** 17:8 112:22
  113:7,8
**anybody** 18:8 60:6
  75:11 86:23 89:18
**anymore** 17:14,25

30:21 59:21 75:22
  123:24
**anyway** 36:19 70:13
  72:5
**apart** 9:25
**apathetic** 22:5
**apologize** 42:23
  102:13
**apologized** 45:17
  123:2
**apologizing** 97:2
**Apostacon** 103:14
**appear** 95:9
**APPEARANCES**
  3:1
**appears** 95:18
**Apple** 53:18,25 54:6
**Apple's** 52:17
**applied** 42:3
**applies** 119:9
**apply** 68:25
**approach** 33:13
  69:1,2
**approve** 122:13,14
**approximate** 102:12
**approximately**
  104:8
**archive** 61:11,17,18
  61:21,25
**archived** 61:14
**arduous** 95:1
**area** 7:19 22:12
**areas** 22:10 24:23
  24:25
**argument** 117:11
**arguments** 36:8
  110:10
**Arizona** 14:7,8
**Arkansas** 22:22,25
**arranged** 72:12
  73:21 76:1
**arranging** 72:20
**article** 8:14 9:20
  35:13 57:7,8 61:2
  89:23 90:2,7 91:9
  91:11 98:20 102:8
  122:2,12 123:7
**articles** 9:4 96:18
  120:1
**artist** 20:4 118:18
**arts** 6:10,13
**Aside** 11:13
**asked** 5:11 8:22
  11:4 29:23 59:2
  69:10,17,18 81:11
  85:6 94:13 104:23
  116:1,14,25

**asking** 5:24 32:2
  33:19 52:21 69:4
  78:17 79:11,16
  82:8 102:21 119:2
**asks** 122:18
**assault** 77:23 78:8
  78:11 99:14,25
**assigned** 56:3
**associate** 111:12
**associated** 30:12
**association** 53:9,12
**assume** 14:8 44:1
  66:24
**assumed** 14:4,7
**assumes** 50:13
**assuming** 50:24
  125:2
**Atheist** 103:11,15
**ATM** 94:18
**atmosphere** 74:13
**attached** 88:25
  91:14
**attempted** 32:15
**attempts** 32:22
**attend** 40:18,19
  68:19 72:24 80:23
  81:1 103:23
**attendances** 103:16
**attended** 16:15,16
  74:15
**attendees** 16:7
  103:18,19,25
**attending** 76:13
  110:18
**Attitudes** 7:24
**attorney** 3:4 28:10
  28:18,21 77:14
  126:14
**attorney's** 20:25
**attorney/client** 28:9
  88:7
**Attorneys** 3:10
**attractive** 24:8
**audience** 30:13
  103:21,21
**audiences** 103:10
**August** 74:22 84:20
  84:21
**Austin** 16:25 17:2
**authenticated** 65:20
**authentication** 54:9
**automated** 122:21
**availability** 33:1
**available** 47:9 54:15
  116:12
**average** 63:21
  104:11 116:4

Case: 2:16-cv-00906-MHW-EPD Doc #: 41 Filed: 05/30/18 Page: 129 of 141 PAGEID #: 701

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 2

avoid 86:17
aware 35:5,7 59:15
  86:1 93:10 105:8
  105:15 106:22
awhile 7:11 17:13

_____

**B**

B 18:23,24 19:1
bachelor 6:10
back 6:2 15:18
  29:20 30:18 31:6
  31:14 33:4 35:24
  42:10 47:12 52:24
  55:15 63:18,19
  65:21 75:23 89:23
  96:4 122:17
balance 120:18
ban 40:17 122:19
bang 89:23
Banged 89:24
bangs 88:15,17
bank 94:19 95:10
  120:6
banned 42:7,9 68:4
  68:6 121:19
banning 58:7
base 96:15
based 21:22 66:15
  68:18 110:9 118:4
  120:23
basically 8:23 17:11
  17:16 26:10 38:4
  38:5,7 73:1
  109:12 123:23
basis 29:5
Bay 7:19
BC 8:1
becoming 8:20
bed 11:6 15:19
beginning 26:20
  91:12
behalf 3:2,7 100:23
behavior 69:22,23
  71:4,4 78:18
  125:2
beleaguered 21:25
belief 93:16
believe 9:15 11:10
  56:10 59:1,17
  64:8 65:9 98:23
  123:10
believed 59:22
  60:12 97:7
benchmark 25:4
Berkeley 6:10
best 19:6 25:4
better 6:7 15:9

20:19,22 87:19
  118:6
bewildered 36:15
beyond 10:18 69:8
big 5:12 24:7 33:4
  102:22 112:15
bigger 20:11
Billings 34:3
bit 45:4 48:3 85:13
  114:15
black 36:5
block 32:17
blocked 31:4
blog 30:8,8,16,17
  31:2,5,7,8,12 32:7
  32:11 34:15,17
  35:2,13 42:18
  43:19 45:24 60:24
  63:15 78:6 84:7
  102:17 104:5
  117:24,25 119:12
  121:17 123:2,22
  123:23
blogged 30:7
blogger 11:20,23
  89:16 121:5
bloggers 121:11,23
  123:19
blogging 121:1,10
blogs 11:21 30:19
  31:4,11 34:23
  39:18 40:7,11,13
  42:8,10 63:12
  92:15,19,20 104:2
  105:21 109:3
  121:17 122:16,25
  123:1,8,16,17,18
  124:24,25
Blogs' 96:24
blue 79:20 80:6
board 91:17 112:16
bologna 4:12
book 40:23 108:3
books 8:5,9 9:4 24:8
  107:23 108:1
Boot 7:10
Boston 22:8,9,9,11
  22:15
bought 76:11
bound 24:7
boycott 109:19,21
  110:24
boycotted 109:18
brackets 64:21
branch 6:22
breach 114:23
break 17:5 23:7

24:22 60:18 91:24
breakfast 6:5
breaking 120:4
brief 23:6 84:5
briefly 107:15
briefs 96:14
bring 79:19 80:5
  81:2,3
bringing 26:12 83:6
brings 122:16
Brooks 118:11,18
brought 62:8 83:7
  122:24
browser 50:23
  54:24 56:3,20,21
browsers 50:25
Brunsman 74:22
  84:20
build 108:6 112:12
building 107:17,18
built 117:4
bullshit 118:18
bunch 72:12
burden 115:6,8
bureau 41:24 42:3,5
  42:6 87:5,9,16,17
  96:7
bureaus 91:18
Burgundy 24:6
business 20:8 25:6
  25:10,20 26:5,9
  26:12,19,20 28:4
  28:14 29:6,9 31:9
  69:4 88:1 102:10
  104:25 107:16,18
  107:21,24 111:3,4
  111:15

_____

**C**

C 3:10
cache 56:4
Cahill 3:10
calendar 54:6,6
calendaring 54:4,5
California 7:19
  19:12,13,17,18,20
  20:3,13,19,25
  21:19 22:4,6 25:9
  25:9,10 26:4 28:1
  38:13,18,23 39:1
  39:2,14 87:23
  88:2,4,8 97:3,8
  116:7
call 7:3 13:19 35:13
  70:15 85:24 92:13
  96:10,19 109:19
called 1:13 7:4 61:2

89:12,13 96:21,22
  96:23,24 102:8
  109:21 110:24
calling 89:10 97:3
  118:2
camp 7:10 38:1,1,2
  38:3,5,12,12,15
  38:19,22 46:21
  74:4 84:8,13
  91:16 94:7,8
  106:16,22 107:1
  107:11 109:10,14
  109:15 111:1,7,12
  118:22,24
Campbell 1:17 3:3
camps 38:4,6,11
campuses 66:17
canceled 111:6,11
Cape 7:10,11
Capitan 3:11
capture 57:16
card 24:13 55:14
  94:15,19 95:10
care 26:11,17 42:22
career 13:2 23:14
carefully 29:8
Carrier 1:5,12 4:1,7
  23:15 46:12 47:19
  48:17 49:14,21,22
  49:23,25 50:11
  62:15 126:7
Carrier's 49:8
Carriers 62:2,10
case 1:6 11:25 14:1
  15:1,3 20:24
  27:17 69:3 85:5
  88:9 97:25 99:1
  101:11 108:2
  112:21 113:9
  116:25 117:4
  118:19 123:17
cash 94:17
Catalina 38:25
category 81:23
caught 124:4
cause 74:14
cautioned 4:3
cease 113:14,17
  114:2,12,15,19
cell 54:12 96:16
CEO 92:14,19,20
certain 33:17 59:20
  98:5 116:7 122:24
  124:2
certainly 10:10 46:8
  46:9 93:20 97:9
  104:5

CERTIFICATE
  126:2
certified 4:3
CERTIFY 126:6,13
cetera 74:20
chance 9:6
change 12:14 82:12
changed 16:4,9
channel 122:17
chapter 71:21
chapters 66:12
  71:17 75:8
charge 21:4 95:21
charges 94:24
chatting 45:2
cheaper 116:8
cheating 17:7
check 12:16 57:18
  61:15 70:12 120:5
checkable 61:10
checked 32:4,24
  61:16 62:8
checking 99:2
children 109:13
  112:9
choose 80:21
chose 40:12
Christian 38:5
Christina 103:18
circumstances
  69:10
circumstantial
  118:3
cities 20:10
city 33:17 38:18
Civil 1:14 126:17
civilizations 6:11
claim 115:12
claimed 99:20 101:6
  101:8
claiming 28:14
claims 25:21 42:24
  96:25 101:17
  115:19
clarification 72:18
clarify 108:14
class 7:6 118:8
classical 6:11
cleaning 26:16
clear 5:14 31:5
  36:19 37:3,18
  42:11,14 55:24
  56:3 60:11 73:4
  74:18 79:17
  109:23
clearances 7:12
cleared 56:20,21,24

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

**clearly** 42:12 111:21
**clicking** 50:10,16
**clients'** 25:5,21 26:2
  68:16
**Clintonian** 15:4
**close** 4:18 11:4
  54:23 57:3 59:15
**closed** 11:1
**closely** 110:19
**club** 70:25
**clubs** 71:13
**coast** 6:23 7:19
  20:20
**code** 15:23 51:12
**coitus** 16:21
**collapsed** 8:17
**colleagues** 60:16
**collect** 53:12,24
**collective** 124:1,9
**collectively** 124:15
**college** 6:20 7:7,8,14
  66:17 85:8
**Columbia** 6:13
  53:10,11,11
**Columbus** 12:6 20:1
  53:9,10 58:9,11
  58:12 66:6,7,16
  72:11 73:24
**come** 5:13 22:11
  37:20 68:20 69:5
  69:12 72:23 81:5
  93:18 106:4
  112:13 121:14
**comes** 32:25 34:20
  35:1
**coming** 21:11 34:11
  69:4 72:13 73:24
**comment** 64:20
**commented** 57:11
**comments** 57:8
**commission** 127:9
**commissioned** 126:4
**committing** 27:3
**common** 30:1 44:20
  106:10 107:11,13
**communicate** 71:18
**communicated**
  11:24 60:14 73:7
  73:17
**communication**
  17:17
**communications**
  70:20,21,22 71:3
  75:24 82:3
**communities** 22:14
**community** 30:9,12
  30:15 60:15 75:13

75:15 89:17
  102:14 103:5
  104:4,6,7,10,17
  106:4 120:22,25
  121:1,10
**commuting** 26:3
**company** 92:21,21
**comparable** 103:12
**compare** 49:23
  69:22 71:3
**comparison** 49:15
**competent** 93:1
**complain** 19:7
**complained** 84:25
  85:3,14 86:14,20
  89:18 90:4,12
**complaining** 86:22
**complaint** 23:12,13
  24:16 40:2 57:8
  82:24 83:5 88:25
  89:22
**complaints** 123:25
**completely** 36:15
  69:8
**complied** 86:25
**compose** 123:7
**computer** 55:1,10
  55:13 61:22,25
  122:5
**concerned** 51:24
  56:13,16
**concerning** 25:19
**concerns** 90:1
**concluded** 125:11
**conclusion** 9:5
**conditions** 4:21
**conduct** 15:23 19:7
  89:19 100:8,11
  112:21
**CONDUCTED** 2:1
**conducting** 26:9
**conference** 16:25
  17:2 24:5 72:11
  72:16,23,25 73:5
  73:25 74:15 76:7
  76:10 104:20,20
**conferences** 78:19
  78:23 103:11,17
  103:19 104:21
**confessed** 17:24
**confirm** 70:17 83:3
**confirmed** 57:21
**conflict** 37:21
**confusing** 36:21
**connected** 53:15
**consensual** 16:5
  36:4

**consider** 33:16
  51:14 56:2 92:19
  96:1 103:21
**considered** 35:14
**constant** 113:9
**constantly** 110:16
**construct** 34:7
**consult** 28:13,18
  29:3 88:8
**consulting** 26:7
**contact** 45:21 70:23
  91:7 100:24 101:2
  101:23 102:2
  123:13
**contacted** 85:1
  86:13 98:23
**contain** 77:11
**content** 40:13
**context** 79:16
**contingency** 116:14
  116:23
**continued** 19:2
  45:12 124:18
**contract** 112:12
  114:24 126:17
**contractors** 71:10
**control** 42:10,18
  121:22,24 122:23
  123:6,13 124:1,21
**conventions** 103:2,5
  103:8,23,24
**conversation** 42:15
  45:18 73:13,14
  78:22 79:1,5,9,18
  80:3,4,20 81:5
  82:11,22 83:3,8
  83:15,20,25 86:21
  92:16 97:1,2,11
  102:9
**conversations** 21:23
  75:1 113:2
**conversing** 45:11
**cook** 26:14
**cookie** 61:21
**cookies** 55:9,15,25
**cool** 17:13
**coop** 124:6,7
**copy** 64:1,5,7,24
  114:12,19
**corporations** 121:11
**correct** 5:5 15:2
  16:10 27:19 28:5
  36:7 48:1 58:5
  62:1 75:9 84:9,14
  87:3 89:25 91:19
  91:21 93:7,15,23
  97:11 114:5

119:19 121:7
**correction** 122:18
**correctly** 67:21
**cost** 20:15,18 95:1
  116:4,12,16
**counsel** 92:24 93:5
**count** 15:7 62:11
  69:3 113:22
  120:24 121:13
**counting** 120:2
**country** 20:20 47:1
  66:13
**counts** 68:23
**COUNTY** 126:2
**couple** 99:10
**course** 29:22 30:18
  82:11
**courses** 15:14,14,15
**court** 1:1 93:18
  125:5,9 126:16
**cover** 98:14 114:18
**covered** 99:3
**CPA** 29:3
**crashes** 55:12
**create** 25:1
**created** 23:18 34:16
**credit** 55:14 94:15
  94:17,18,19 95:10
**credits** 6:20
**creepy** 78:6,13,19
  79:1,3,14 80:1,17
**crime** 5:1
**cross** 98:3
**CROSS-EXAMI...**
  98:10
**cultivate** 76:10
**current** 34:15 69:23
  71:4
**cut** 17:16
**cutter** 7:18

**D**
**Dadabhoy** 89:3,16
**damaging** 100:15
  107:15
**dashboard** 31:19
**data** 31:22 34:13,17
  35:4 61:24 68:18
  116:11 120:5
  121:14
**date** 19:22 37:19,20
  38:17 64:5,6,9,9
  65:20 81:11 93:22
  113:2,3
**dates** 94:23
**dating** 37:2,5,8,11
  37:12,14,15 58:23

59:19 84:12
**day** 34:2 40:8 59:3,5
  63:20 94:21 127:3
**Dayton** 127:2
**deal** 11:1,4 24:7
  33:4 74:14 82:10
  112:4,11,16 113:1
**decade** 23:15
**decide** 87:14 124:14
**decided** 8:23 18:1
  40:7 87:14,15
**decree** 88:5
**deductible** 29:6
**deducting** 28:3
**deductions** 29:9
**deeper** 50:15
**defamation** 25:5
  26:3 29:8 70:3
  75:25 76:17,19
  94:7 111:22
  112:14,25 117:18
**defamatory** 34:16
  35:15 77:12 87:2
  87:6 96:17
**defame** 93:18
**defamed** 73:2
  122:25
**defend** 42:16,21,25
**defendant** 65:21
**defendants** 1:10,13
  3:7 13:16 14:25
  15:3 39:24 46:2
  91:25 92:7 102:4
  105:7,18 106:21
  106:25 107:5
  108:15,21 109:6,8
  113:14,17 114:7
  114:11
**defendants'** 99:11
  99:14,16 105:6
  108:9 111:14,23
  112:20 116:2
**defense** 95:12,14
  113:10
**define** 30:5
**defined** 126:17
**definitely** 27:9
  32:18 36:3 37:10
  97:7
**definition** 15:5
**degrees** 6:12
**delete** 55:9
**deleted** 30:20
**delivered** 27:8
**demand** 20:12
  21:17 24:24 93:11
**demanded** 114:5

democratically 124:10,14
demonstrated 47:21
demonstrating 48:13
denunciation 123:23
departmental 9:23
departments 8:19
depend 101:10
depending 70:22
deponent 18:19
deposing 37:16
deposition 1:12 4:14 5:18 29:23 40:5 65:3 98:7 125:11
depositions 15:12
Descending 78:12
describe 29:23 43:10 44:25 101:7 104:16
described 51:21 78:18 123:6 124:13
deserve 59:15
desire 56:22
desist 93:8 97:13 113:15,18 114:2 114:12,16,19
destruction 56:9
detail 43:23
details 71:15
develop 25:10 40:14 73:1
developing 26:5 107:21 111:4,19
development 111:16
device 33:14
devoted 104:6,13
diagram 37:14,19
die 56:4
died 62:18
Diego 7:13
difference 20:21 49:3 50:18 64:22 69:23
different 16:23 20:23 24:23 32:23 36:22 37:8 48:16 50:25 51:1 54:5 67:8 118:4 123:16
differential 21:5
difficult 22:24 23:2 29:24,25 31:8 68:16 82:9 112:17 112:25 113:2 115:24

difficulty 82:1
dig 32:24
dignity 15:13
dinner 26:14
direct 1:14 4:5 25:20 52:25 117:14,22,24 118:1
directed 83:10
directly 61:17 108:20 109:6 123:10
director 74:20 84:13 84:21
directors 91:17 112:16
dirty 125:7
disagree 80:18
disapprove 37:4,5
discharge 7:1
disclose 56:15
disclosures 77:16
discovered 49:13
discovery 27:7 46:10 49:10 92:12 94:13 95:8 107:20
discuss 59:16 96:24 108:14 109:5
discussed 40:5 82:23 83:11 88:21 95:24 97:15 99:12 102:9 108:12 114:14
discussing 83:9 88:15
discussion 18:15,18 18:22 23:9 44:14 44:17 65:15,23 84:3 89:8 90:22 95:5,8
discussions 79:7
disinvited 112:15
dislike 56:9
dismantled 109:23
dispute 36:11 95:8
dissertation 8:2
DISTRICT 1:1,2
DIVISION 1:3
divorce 18:1 87:25 88:2,3
divorced 18:3
document 63:23 79:24 91:14
documentation 12:24
documents 13:2 25:15 28:5 29:8

46:10 107:20
doing 5:15 6:7 7:12 17:9,23 32:14 34:9 48:6,7 51:2 60:17 79:25 116:19
domestic 26:11
domicile 27:23
donors 13:12
double 112:11 114:9 114:10
downed 114:10
Dr 1:5,12 4:1,7 23:15 126:6
draws 103:10
drill 32:20
Drive 1:18 3:5
driving 20:11 51:15
drugs 5:21
Dublin 1:18 3:6
due 87:18
duly 4:3 126:4,7
duties 26:15

**E**

E-4 7:6
e-mail 52:16,18,20 52:23,25 53:2,5 53:12,14 70:19 82:4 89:1,4,5 125:7
e-mails 52:25 70:7 70:10,12 89:21
e-tran 125:8,9
earlier 40:5 43:25 45:23 85:5 97:1 99:12 104:23 108:12 110:11
early 8:1,7 17:4 97:3
earn 102:14
earned 40:22
earth 86:22 121:3
easier 25:10 43:18 65:2
easily 86:24
east 20:20,20
EASTERN 1:3
easy 37:17
ECF 64:2
economy 8:17
ecosystem 102:14
edge 112:11
edited 61:6 64:8
editor 122:13 124:12,15
editorial 121:22,24

123:6,13
edits 64:18
education 6:9
effect 49:3 83:7
effects 112:8
egregious 122:1
either 18:4 28:2 76:25 87:11 91:16 105:13 111:5 126:14
El 3:11
electronics 7:15
eliminated 123:20 123:21
else's 52:5 56:13 80:14
embarrassing 60:4 85:14
emotionally 112:21
Empire 8:1
employed 84:8
employee 84:11 91:15
employees 71:6,7
enabled 54:10
encounter 97:25
endeavor 95:14
ended 118:21
engage 72:14 80:20
engaged 16:21
engagement 47:2
engagements 37:24 46:13,14 72:7
engine 63:13
engineering 7:15
England 52:14
enjoy 65:22
enjoying 83:15
Enjoys 89:24
enter 61:16 71:13 122:10
entered 88:5 96:14
entering 65:2
enthusiastically 11:8 69:6
entire 56:3 109:22
entirely 37:15 67:21 83:9
entry 9:23
equally 29:25
equation 120:14
equivalent 7:5 78:14,15
error 64:15
errors 41:12
especially 110:21 112:5

essentially 11:5 31:7 72:25 75:17 89:10 91:24 96:6 109:12
established 43:4,8
estimate 5:11,13 23:5 47:4
et 74:20
ethical 33:24 51:9 51:11,11,15
ethically 17:20 33:20
ethics 33:22 51:12 51:25
event 40:23 41:9,9 45:2 67:9 85:7,21 85:23 86:2 98:25 99:3 105:25 110:22,23 126:15
events 22:7 42:5 46:21,21,23 47:20 68:10,22 79:10 83:1 86:3 94:4 97:15,17 101:3 105:14 108:6,7 110:17 112:10
eventually 10:24 11:5 17:23 18:2 27:9 87:15
everybody 74:13 83:5 93:17 121:4
evidence 46:1,5 47:12,14,16 77:1 117:14,20,22,24 118:1,3,6,8
ex 29:14
exact 12:13 38:20 41:14 53:7 62:11 68:23 76:7 86:11 86:12
exactly 11:25 19:15 37:17 57:23 61:7 62:6 69:15 75:2 80:20 110:25
examination 1:14 4:5 115:17 124:18
EXAMINATIONS 2:1
examined 4:4
example 5:18 14:12 20:17,24 46:21 53:7 97:19 102:17 117:9,23
exception 102:7
exchange 89:5
excited 22:1,2
executive 84:12,21
exercise 121:22

Case: 2:16-cv-00906-MHW-EPD Doc #: 41 Filed: 05/30/18 Page: 132 of 141 PAGEID #: 704

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 5

122:1,23 124:21
exercises 123:12
exhibit 64:2,23 65:3
  79:24 89:1
exhibited 121:24
exhibits 65:8,19
existed 9:2,7
existence 49:7
existent 21:5
expect 5:3 92:25
expectances 104:25
expense 28:4,15
  108:5
expenses 20:7,21
  27:16 28:3,14
  29:6
expensive 115:24
experience 69:7
experiment 111:8
expires 127:9
explain 23:3 50:5
  98:15 107:15
  112:20 124:8
explained 97:12
exposing 103:25
express 90:1
extent 94:22
extraordinarily
  115:23
Extraordinary
  112:22
extrapolating 77:2
  91:25 117:17
extreme 4:21

            F

F 44:20,24 85:16
  97:25
Facebook 30:10
  35:3 45:24 46:2,3
  46:7,12 47:17
  48:8,20 57:22
  70:17 92:2 94:5
  110:16 117:8
fact 28:23 44:19
  47:6,24 49:9 52:1
  68:17 71:12 91:24
  94:5,8 99:1 116:9
  122:17
factoring 120:3
facts 47:9 98:17
  117:11,12,13
factual 98:6 99:6,9
factually 35:20
  98:15 116:6
failed 110:20
fair 31:6 39:20

42:12
fairly 69:3 107:13
  116:7 124:2
fallacy 48:3
falling 60:6 85:19
falls 29:9
false 40:10 42:24
  100:15 102:5
  105:6
falsehood 5:1
falsified 64:1
familiar 31:23 123:8
famous 23:21 24:9
  29:24
fan 76:18
fans 8:21,22
far 16:8 34:19 39:3
  43:3 93:24,25
  117:15 118:6
  124:23
fascinated 45:9
fascinating 45:6
fascination 41:11
fashion 64:17
February 127:3
federal 25:17
federally 27:16
feel 60:20 95:21
  112:23
fees 20:25 108:1
fellow 11:20
feminism 112:6
fewer 50:16
fields 6:19
fight 41:23 112:15
  113:9
fighting 27:16
figure 24:14 94:23
  106:3
figures 120:20
file 27:12,14 28:1
  63:23
filed 27:25 63:24
  65:19 92:12 96:14
filing 88:9
final 88:5
financial 107:19
  115:5,8
financials 102:18
find 13:3,7 24:8,24
  31:12 47:7 49:25
  62:5,6 71:19
  113:5
fine 60:22 65:5
finished 8:15 10:5
Firefox 50:24
firm 126:16

first 4:2 9:11,18
  11:17 37:21 44:6
  44:8,9,25 45:1,3
  56:8 76:21 86:13
  102:8 105:19
  108:4 112:24
  122:5 126:7
five 55:16
fixed 21:12,13
flirtation 10:18
  41:11
flirtatious 10:16
  19:2
flirted 36:24
Florida 22:21,22
  25:13 38:9
focus 21:11
focused 66:14
follows 4:4
footnotes 8:8
footprint 102:22
forced 31:7
foresee 95:17
Forest 82:19
form 8:4 28:16,22
  29:5 70:20 79:20
  80:6 88:10 102:16
  103:6 104:18
  106:13
formal 62:24 63:1,5
  63:6,11 119:1
formality 64:2
formally 77:22,25
formed 123:14
forming 120:15
Formulate 78:16
forward 42:12
forwarded 53:18
forwards 53:2
found 86:14
Foundation 104:14
  110:8
four 55:16,20 76:6
fraction 103:22
frame 116:5,9,11
  117:2
Frank 1:9 46:7
  76:25 78:2 83:10
  83:13,14 90:8
  91:10 94:4 105:24
  114:13
Frank's 40:4 76:20
  109:11
Frank-Skiba 14:6
  94:3 100:2 107:4
Frank-Skiba's
  99:19

frankly 13:6
fraternization 42:2
  87:13,18,21 96:6
  99:4 119:11
freaking 17:12
free 40:13,22 95:22
Freethought 11:21
  30:19 31:4,11
  34:23 39:18 40:7
  40:11,12 42:8,10
  92:15,19,20 96:24
  104:2 105:21
  121:17 122:16,25
  122:25 123:8,17
  123:18 124:24,25
FREETHOUGH...
  1:7
Freethoughtblogs....
  122:6
freeze 8:18
frequently 68:22
friend 58:2
friendly 10:16 19:2
friends 59:9,20,21
  60:10,16 91:4
  108:16
friendships 59:24
front 63:18
fuck 75:17 89:11
fucking 37:8,10,15
fulfilling 27:6
full 4:11 88:1
full-time 26:10
full-timed 26:19
function 32:23
  61:19
functional 56:22
fund 8:24
funding 115:24
fundraisers 13:13
funny 21:1 36:20
further 18:21 19:4
  50:15 123:3
  126:13
future 82:15 112:18

            G

gang 88:15,17 89:23
  89:24
garnered 57:8
gas 112:23
gender 26:13
general 8:5 40:3
  121:2
generally 56:8 81:4
  94:17
generated 49:16

120:21
genre 40:3
geographic 24:23
geography 21:16
George 1:15 126:3
  127:8
getting 56:17 71:2
  89:24 107:25
  119:15
ghost 70:4
gigs 68:21 72:14
  108:3 111:19
girl 24:5 33:3 80:15
girlfriends 20:9
  58:12 59:9
give 5:10,17 9:24
  37:18 40:3 42:22
  50:7 53:5 85:22
given 44:19 47:9
  54:1 68:24 94:21
  107:20
glad 118:20
Gmail 53:16
Gmails 53:18
go 13:3 15:18 18:14
  20:6 29:20 33:4
  39:7 43:2 44:13
  49:24 51:4,13
  61:10 63:4 65:14
  65:21 68:25 69:5
  72:10,19 74:15
  79:12 85:23 86:3
  92:10 98:6 103:24
  104:1
God 88:17 89:24
goes 10:2 33:3
  122:13,15
going 4:7 5:3 10:4
  14:10 23:2 31:5
  42:11,21,25 43:1
  50:8 63:22 72:13
  75:19 76:13,14,16
  86:7,20 94:14
  95:1 98:12 103:13
  113:6 116:8
good 5:17 6:3 22:6
  22:22 25:7 52:11
  56:2 70:16 91:4
  102:19
Google 13:6 31:10
  31:19 48:23 49:2
  50:4,4,6 54:5,10
  54:19 55:5 62:24
  63:5
Googled 62:21
Googling 49:1
Gosh 11:16

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

**gotcha** 15:6 59:5
**graduate** 6:12
**grant** 8:23
**great** 37:16 74:14
**Greco-Roman** 6:17
**Greta** 108:17
**ground** 22:18
**group** 3:8 83:3 85:8
 108:16
**groups** 21:24 69:5
 75:13,15,17
**growing** 30:13
**Guam** 58:4
**Guard** 6:23 7:19
**guess** 5:11 23:5,21
 23:25 36:24 47:4
 68:17 82:7 116:10
 118:3 121:4
**guy** 49:16 118:12
**guys** 41:20

**H**

**H** 7:24
**habit** 64:12
**hack** 32:15,22
**hacking** 56:18
**half** 68:15 69:9
 108:4,7
**Hall** 12:6
**hand** 4:11 127:2
**handful** 76:4
**Handies** 15:7,9
**handle** 98:8
**hang** 37:20
**hanging** 58:12 98:5
**happen** 5:4 73:3
 112:13
**happened** 18:5 36:5
 40:8 55:12,16,19
 81:7,9,20,24
 97:10
**happening** 52:7,9
 69:19 108:11
**happens** 69:18 71:5
 122:10
**happy** 22:17
**harasser** 112:4
**harassing** 35:17
**harassment** 40:10
 78:3,12 97:21,23
 99:17,24 100:13
 100:16
**hard** 113:2 120:20
**harm** 52:3 56:15
**Harriet** 26:13
**hate** 113:6
**Hawkins** 83:4

**head** 12:16 120:15
 120:19,20
**headquarters** 66:1
 66:22 69:11
**healthy** 6:5
**heard** 24:6 101:17
**hearing** 22:1
**Heina** 89:3,15,16
**held** 11:4 103:2
**helped** 76:25
**helpful** 41:19
**hereinafter** 4:3
**hereunto** 127:1
**hey** 28:11 33:19
**hide** 56:12,13
**hierarchy** 124:5
**high** 51:25
**higher** 21:17
**highlight** 95:22
**highly** 21:15 56:11
**hire** 22:3 37:19
 112:10,18
**hired** 107:22
**hires** 8:18
**hiring** 111:22
**historian** 56:9
**historicity** 8:25 9:1
**history** 6:11,14,15
 6:17 56:20,21,23
**hit** 76:18,22 117:23
 122:12
**hits** 30:15 32:1 50:6
 119:18,20
**hitting** 24:5 96:1,5
**hob** 72:25 76:9
**hold** 63:1 72:17
**hole** 85:20
**home** 26:12,14 33:3
 111:18 116:2
**homemaker** 26:10
**honestly** 54:25
 55:19 56:25
**Honorable** 7:2
**hoping** 72:18
**hopped** 15:19
**hot** 33:3
**hotel** 12:15
**hour** 21:2,4 45:13
 97:5
**hours** 45:13 97:4,5
**house** 26:15 82:19
**huge** 40:25 81:23
**humanities** 8:18
**humor** 118:20
**hundred** 30:9,23
 37:3 47:11 102:18
 102:25 119:12,21

 119:23,24,25
**hunger** 60:17
**hunting** 22:18
**husband** 82:2
**Hyatt** 80:14
**hypocrite** 112:8

**I**

**iCloud** 52:24 53:15
**iCloud.com** 53:25
**idea** 8:20 11:12
 33:10 41:21 56:7
 71:11 86:21
 116:24
**ideas** 45:7
**identified** 44:18
**ignominy** 109:16
**image** 23:18
**imagine** 36:13
**iMail** 52:17 53:8
**immediately** 45:17
 73:2 120:17
**immensely** 85:12
**impact** 76:24
**impacted** 25:21
**implicate** 28:8
**impression** 39:19
**in-person** 15:16
 107:24
**inaccuracies** 99:6,9
**inaccurate** 43:24
**inaccurately** 98:18
 98:19
**inauthentic** 65:10
**incident** 17:22
 43:20 44:5 84:24
 85:17 90:25 98:23
 101:7,18
**incidents** 101:9,15
**include** 49:10
**included** 40:2 47:2
 49:11 89:21
**including** 48:14
**income** 20:18,19
 21:12 25:17 26:12
 27:12,15,15 28:2
 29:11 37:23
 102:11
**incorrectly** 68:3
**independent** 20:4
 31:2 71:10
**independently**
 53:13
**indicate** 64:20 88:7
**indicated** 37:1
**indicates** 64:21
**indication** 64:25

**Indirect** 118:6
**individual** 32:20
 119:18
**individuals** 103:1
**industry** 121:16
**influence** 5:21
**influential** 104:3,17
**informally** 45:12
**information** 42:22
 51:16 56:14 75:2
 77:8 92:6 93:10
 95:15 96:15,15
 99:2 119:15
**informed** 108:18
**informing** 92:19
**initiated** 82:23
**innate** 52:17 54:6
**inside** 37:15
**insisted** 42:16
**instance** 85:6 124:4
**instructions** 63:8
**insulted** 112:7
**insults** 112:4
**intellectual** 6:15
**intelligence** 7:12
**intelligent** 31:24
**intend** 94:25
**intending** 76:10
**intent** 95:16 118:21
**intentions** 108:21
**interaction** 43:11
 44:19 45:19
**interactions** 45:5
**interest** 43:17
 111:22
**interested** 22:1,6
 37:2 82:14 126:15
**interesting** 45:7
**interjecting** 79:7
**Internet** 27:11
 61:11,17,18,25
 121:1,6
**interpreting** 121:15
**interrogation** 4:20
**introduce** 118:20
**invasive** 33:13 51:7
**investigation** 31:6
 39:20 42:17 74:25
 96:25
**involved** 123:16
**involving** 46:14
 90:25
**iOS** 54:6
**IP** 30:25 31:9,25
 32:1,5,13,16,20
 51:3,8 117:23,25
 119:21 120:3

**IRS** 29:8
**Island** 7:19 38:25
**issue** 29:22 83:15
 95:19 118:19
 121:19 122:17,24
**issued** 40:17 123:23
**issues** 87:19 93:2
 98:6 122:15
**italics** 80:4

**J**

**J** 3:9
**January** 1:18 72:9
 72:10
**Jeffrey** 3:4
**Jersey** 7:11
**Jesus** 8:25
**Jetpack** 31:21
 119:17
**job** 10:5
**joined** 123:25
**journal** 9:4 13:5
**judges** 21:1
**jump** 98:12
**jumped** 11:6
**June** 26:22 27:1
 35:12 64:6 76:22
 79:23 80:15 91:9
 92:17 105:18
**jurisdictional** 93:2
**justice** 112:6
**justifies** 79:2

**K**

**K** 7:25
**keep** 13:5 20:5 50:7
 52:6,8 54:2 81:22
 115:24
**keeps** 113:19
**kept** 17:14
**kicked** 123:18
**kind** 8:9 15:23,25
 21:5 22:1 24:7
 31:22 33:13 36:22
 98:4 110:1 112:4
 117:1,5
**knew** 11:20,23 32:5
 57:24 92:12
 105:24 106:1,2,3
 106:7 107:6 108:4
 108:4 110:5,13
**Knights** 12:6
**knob** 72:25 76:9
**knot** 21:5
**know** 4:23 5:9,9,11
 6:2,2 8:12 11:18
 13:12,16,21,23,25

Case: 2:16-cv-00906-MHW-EPD   Doc #: 41 Filed: 05/30/18 Page: 134 of 141   PAGEID #: 706

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 7

15:11 16:9,10
17:1 20:24 21:22
22:16,24 26:8
28:20 30:21 31:25
32:4 33:1,2,7 34:3
34:19,25 35:11
36:20 37:7 38:21
39:3,4,5,8,9,11
43:3,6 44:5 46:4
46:10,17 47:6
48:19 49:7 51:22
52:1,8,10,11
57:17,19 58:1,4
59:22 60:13 61:23
61:24 62:1,4,6,17
63:24 70:9 71:14
71:21,23,24 73:12
73:16 75:13 76:12
77:20 78:5,9,16
79:14 81:13 82:9
86:8,15,18 89:6
90:14,17 91:23
92:8 95:19,20
98:13 101:14,22
102:12 103:2,12
105:7,12,17,20
106:1,21 107:5,8
107:10 110:5,13
115:22 116:3,18
117:3,20 119:2,22
120:7 123:10
124:23,23 125:1
**knowing** 93:25
**knowledge** 13:15
19:7 27:10 30:1
47:9 50:5 99:21
100:1,3,8,11,19
101:6,12,20
106:10 107:11,13
**known** 29:21 30:5,6
58:18,22 72:2
92:1 107:1,2
110:2,9
**knows** 74:7

**_____**
**L**
**label** 79:3
**Lane** 1:9 10:9 14:3
14:11,19 15:1,19
16:18 76:23 92:24
93:4 94:2 100:7
100:14 106:6,7
107:2 113:19
114:15,18 115:1
**Lane's** 100:23
**large** 71:25
**larger** 103:9

**largest** 34:11 35:1
71:22
**Las** 3:11
**late** 67:20
**Lateigra** 3:10
**laundry** 26:16
**Lauren** 1:9 10:9
14:3,11,18 15:1
76:23
**law** 3:4,8,10 8:10,14
118:8
**lawful** 4:2
**lawsuit** 95:12
106:21
**lawyer** 21:17 92:25
93:1,3,12,14,21
97:14 98:3 116:8
116:13,22
**lawyers** 88:9 116:1
116:3,7,12,24
**lax** 121:25
**leader** 104:20
**leadership** 109:22
**learn** 63:7
**lease** 27:5
**leather** 24:7
**leave** 19:19 61:21
83:16
**leaving** 34:22
**lecturer** 23:17
**led** 17:22
**left** 7:6 53:23 61:25
81:23 92:22 98:4
**legal** 27:16 28:3,14
71:11 98:25
**lessons** 37:18
**let's** 5:14 6:9 9:9,10
10:21 15:18 18:14
23:23 24:4,4
44:13 60:10 65:14
98:9 104:2
**letter** 92:25 93:4,6
93:12,14,21
113:15,18 114:12
114:16,19
**letters** 93:9 97:14
113:24 114:2,8
**licenses** 38:3
**licensing** 66:19
**lies** 113:11
**life** 17:9,23 52:3,4
**lifestyle** 18:4,4
**lighted** 112:23
**liked** 45:11 57:22
**likes** 88:17
**line** 5:6 20:23 21:5
99:8 101:5

**link** 50:12
**linked** 54:8
**links** 50:7,11
**list** 12:25 39:8 57:10
79:13,25,25 80:18
**listen** 112:3
**literary** 45:8
**litigate** 115:4,11,20
**litigation** 115:2
**little** 4:9 18:2 33:25
85:13 114:14
**live** 19:10 20:3
57:17,19 62:2
122:15
**lived** 14:14,16 57:24
58:1 62:18 97:8
**livelihood** 107:16
**lives** 13:21 14:15
**living** 20:7,15,18,21
25:9 58:10,11
82:19 102:15
110:6,14
**LLC** 1:17 3:3
**local** 69:11
**location** 31:13 32:24
38:20 39:16 93:11
**locations** 12:11
38:22 95:16
**log** 54:17,23 55:4,15
63:15,17 122:5
**Logan** 67:22,23
68:8,10
**logged** 32:6 54:21
55:5
**logging** 55:7,8
**logical** 48:3
**lonely** 8:10,13
**long** 6:24 57:1 58:18
104:25 106:15
109:3
**longer** 20:3 106:17
109:25 111:12
**look** 21:1,3 32:25
33:5,19 34:5 39:7
49:20 51:7 62:12
64:3 104:21
120:21
**looked** 31:1 33:6
34:10,13 39:16
72:4 92:1
**looking** 30:22 33:18
40:14 43:22 46:12
48:11 49:19 50:1
50:13 94:10,11
110:21
**looks** 32:17 79:25
**lost** 59:25 67:11

112:23
**lot** 20:10 22:4,13
30:15 45:6 49:16
67:7 69:2 70:3
72:17 75:1 95:2
112:5 113:6
121:23
**Louis** 14:17
**low** 20:5,7
**lower** 20:21 21:18
**LSD** 5:18
**lunch** 41:20
**lying** 8:15 34:4 36:3

**_____**
**M**
**Mac** 50:17,19,20,21
**mad** 122:21
**mail** 53:25
**mailed** 114:21
**main** 54:3
**Maine** 49:14
**major** 20:10
**majority** 121:8
**making** 41:10 49:12
**male** 78:14,14
**management** 110:1
**managerial** 124:5
**manner** 126:14
**map** 25:1
**Marc** 3:9
**margin** 37:15
**Marie** 57:22 60:8
108:18
**market** 8:5 35:10
102:12,13,22
103:1,22,23
**marriage** 18:2
**married** 74:4 84:19
**master** 6:13,13
**material** 49:16
77:12
**materials** 49:10
96:14
**math** 34:14 120:12
120:15,17
**mathematician**
120:18
**matter** 21:8 34:15
41:11 55:24
115:10
**mean** 4:25 6:16
13:10 16:21 22:12
37:2 39:13 46:9
50:3 51:11 59:3,7
63:17 67:4,7 68:9
71:7 77:25 79:3,5
79:11 89:6 117:16

124:11
**means** 4:23 6:17
7:25 9:22 50:15
63:14 80:21 94:8
94:11 117:20
**meant** 22:25 79:14
84:10
**measure** 23:24 24:2
**medication** 5:22
**meet** 33:3 70:19
73:22 75:19,20
76:1
**meeting** 10:12 22:3
67:1,6 72:19
73:19,22 76:8,9
77:16
**meetings** 15:16
16:22 68:4 72:12
72:20 73:3 75:12
76:10 80:23 81:1
**Mel** 118:11,18
**member** 86:12
**members** 108:23
111:20
**men** 83:9,18
**mental** 25:1
**mentioned** 45:23
82:11 94:14
103:20
**message** 54:13
70:18
**met** 10:8 11:1,13,17
11:22 14:9
**meta** 61:24
**methods** 54:15
**Metskas** 58:19 73:8
73:16 84:18
**mid** 69:7 106:25
**midst** 18:5 45:14
**military** 6:21,22
7:15
**million** 104:8
**mine** 20:24 50:22
58:2
**Minnesota** 13:22
14:2
**minor** 6:11 90:6
**minus** 38:13
**minutes** 37:21
**misconduct** 95:25
123:19
**misread** 41:10
**Mississippi** 22:17
**Missouri** 12:8 14:5
14:11
**mistake** 26:22
**misunderstood**

Case: 2:16-cv-00906-MHW-EPD Doc #: 41 Filed: 05/30/18 Page: 135 of 141 PAGEID #: 707

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 8

43:14,15
mocked 112:5,7
Mogilevsky 57:22
  60:8 108:18
moment 63:2 93:16
  108:8
money 20:13 25:8
monitoring 54:2
  82:3
monogamous 17:10
monogamy 17:25
monograph 8:8
Montana 34:3
MONTGOMERY
  126:2
month 27:5 120:1
months 55:20 95:11
  95:11 112:24
morning 6:1 82:21
MOS 7:3,5
motion 113:10
motions 49:12 62:8
mountains 39:1
move 34:18 45:24
  108:12,15,19,20
  108:21,24 109:3,5
  110:20,22 117:15
moved 11:21 19:21
  19:23 26:22 29:21
  30:1 83:12 92:1
  92:14 97:4 108:6
  108:8,9,19
moves 14:15
movie 118:11
moving 46:16,25
  96:11 101:5 108:4
  108:14
Muirfield 1:17 3:5
multiple 9:3 30:7
  38:6 55:12,23
  61:15 120:3,11
Myers 1:8 9:15
  11:13,17 13:19
  14:23 42:11 92:13
  92:16,18 96:11,21
  102:7 105:22,23
  107:9 122:16

**N**

N 1:15 126:3 127:8
nail 29:24,25
name 12:3 18:12,19
  18:21 44:6,8,9,11
  44:19 46:11 47:19
  48:10 49:5 62:21
  62:22 84:17 86:11
  89:2 90:17,20

named 62:14 89:1
  90:11,14
names 57:12 60:1
  77:13,15,20
national 38:2,7
  66:15,19 67:10
  68:22 69:11 71:14
  72:6,11 111:9
nationwide 67:2
  102:23,24,25
  111:8
natural 7:25
nature 25:6 46:15
  99:11
near 20:9 28:12
  47:11
necessary 18:22
need 20:4 24:19
  33:23 36:22 51:13
  51:16 58:21 60:18
  63:24 79:16 95:2
  122:18
needed 52:14
negotiations 111:7
Neil 60:5
neither 35:8,21
network 1:7 34:23
  72:25 104:3,6
networking 72:14
Nevada 3:11
never 14:4 31:1 33:8
  34:9 35:22 36:5
  36:18,24 39:16
  41:1 53:14 54:19
  56:6,20 68:6
  71:16 72:4 74:12
  84:8,10 119:1,3,5
  119:7,7
new 7:11 31:12
  38:24
night 5:19 6:3 83:2
Non 75:16
nonevent 110:19
nonmonogamous
  17:21
nonreligious 38:4
Normally 39:6
  92:20
North 21:24 38:19
northern 98:1
Notary 1:16 126:3
  127:8
note 64:16
notes 12:17,18,20
  12:22 23:3 26:8
notice 93:17 94:7,8
  94:12

noticed 46:19
noticing 47:22
  48:14
notify 70:9
number 15:14 18:7
  43:24 50:15 52:20
  63:23 76:7 98:5
numbers 25:16
  56:18 72:1 95:13
numerous 107:21

**O**

O 7:25
o'clock 1:19 125:12
object 28:13,16,22
  42:1,7,9 88:10
  102:16
objected 64:1
Objection 28:11
  104:14,18 106:13
  110:8
objections 83:16
obscure 8:7 46:19
  47:22
obvious 69:24
obviously 5:25
  56:16
occasion 11:24
  32:18,19 64:14
occasions 16:23
  51:1 52:15
occupation 10:4
  118:12
occur 33:25
occurred 97:25
  100:6,22
odds 47:11
off-the-record 18:15
  23:9 44:14 65:15
  65:23 84:3 90:22
  95:5
offhand 96:13
office 66:15 74:9,10
  111:9 127:2
officer 7:6 74:20
  113:21
officers 71:1
offices 1:17
officially 68:7
oftentimes 70:19,19
  112:2
oh 22:25 28:10 62:7
  86:19 91:6 109:1
Ohio 1:2,16,18 3:6
  19:21 20:9,9,11
  25:8 26:4,5,6,22
  27:12,15 28:1
organization 38:2,3
  38:7 66:9,14,20

29:22 30:2 39:6,9
  57:20,25 58:1,9
  60:10 62:3,9,15
  66:9,14,15,20,22
  88:2 92:1,14,25
  93:19 94:1 96:12
  97:5,16,22 98:1
  104:25 106:11
  107:12,17,19
  108:3,6,13,22,25
  109:5 110:3,6,14
  111:9 114:3,21
  115:5,11,20
  117:15 126:1,4
  127:2,8
Ohio-related 111:15
Ohioan 93:17
okay 4:10 5:3 10:12
  19:1 41:22 58:21
  84:12 86:20
  107:11
old 55:13
once 26:20 49:11
  63:20 64:12 98:25
  111:13
ones 40:2 54:16
  83:19 103:9
  108:16
ongoing 74:25
online 15:14,15
  88:14,21 95:25
open 18:1 56:10
  82:1,5,12 122:5
opened 38:24,25
  39:5 70:7
openly 17:18 36:24
  83:11
operates 70:21
  124:10
operators 108:17
opinion 29:5 68:17
  74:16
opportune 17:15
opportunities 73:2
  107:25 111:15
opposite 69:8
oppression 21:25
optimize 63:13
Orbit 1:8 11:21
  92:11 102:1 104:9
  108:23 123:9,12
  123:14 124:1,3,5
  124:20 125:1
order 9:19 18:20
  55:13,15

71:14 74:12 82:22
  104:4 106:5
  112:12,14
organizations 21:24
  72:15 75:16
  107:22 110:3
  111:5,19,21
organize 71:12
organized 52:2
originally 11:20
  87:15 98:19
outraged 58:17
outside 39:14
overhead 20:5
owing 27:16
owned 123:15
Owners 108:17
ownership 88:1
Ozzie 26:13

**P**

P 7:24
p.m 125:12
Pacific 7:20
page 2:1 50:7,8,8,8
  61:12,17,18 63:9
  79:23 80:13 94:5
  117:8
pages 49:24 50:5,8
  50:15
paid 27:22 40:12
  41:1 71:7
painful 113:12
paper 65:4 111:10
paranoid 35:23
part 26:9 103:3
  121:19 123:14
part-timing 26:18
participate 83:24
participated 11:8
particular 51:15
  94:23
particularly 6:18
  46:13 71:24
parties 65:18
partner 82:10
party 41:5,8 79:7
  101:18 126:14
password 122:8,11
patron 40:14
Paul 1:8 13:19
pay 40:11,21 41:3
  68:1 94:17
pays 13:10 20:18
PC 50:17,19
penalty 4:22
people 8:13 21:23

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 9

22:5,11,15 30:15
31:12 33:14 35:24
38:5 45:14 49:15
50:1,10,12,16
51:2,18,24 57:10
57:17 59:14,14,17
59:19,20 60:15
69:4,18,21 71:19
72:12,22 73:21
74:7 75:19 76:3,8
76:13 77:2,15
96:7 103:11,20
109:24 112:3,10
120:10 123:15,25
**percent** 37:3 47:11
**perception** 11:10
**perfect** 23:3
**period** 68:4 77:19
**perjury** 4:23 5:25
27:3
**permission** 35:24
**perplexing** 85:20
**Perry** 1:17 2:3,5 3:3
3:4 23:8,25 24:15
28:16,22,25 60:19
65:5,11 88:10
98:9,11 102:20
104:15,22 106:14
110:12 115:15
118:16 123:5
124:16 125:4,10
**person** 28:7,9 32:11
32:12 44:7,21
56:10 57:22 74:8
78:1 82:17 86:12
86:19 90:17
**personal** 51:11
99:20,25 100:3,8
100:11,18 101:6
101:12,20 113:1
**personality** 23:18
**personally** 92:13
105:17,24 106:2
**persons** 73:9
**pets** 26:17
**Ph.D** 1:8 6:14 7:21
8:15 10:5
**philosopher** 7:25
118:10,14
**philosophy** 6:14,18
**phone** 42:15,18
54:12 82:16 85:24
92:13 96:10,16,19
102:8
**phonetic** 80:15
82:20
**Phyikos** 7:24

**physical** 45:21
**pick** 20:1,6 59:13
**picture** 94:20
**pin** 41:21
**pinning** 120:11
**place** 12:4 19:11
20:6 21:3 97:16
97:21
**places** 7:10 14:5,14
19:14
**plagiarism** 123:21
**plagiarized** 123:22
**plagiarizing** 124:4
**plaintiff** 1:6,13 3:2
4:2 65:21
**plaintiffs** 9:10
**plan** 72:24 76:14
**planet** 121:4,9
**planned** 76:8 108:6
**planner** 23:4
**planning** 72:10 76:8
76:9 77:15
**platform** 31:20
52:16
**play** 24:4 88:21
**playing** 59:5
**pleasant** 10:3
**please** 86:17 95:21
**plus** 38:13
**point** 11:12 17:16
26:19 35:9 41:20
45:15 52:11 58:23
63:25 95:15 97:7
112:14
**pointing** 31:10
**points** 110:10
**police** 78:1
**policies** 16:3
**policy** 16:4,5,10
41:9 42:3 43:4,8
71:2 87:13,13
96:5,6,8 97:18
99:4 100:13,16
119:4,5,7,9,10,11
**politics** 9:24
**poly** 17:20
**poorly** 98:13
**popular** 25:3
**porn** 88:23
**ported** 7:18
**pose** 115:5
**position** 8:19 36:1
74:2
**positioned** 20:10
**possible** 33:2 46:24
55:6 101:22
**possibly** 22:11 34:6

**post** 35:13 41:15,16
41:19 57:23 58:8
58:14 64:24 84:7
88:15 96:17,19
109:11
**post-op** 8:23
**posted** 35:12,14
58:6 121:21
123:21
**posting** 94:6 122:2
**posts** 110:20,22
**potential** 93:1
103:21
**pounds** 112:24
**practical** 115:10
**practice** 55:24 56:2
**pre** 96:17
**precautions** 52:6
**preceding** 95:11
**precise** 25:14 38:21
74:19
**precisely** 39:13
**precision** 39:13
**prediction** 68:18
**preliminary** 4:8
**prepublication**
93:24
**presence** 126:11
**present** 45:14
**presently** 35:2
**president** 74:5,23
**prestige** 111:10
**Pretend** 24:8
**pretty** 21:11 24:9
55:13 90:5 121:25
121:25
**prevent** 56:17
**prevented** 108:10
**previous** 26:6 61:11
103:13 106:24,24
107:14
**previously** 63:24
76:1
**pricing** 116:1
**Primary** 20:2
**printed** 64:7,10
**prior** 14:16 25:25
26:1,2,25 28:14
73:23 88:9 93:11
106:8
**privacy** 18:20 51:7
95:19
**private** 12:14 56:14
72:20 82:22
**privilege** 28:9 88:8
**privy** 73:12,14
**probability** 47:10

**probable** 47:7
**probably** 5:12 13:3
13:6 21:3 22:24
23:2 31:23 55:16
58:23 63:20 87:16
87:17 94:22 95:20
104:12
**problem** 82:13
86:23,25
**problematic** 22:10
22:12 31:13
**problems** 74:14
112:1
**Procedure** 1:15
**proceeding** 5:2
**process** 42:12 122:2
123:11,17
**produce** 94:25 95:9
95:20
**professional** 23:17
104:24 111:24
**professionally** 60:15
106:3
**professor** 8:21
**program** 7:21 8:16
**prohibiting** 15:23
15:25
**project** 9:3
**projects** 111:3,4
**prominent** 47:1
103:7
**promote** 107:23
**promotion** 107:25
**promotional** 40:24
111:3
**prongs** 107:24
**pronounce** 89:2
**proposition** 79:10
79:19 80:5
**propositioned** 81:16
81:18
**protocol** 123:7,9
**prove** 46:5
**provide** 77:13,14
**provided** 25:17 65:9
**providers** 123:13
**provides** 31:22
**pub** 41:5,8 45:12
85:5
**public** 1:16 23:16,18
24:14 27:10 50:5
56:17 58:20 87:10
114:11 126:3
127:8
**publication** 35:10
40:9 61:6 64:6
76:21 77:6 87:6

93:22 96:21 97:10
**publications** 8:11
76:23 77:9,11
87:2 93:7
**publicity** 111:10
**publicize** 108:24
**publicized** 45:23
108:13
**publish** 122:12,20
123:7
**published** 8:3,4 64:5
64:9,13 75:25
76:17,24 88:19
90:7 102:5 105:19
109:4 111:21
113:13 123:19
124:21
**pull** 41:15,18
**purchase** 95:21
**pursuant** 1:14
**pursue** 51:16
**pursuing** 11:9
**pushing** 60:21
**put** 12:22 15:11
24:4 37:10 41:21
60:1 64:20 90:20
95:13,14 120:18
122:8
**PZ** 9:15 13:19,20
96:11

**Q**

**qualified** 126:5
**Quest** 38:1,1,2,3,12
38:15 46:22 74:4
84:8,13 91:16
94:7,8 106:16,22
107:1,12 109:10
109:14,15 111:2,7
111:12 118:2,22,5
**question** 24:11,12
28:8,19 30:3
36:23 37:7 39:6
47:5,12 51:5 53:4
66:10 67:3,11
69:25 70:8,16
78:7,16,24 79:17
93:13 98:13,14
117:19
**questioned** 112:2
**questions** 4:8 10:22
15:12 31:24 99:10
101:5 104:23
115:16 123:3
124:16
**Quests** 38:22
**quite** 8:10,13 27:10

Case: 2:16-cv-00906-MHW-EPD Doc #: 41 Filed: 05/30/18 Page: 137 of 141 PAGEID #: 709

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 10

35:23 68:22 69:23
79:17 109:23
119:2
**quote** 100:1 125:10
**quotes** 48:17 49:2,3
62:21,21
**quoting** 41:6

**R**
**rabbit** 85:20
**raised** 79:8
**Randazza** 2:2,4,6
3:8,9 4:6 18:14,17
23:11 24:3,13,18
28:17,20 29:2
41:15,17 44:13,16
60:20,23 65:7,14
65:17,25 77:18,21
84:2,6 88:13
90:24 95:4,7,23
98:2 102:16
104:14,18,23
106:13 110:8
115:18 118:15,17
123:3 124:19
125:3,7
**ranked** 50:1,3
**ranking** 50:14
**ranks** 50:10
**rape** 78:11,12
**rarely** 91:20
**rates** 7:4
**RCarrier@infedel...**
53:22
**reach** 102:4 104:9
104:11
**reaches** 102:17
**reaction** 45:16
**read** 8:14 23:13
29:8 32:6 34:2
41:19 43:25 46:2
46:3,6 47:10,13
47:24,25 48:2,4
53:13 58:8 63:8
63:25 70:9 79:22
80:13 81:10 99:8
104:5 117:15,25
120:1
**reader** 51:23
**reader's** 51:7
**readers** 8:22 30:11
102:18 104:12
119:13 120:7,12
120:13,23
**readership** 30:8,17
30:23 31:15 34:11
34:20 35:1 104:7

121:12
**reading** 30:22 32:11
43:19 48:8 78:6
78:25 79:13 80:8
**ready** 28:13 108:2
**realize** 27:1
**realized** 76:14 99:2
**really** 10:5 20:5
21:7,22 29:25
45:6,7,9,10 46:19
56:11 76:22,24
85:20 95:2
**reason** 4:9 5:17,24
6:3 33:23 51:9,13
51:15,17 52:14
55:11 64:4,8 81:4
108:24 109:2,5,24
110:1 123:14
**reasonable** 94:20
117:11
**ReAsoncon** 103:14
**reasons** 20:2 33:24
51:12 53:20 56:22
**rebuild** 31:12
**rebuilding** 31:8
**recall** 12:12 11:25
12:7 16:8,20
32:14 41:6 43:20
48:22 49:6 50:25
54:16 55:7,8 57:5
57:6 58:25 60:11
61:1,7 62:16,20
62:23 64:11 67:21
69:10,17 70:12
74:23 75:13 76:4
76:7 78:20,21
81:6,8 84:1 86:5,7
88:19 90:3,8
96:10
**receipts** 70:10,11
**receive** 29:14 70:24
**received** 6:20 7:14
93:4 113:17,19,23
114:7,19
**receiving** 93:11
**recess** 84:5
**recollection** 43:22
75:4
**record** 18:13,14,18
44:10,13,17,21
57:15,24 58:20
60:2 61:9 65:4,4
65:14,18,22 84:2
90:20 92:18 95:4
95:7,13,15
**recorded** 50:9
**records** 25:7 27:8

30:20 56:9 95:10
95:10 96:16
**RECROSS-EXA...**
123:4
**recusing** 74:24
**REDIRECT** 115:17
124:18
**reduced** 126:10,12
**refer** 18:23 44:20
63:22
**reference** 116:5,10
116:11 117:2
**referenced** 97:1
**referring** 12:23
102:13
**reflect** 52:23 53:23
54:3,7 94:20
**refresh** 43:21
**refused** 42:16 69:16
**regard** 22:10
**regarding** 90:8 91:9
**registered** 62:14
**registry** 62:9
**regular** 12:23
**regularly** 46:11
47:18
**reignite** 17:15
**rejected** 36:16
**related** 6:19 7:16
49:17 57:23 75:16
103:5
**relation** 71:11
**relations** 14:18 16:6
16:17 19:4
**relationship** 9:9
10:15 15:18,24
16:1 17:5,7,11,12
17:15 19:3 82:1,5
82:13 90:16 91:3
**relationships** 59:15
104:24 107:21
113:1
**relative** 99:11
104:24 126:13
**relaunch** 31:7
**relaying** 73:8
**releasing** 42:18
**reliably** 69:3
**religion** 6:18
**religious** 21:17,18
21:25 22:14
**remember** 9:17,19
11:17 12:1,3,5,11
12:13,15 14:13
15:22 18:7 25:14
29:23 38:20,25
43:23 44:6 45:5

50:23 51:6 53:7
54:15,20,25 55:20
55:22 56:25 57:23
58:7,13 62:10
66:6 67:17 68:23
75:2 86:11 88:20
99:8 105:3 106:17
109:2,7
**remembering** 68:3
**renew** 45:18
**repeat** 120:2
**rephrase** 93:13
98:14
**replied** 114:15
**reply** 69:20 114:21
114:23 115:1
**report** 29:12
**reported** 47:18
98:18,19 101:11
**REPORTER** 125:5
125:9
**reporting** 126:16
**representing** 72:23
101:1 102:1
**reputation** 111:25
112:8
**request** 69:16,20
70:24
**requests** 27:7 70:17
71:17 72:6
**required** 115:11
**research** 8:23,24
9:25 10:1 32:16
58:5 111:10
**researched** 34:22
**researching** 49:13
99:1
**reside** 13:17
**residence** 19:16
27:4
**resolved** 95:9
**respect** 89:20
102:10
**respond** 21:16
113:10
**response** 15:13
35:20 93:8
**restriction** 87:20
**restroom** 65:22
**result** 23:13 48:13
**resulted** 46:15,17
94:6 111:9
**resulting** 9:3
**results** 31:10 48:16
49:24 63:13
110:18
**retired** 45:12 53:22

**retract** 97:12 114:8
114:10
**retraction** 114:5
**return** 70:10,11
**returned** 113:24
**reveals** 60:3
**reverse** 26:13
**review** 8:10,14
115:13
**revisit** 113:11
**revisited** 19:1
**RichadCarrier.info**
60:24
**Richard** 1:5,12 4:1
46:11 47:19 48:17
49:8,13,21,22,23
49:25 50:11 62:2
62:10,15 126:7
**Richard.Carrier...**
53:1
**RichardCarrier.i...**
61:5
**rid** 55:14 56:23
123:2,22
**right** 4:7,13 5:16 6:8
9:8 15:6,8,10
21:14 27:22 32:6
32:9 37:9,22
54:16 61:2,5
73:20 74:1 77:4
81:14,15 98:2,21
101:19 102:24
107:18 108:9
112:19 113:15
114:3,16,20 118:5
**risk** 93:20
**role** 24:4 83:7
104:17
**Roman** 6:18 8:1
**romantic** 10:3
**Ron** 24:6
**room** 82:19
**Rule** 126:17
**Rules** 1:14
**run** 13:13 70:22
111:8 112:1
**running** 125:1
**runs** 74:4 125:2
**rural** 22:13

**S**
**S** 3:11 7:25
**Sacramento** 38:19
**safe** 34:25
**sake** 64:2
**salaried** 84:11
**sales** 25:20 40:24

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                                Dr. Richard Carrier

102:19
San 7:13
saw 4:19 10:5 14:14
    46:23 47:7,16
    92:3 94:7,8
    110:19
saying 6:2 20:15
    26:25 51:22 66:22
    113:19
says 28:10 34:2 57:8
    109:12 118:12,14
scenario 34:7
scenes 10:3
scholarship 112:2
school 14:10 118:9
Schrike 82:20
science 6:18 111:8
SCO 63:10
screen 57:16
script 118:19
se 60:16
sea 7:17
seal 127:2
search 31:10 46:14
    48:16 49:21,23
    50:4,6,9,12 61:18
    61:19 63:13
searched 48:17,20
    49:22 62:20
searching 46:11
    47:18,19,20 48:10
    49:5,15 94:4,6
    110:16
second 68:15 69:9
    98:12 104:12
    108:7
Secondly 56:10
secrets 56:14
secular 22:4 30:14
    41:23 53:23 66:2
    66:11,21,25 67:6
    67:9 75:16 84:22
    84:25 85:1 89:17
    103:5 104:6,7,13
    105:1 109:9 111:2
seculars 38:6
security 7:12 32:23
    56:18
see 10:21 17:14
    23:23 32:24 33:17
    34:10 46:22 48:12
    49:3 50:6,14
    59:17 60:10 61:11
    80:10 110:20
    118:11
seeing 46:15
seek 20:25 29:18

seen 4:17 46:23,25
    59:10 70:18 92:4
    94:9,11 117:8
    118:15
Self 49:1
self-employed 10:6
sell 76:12 107:22
    108:1
semen 88:21
send 54:12 69:19
    70:17 125:10
senior 124:11
sense 42:6
sensitive 95:21
sensor 124:12,14
sent 28:6 49:11 72:6
    92:24 93:14
    113:20 114:2
separate 53:2,20
separated 26:20
served 7:17 113:14
service 7:6
services 24:24
set 127:1
seven 11:16
sex 10:23 15:2,4
    18:8,12,19 79:7
    79:19 80:5,22,25
    81:16 89:8
sexual 14:18 15:6
    16:5 19:4 37:4
    40:9 41:10 77:23
    78:8,11,12 79:21
    80:7 83:6,20 91:7
    97:21,23 99:14,17
    99:24,25 100:12
    100:16 112:3
sexualize 79:9 80:4
sexualized 79:1,18
sexualizing 78:21
    80:2
sexually 35:17
shaming 78:15
share 51:24
shared 74:9
Shelley 90:11,14,18
Sherman 7:18
shit 76:18
short 77:19
show 58:14,24 59:13
showed 59:11
shown 28:5 59:2
shows 107:19
shut 123:1
sic 9:10
side 20:20 101:2,24
    102:2

signal 4:11
signed 27:5
significant 115:8
Similar 101:5
simply 95:16
single 32:10,12,13
    48:12,14 52:24
    101:11
Sir 84:7
site 32:15,22,25
    33:6,18 34:2
    38:19 50:16
    124:15
sites 50:2
sitting 32:9 34:21
    35:8 43:10,21
situation 5:14,25
    82:9,12
situations 5:10
six 12:10,10 101:9
    112:24,24
six-year 9:3
size 102:12 103:12
sizeable 104:9
Skepticon 1:8 9:11
    9:11,15,19 10:8
    10:25 11:13,22
    12:2 15:20,21,22
    16:13,24 18:6,9
    40:8,16,21,22,25
    41:1,2 58:6 76:23
    92:23,24 93:4,10
    93:14,25 94:2
    100:13,17 101:1
    103:9 104:16
    113:20,21,21
    114:15 115:1
    119:4,5,6,8,9
Skepticon's 40:9
Skepticons 12:9
    13:1
Skiba 1:9 35:12
    81:11 86:1,15,18
sleep 6:3
slightly 31:23
slut 78:15
small 22:15
smaller 103:17
social 56:18 112:6
solely 104:7
solve 82:13
somebody 18:19
    43:14 48:4 56:3
    84:24 85:14 95:25
    117:24 122:21
    124:12
someone's 41:10

43:15 48:10
sonar 7:5,16
soon 75:25 76:14,17
    92:18
sort 45:11 71:13
    75:6 78:13
source 102:11
sources 37:23
soured 8:20 9:21
south 39:5
southern 1:2 22:20
spanning 23:14
speak 40:18 42:4
    67:24 69:5,12
    103:24 106:4
    107:22 108:20
    109:25
speaker 91:18
speakers 9:14 41:2
    41:24 42:3,4,4
    87:4,9 96:7
speaking 24:25
    25:19 37:23 40:24
    46:13,13,20 47:2
    47:21 48:12 72:7
    83:17 102:11
    108:1
specializing 6:15
specific 7:22 10:20
    10:21 12:25 24:1
    24:12 44:4 67:4,5
    69:10 76:19 77:1
    86:2 92:6 99:13
    99:19 100:7
    117:19
specifically 30:4
    39:25 46:12 47:20
    48:11 69:25 74:23
    91:22 94:10
    104:13 109:8,17
specifics 85:22
specify 82:7
speculating 21:21
    116:6 117:7
speculation 117:5
    117:10 118:3,7
Spencer 83:4
split 27:25
spoke 9:11 16:12
    44:24,25 45:1,2,3
    81:25 82:21 107:2
spoken 12:9 25:3
    26:6 68:11 97:14
    105:13
sponsored 13:14
    41:9 67:10
sponsors 13:9

spreadsheets 25:19
    25:22
Springfield 12:8
spying 33:14,16
    51:14 82:3,10
SS 126:2
SSA 42:4 67:14,15
    68:4,6,21,22
    69:11,12 70:2
    71:9,12,21 72:11
    72:24 73:5,9 74:2
    74:3,5,6,8,19,20
    74:24 75:16,18
    80:23 81:1 83:1
    84:8 85:21,23
    86:3,13 87:5
    91:16 96:4,6
    97:18 98:22,25
    99:3,3 105:8,14
    105:25 106:10
    109:17,23 119:10
St 14:17
stabbing 10:2
staff 86:12
stamina 83:6,20
stand 23:19 72:3
standard 121:13,16
Star 45:8
start 6:9 17:22 31:3
    76:21 79:6 104:2
    111:19
started 17:8,21 26:5
    43:18 49:12,12
    97:2 99:1,1
    107:18,20 109:11
    112:25
Starting 69:7
starts 50:14
state 1:16 22:14,14
    25:3,8,12,12
    27:12 28:2 111:18
    115:5 126:1,4
    127:8
stated 64:6
statement 23:19
    28:23 41:4,12
    43:25 61:1 95:24
statements 26:25
    34:16 35:14 39:23
    40:1 43:19,25
    49:12 68:16 94:15
    94:19,20 97:16
    99:12,19 102:5
    105:7,18 106:20
    106:24 107:6,15
    108:10 109:4
    111:14,24 113:13

Case: 2:16-cv-00906-MHW-EPD Doc #: 41 Filed: 05/30/18 Page: 139 of 141 PAGEID #: 711

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 12

114:8 124:20
**states** 1:1 6:23
  21:18,18,24 22:7
  22:20 23:16 25:11
  34:10 38:7 39:8
  49:8 66:18 72:23
  116:2
**stationed** 7:9
**statistics** 119:17
  120:21
**status** 7:1
**stay** 5:7 86:23
**stayed** 7:11 12:24
**staying** 82:20
**stenographically**
  126:11
**Stephanie** 1:8 11:18
  13:25 40:5
**Steubenville** 39:15
**stick** 25:2
**stigma** 111:13
**stipulate** 24:17
  64:23 65:10,19
**Stockton** 19:18,19
**stop** 17:11 43:2
**stopped** 60:13 75:24
**storage** 87:22
**story** 98:16 99:7
  100:24 101:24
  102:2
**stress** 112:17,22
**stripped** 11:5
**strongest** 34:20
  35:10
**structure** 71:1
**Student** 41:24 66:2
  66:11,21 67:1,6,9
  84:22,25 85:1
  105:1 109:9 111:2
**students** 80:23 81:1
  96:1,5
**stuff** 26:16 56:19
  94:5
**subcategory** 37:11
**subject** 8:24 41:11
  45:9 83:6,12
**submitted** 49:17
  65:20 88:25
**subsequent** 16:24
  27:6
**substantially** 25:12
**successful** 72:3
**suddenly** 79:6
**sue** 43:1 97:13
**sued** 93:9
**suffer** 109:15
**suggested** 45:16

51:3
**suit** 92:12 115:4
**Suite** 1:18 3:5
**summer** 38:4,5
**super** 95:1
**supplement** 77:18
  94:14
**supplied** 25:15
**support** 38:3 40:14
  66:18 123:1
**supports** 38:4,8
**sure** 5:7,14 7:23
  10:10 11:22 12:10
  14:4,15 17:8
  21:22 23:8 24:21
  26:14,21 30:13
  34:14 38:10 43:9
  53:4 61:13 63:14
  67:21 71:8 77:7
  78:24 80:8 89:20
  90:21 105:23
  109:1 120:5
**surprised** 85:12
**surprisingly** 8:9
**surrounded** 22:10
**survivable** 20:22
**survive** 20:8
**suspect** 34:4
**suspected** 111:17
**suspend** 39:22 40:7
**suspended** 39:19
  40:1,15
**suspending** 111:2
**suspicious** 32:17
**swinger** 17:19
**swoon** 24:9
**sword** 112:11
**sworn** 4:3 126:7
**system** 54:4
**systems** 54:5

─────────────
              **T**
─────────────
**T** 3:4
**table** 5:12 24:14
**tacks** 25:2
**take** 5:18 23:6 52:6
  116:22,24 118:8
  122:18
**taken** 1:15 4:14 6:1
  87:4,8
**takes** 41:2
**talk** 9:9,11,17,18
  77:3 80:22,25
  104:1 120:22
  121:11
**talked** 24:24 43:13
  58:15 65:11 71:16

77:2 80:3 85:5
  91:23 105:15
  116:13
**talking** 11:15 19:15
  24:23 27:19 37:12
  41:5 43:16 45:10
  45:13,20 51:12
  58:19 60:13 63:18
  67:1 72:8 75:21
  81:13 83:5 85:18
  86:2,18 98:20
  101:10 121:8,10
  121:12
**talks** 9:18
**target** 109:8
**taught** 15:13
**tax** 25:18 27:19,23
**taxes** 27:12,25
**teach** 15:15
**teacher** 23:17
**teaching** 9:25 10:1
  102:11
**technician** 7:5
**technologies** 7:17
**technology** 6:19
**tell** 5:9 6:8 7:21 8:7
  9:22 28:7 31:18
  32:5,7 33:4,5 35:9
  36:25 37:22 42:16
  42:19 45:4 49:18
  59:24 64:3 69:22
  70:6 75:12 89:2,4
  90:16 92:20
  102:15 103:7
  107:15 111:23
  113:3,4 120:14
  122:2
**telling** 75:4 92:21
**ten** 6:1 11:16 37:21
  50:7,8 63:23 76:5
  76:6 103:4 112:24
**Tennessee** 22:25
**term** 49:21 75:9,10
  78:5
**terms** 17:9 21:16
  22:13 26:11 36:19
  72:17 104:20
  112:9 113:8
**terrible** 24:10
**testified** 111:1
**testify** 126:8
**testimony** 73:18
  126:10
**Texas** 16:25
**text** 54:13 64:22
  123:22
**thank** 15:12 53:11

**theoretically** 55:6
**theory** 45:7 47:8
**thesis** 7:23
**thin** 36:2
**thing** 4:18 29:24
  48:14 53:17 63:25
  75:6 76:25 80:1,3
  92:3 94:10 98:4
  99:5 100:19,22
  101:21 109:12,17
  117:1 124:3
**things** 8:9 12:25
  13:2 17:13 26:18
  27:1,8 32:19
  35:21 37:9 40:6
  44:2 45:10 47:17
  47:22 49:4 54:1
  54:14 56:12,13,17
  64:12 66:19,24
  67:8 80:1,19
  81:23 82:4 92:2
  94:9,15 100:3,6
  109:25 110:17
  124:2
**think** 8:14 10:10
  11:15,22 12:10
  13:18,24 14:14,17
  17:13 23:23 24:15
  27:3,6 32:18 34:7
  34:9 45:13 50:18
  52:3 55:21 57:16
  57:22 58:16 59:15
  60:3 62:8,9 64:3
  64:14 65:2,11
  67:20,22 75:17
  76:22 77:9,19
  78:8 82:20 85:3
  85:15 90:6 91:23
  92:3 96:13 99:4
  104:11 108:17
  109:23 111:1
  112:19 114:1,14
  115:15 116:19,22
  117:1 120:19
  123:12
**thinking** 17:22
**third** 7:6 101:18
**Thoroughly** 89:24
**thought** 10:4 56:6
  74:14 97:3 98:25
**thousand** 30:9,24
  102:18 103:1,10
  119:13,21,23,24
  119:25
**thousands** 30:14
  120:10
**threat** 109:13 112:9

**threaten** 115:2
**threats** 123:20
**three** 9:6 25:24 26:2
  39:2 107:24
**throw** 24:13
**thumb** 25:2
**ticket** 76:11
**time** 8:21 10:4 11:9
  14:10 16:12,18
  17:1,6 26:9 30:18
  30:22 32:14 40:6
  45:10 52:13 54:20
  55:18,19 56:24
  57:1 58:9 59:4,7
  66:5 68:4 74:4,9
  74:24,25 77:19
  81:13 84:23 86:13
  95:2 98:21,22
  105:6 106:20,23
  107:14 108:13
  110:2,5,7 111:16
  112:1 113:10
  115:14
**times** 16:20,21,24
  30:7 55:12,16,23
  61:15 68:23 69:2
  81:6,8 107:3
  120:11
**title** 8:2 89:23 98:21
**today** 5:18 34:19
  35:8 43:11,21
  55:2 108:12
**told** 17:11 39:14
  42:18,20,24 47:14
  59:23 68:20 70:1
  73:6,18 74:11,20
  82:8 86:9,10,12
  87:12 92:13 96:11
  101:14
**tolerance** 87:13
**tons** 113:7
**top** 12:15 50:12
**torpedoes** 7:16
**torture** 4:21
**touched** 35:22
**touching** 35:18,24
**tours** 7:20
**track** 30:25 32:10
  67:11
**tracking** 51:3
**tracks** 31:25 32:1
**training** 4:19 6:20
  7:13,16 62:24
  63:1,5,6,10,11
**transcript** 125:6
**transparent** 64:18
**transpire** 76:15,16

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.

Dr. Richard Carrier

Page 13

**Tremendously** 115:7
**trends** 63:5 68:18
**tried** 21:2 22:9,16 22:19 24:25 32:10 42:10 62:5,7 68:19
**trilogy** 45:8
**trip** 15:22
**Trucking** 49:14,21 49:25
**true** 41:23 44:2 61:12 64:4,24 88:15 101:11 118:22 119:4
**truth** 56:11 99:13 99:16 126:8,8,9
**try** 18:1 72:14 73:1 112:6,12
**trying** 15:21 17:15 20:6 23:23 24:9 81:22 120:19
**Tuesday** 1:18
**turn** 22:6 48:16 98:2
**turned** 85:9,11 98:24
**turnouts** 22:22
**turns** 14:2
**tutorials** 63:8
**TV** 4:17,18
**twelve** 7:14
**twenty** 76:5 103:5
**Twitter** 30:12,13 35:6 45:24
**two** 6:25 8:4 16:23 16:24 27:1,5 37:8 38:14 45:13 54:5 55:17 58:23 60:11 62:10,14 80:2 97:6 103:7 111:5
**two-factor** 54:9,14
**typewriting** 126:12
**typo** 64:19

**U**

**UC** 6:10
**Um-hmm** 13:11 37:25 57:9 78:10
**unaffiliated** 74:8
**unasked** 11:6
**unaware** 43:8
**uncomfortable** 86:16
**undeliverable** 113:25
**understand** 5:8

18:24 23:1,2 24:11 37:5 39:25 47:5 51:5 53:4 59:4 66:10,22 70:8 78:24
**understanding** 16:2 40:20
**understood** 17:25 60:22
**underway** 111:16 111:17
**unethical** 51:14,23
**unfortunately** 108:8
**unique** 23:18 119:18,21,25 120:23 121:13
**uniques** 120:4
**United** 1:1 6:23 23:16 49:8 66:18 72:22
**units** 7:14
**universities** 46:14 66:17
**university** 6:13 12:5 46:21 47:3,21 53:11 98:1 110:21 110:23
**unquote** 100:1
**unusual** 44:11
**unwelcomed** 79:20 80:6
**upwards** 40:23
**URL** 61:16,20
**use** 18:21 22:8 33:15 50:17 52:12 52:15,16 53:20,25 54:4,19 61:19,20 63:7 70:6,10,11 94:18 95:17
**username** 122:8,10
**usual** 120:22
**usually** 8:15 55:11 64:17,19,20 69:6 69:18,22 71:4 103:16 111:18 112:13
**Utah** 67:22,23 68:8 68:11
**utter** 28:10

**V**

**vague** 69:21
**valid** 33:23 34:8 51:13,17
**value** 40:24 56:11
**variable** 21:15
**varies** 103:4

**variety** 13:12 20:2 70:22 103:16
**various** 7:10 13:2 14:5 19:14 45:9 45:14 72:24
**vary** 70:25
**vasectomy** 83:1,8
**Vegas** 3:11
**Venn** 37:14,19
**venue** 12:1
**venues** 12:13,14,15 13:4
**verb** 37:6 81:14
**verify** 95:16
**version** 61:4 98:16 100:24 101:2
**versions** 61:11
**versus** 49:16,22
**vet** 26:17
**vicinity** 30:9,23 57:4 103:10 120:8
**Vicodin** 6:1
**victims** 100:1
**video** 4:19
**violate** 18:20 96:8 100:12
**violated** 119:3,5,7,8 119:10
**violates** 33:21
**Violating** 100:16
**violation** 97:18
**Violence** 88:23
**violent** 123:20
**visible** 45:16
**visited** 14:13 38:11 38:12 52:13
**visitors** 119:25 120:2,23 121:13
**vocal** 17:18
**volunteer** 91:20
**voter** 62:9
**voters** 62:14
**VPN** 52:10,13
**VPNs** 52:11,15
**vs** 1:6

**W**

**wait** 28:11 79:22 106:23 109:1
**waive** 125:4
**walk** 24:19
**wall** 46:22,23 47:17 47:19,23,25 48:3 48:5,9,14 92:2 110:16
**want** 5:7 17:12,14 17:24 18:12 25:1

26:21 28:13,20,24 33:2 35:13 37:18 41:20 44:1,5 50:13 56:14,17 60:1,20 77:18 98:6 99:10,12 108:13 109:14 112:5,10 125:9
**wanted** 8:24 17:25 18:5 81:25 82:5 87:12 109:22,24 110:1 124:1
**wanting** 89:8
**wants** 79:11 86:23 112:3
**Wars** 45:8
**wasn't** 11:9 17:8 18:3 36:4,5 42:11 48:6,10 76:14,16 82:2 83:13 85:9 97:23 99:2
**waste** 108:5
**watching** 110:18
**water** 23:7
**way** 3:11 11:3 21:7 24:4,10 33:8 42:12 46:24 48:20 48:21 51:21 52:2 52:3,4 57:15 62:7 98:7 100:2,10,18 101:12 124:13
**ways** 23:24
**we've** 18:20 24:15 40:2 63:24 114:14
**web** 53:13,23 61:12 63:9 70:20
**website** 32:2 33:19 39:7 48:11 51:4 61:13 104:13 120:1,11
**websites** 121:11
**Wehneman** 60:5
**weird** 4:9 15:12 34:1 120:10
**welcome** 73:4,19 74:11,12,21 75:5 75:12 82:14
**well-known** 23:15
**went** 6:12 7:13 8:21 45:19 50:8 66:7 67:23 76:23 85:21
**weren't** 48:8 73:19 74:21 75:5,12
**West** 38:13
**Western** 98:1
**whatnot** 8:8 10:2
**whereabouts** 94:21

**WHEREOF** 127:1
**whispered** 83:11
**white** 36:6
**widely** 29:21 30:5,6
**wife** 17:7,24 26:11
**Wikipedia** 9:20
**wind** 5:6
**wishes** 86:25
**witness** 24:1 28:19 28:23 29:1 41:16 60:22 65:6,13 88:12 98:4 102:17 104:19 110:9 126:11 127:1
**woman** 44:18 85:7 89:1 90:11
**women** 37:18 81:22 83:22 112:9
**won** 116:17
**word** 21:13,14 117:20
**worded** 98:13
**wording** 80:21
**WordPress** 31:21 119:17 121:15
**words** 24:16 41:13 41:14 78:25 80:8 80:14,16
**work** 9:24 20:5,12 20:23 21:6,7,9 22:2 31:18 52:4 74:7 103:25 107:23 112:12
**worked** 40:22 74:10 74:19 124:24,25
**working** 7:12 72:14 72:16 73:1 109:13
**worldwide** 102:23
**worry** 51:2,18,22 52:2 113:7,8
**worse** 80:2
**worst** 80:2
**would've** 63:25
**wouldn't** 5:12 8:12 32:7 33:21 34:4,6 37:21 39:20 62:6 73:4 115:21
**Wow** 11:17
**Wqueana** 1:15 126:3 127:8
**write** 12:16 57:12 79:25 112:6 122:12
**writer** 10:6 23:17
**writing** 8:13 31:3 45:19 61:1 102:10 126:10

Carrier, Dr. Richard v. FreeThoughtBlogs Network, et al.                    Dr. Richard Carrier

Page 14

**writings** 88:14
**written** 78:14 97:16
**wrong** 21:13 61:2
  98:21
**wrongful** 100:8
**wrote** 40:6 79:3,15
  84:7 88:15 98:20
  98:22 109:2,3
  110:7
**Wyoming** 21:3

_____ **X** _____

_____ **Y** _____

**Y** 7:25
**yeah** 7:4 8:4 11:16
  12:21 13:18 15:6
  17:20 19:2 20:16
  25:11 33:18 38:17
  48:25 49:4 51:10
  56:21 58:13 62:16
  63:3 65:1,6,13
  81:4,15 85:10
  86:24 87:16 89:9
  94:16,22 102:17
  103:22 106:23
  109:20 112:22
  117:21 118:16
  122:23 124:7
**year** 7:17 10:25
  11:23 12:14,14
  14:12,13 17:3
  19:24 25:7 26:1
  27:20,24 29:10
  31:11 38:14,17
  57:2,3 68:24
  102:19 103:3,4,13
**years** 6:25 10:14,19
  11:16,25 16:4
  19:3,15 25:24
  26:2,6,7 55:17
  58:22,23 69:19
  88:20 103:13
  105:3,23,24
**yell** 122:22
**younger** 96:1
**YouTube** 9:20
**Yup** 61:3 88:24

_____ **Z** _____

**Z** 1:8
**zero** 27:16 28:2
  87:13
**Zvan** 1:8 11:18
  13:25 40:6 41:4
  92:11 101:6,23
  105:23 107:7

**Zvan's** 57:7

_____ **0** _____

**03-05-2020** 127:9

_____ **1** _____

**1** 9:12,15 10:8 11:13
  12:2 64:2,23
  79:24
**1,000** 40:23
**1.4** 104:8
**10** 64:3 79:24
**10,000** 30:11
**10:50** 1:19
**100** 8:1
**115** 2:4
**12/1/2016** 64:7
**120** 1:18 3:5
**124** 2:5
**125** 2:6
**150** 21:4
**15th** 91:9

_____ **2** _____

**2-** 103:17
**2:56** 125:12
**20** 76:22
**20,000** 88:1
**200-** 104:11
**2005** 38:13,16
**2008** 8:17 11:1
**2009** 118:22,23
**2011** 11:3
**2012** 10:25 11:2,6
  15:20 16:5
**2013** 16:14 17:4
  18:5
**2014** 26:8
**2015** 16:16 25:6
  26:6,20 64:7 69:7
  79:23 80:15 87:3
  88:6 102:19
  107:19 108:2
**2016** 19:25 26:23,24
  27:13,14,18,20,24
  29:12 35:12 68:14
  68:15,21 69:8,9
  71:18 72:9,10
  105:4,18 106:8,18
  106:25 108:3,7,7
**2017** 27:22,25 29:12
  67:20,21 68:13
  69:14
**2018** 1:19 67:19
  127:3
**21st** 92:17
**22** 79:23

**22:16-CV-00906**
  1:6
**23** 1:19
**23-1** 91:14
**27** 89:1
**28(D)** 126:17

_____ **3** _____

**3-** 103:16
**300** 103:17
**31** 27:4
**315** 8:1
**36** 95:11,11

_____ **4** _____

**4** 2:2
**400,000** 104:12
**4035** 3:11
**43017** 3:6
**44** 58:3
**45** 57:8
**47** 79:23

_____ **5** _____

**5** 80:15
**5-** 30:11
**500** 40:23
**5th** 64:6 79:23

_____ **6** _____

**6** 18:6
**600** 103:16
**6th** 127:2

_____ **7** _____

**7-** 21:2
**7240** 1:17 3:5

_____ **8** _____

**80,000** 120:13
**800** 21:2
**89147** 3:11

_____ **9** _____

**90,000** 120:12
**98** 2:3