THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DR. RICHARD CARRIER,** | : | Case No. 2:16-cv-00906-MHW-EPD |
| Plaintiff, | : | Judge Michael H. Watson |
| v. | : | |
| **FREETHOUGHTBLOGS NETWORK, PAUL Z. MYERS, PH.D., THE ORBIT, STEPHANIE ZVAN, SKEPTICON, INC., LAUREN LANE, and AMY FRANK-SKIBA,** | : | |
| Defendants. | : | |

**DEFENDANTS' BRIEF IN SUPPORT FOLLOWING JURISDICTIONAL DISCOVERY TO THE MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) FOR LACK OF PERSONAL JURISDICTION; AND FRCP12(B)(3) FOR IMPROPER VENUE**

Defendants hereby file its brief in support of the Motion to Dismiss the complaint for lack of personal jurisdiction [Fed. R. Civ. P. 12(b)(2)] and improper venue [Fed. R. Civ. P. 12(b)(3)].

**1.0  Introduction**.

Carrier is unable to show that the Defendants have any connection to Ohio or that they directed any statements to Ohio. The Plaintiff was unable to show exactly when he moved to Ohio, or how the Defendants could have known that he moved to Ohio. There is no personal jurisdiction over the Defendants as the Ohio long arm statute does not permit it. Even if this Court were to determine the Ohio long arm statute applies, as a matter of federal constitutional jurisprudence, the Due Process Clause would require dismissal. *See Fraley v. Estate of Oeding*, 138 Ohio St. 3d 250 (Ohio 2014) (the Ohio long arm statute does not reach the limits of due process, therefore, even if the long arm statue is satisfied, the more demanding Due Process clause can demand dismissal).

Plaintiff attempts to manufacture jurisdiction under *Calder v. Jones*, but the *Calder* elements are not present. Even if *some* were present, the facts of this case differ significantly from those in *Calder*.

The Plaintiff is unable to show exactly when he moved to Ohio, or how the Defendants could have known he moved to Ohio, and an evidentiary hearing is needed to resolve this issue. The Plaintiff claims he moved to Ohio around the time the Defendants published the statements, yet the Plaintiff is unable to show how the Defendants could have known that he moved to Ohio. The Defendants published their statements, about someone they believed to live in California, from Minnesota, Missouri, and Arizona. The Defendants could not have known that these statements would put them at risk of being haled into an Ohio court.

**2.0 Argument**

**2.1. Facts**

Carrier is an online lecturer and blogger, and he is "well-known to the public" for his teachings on secularism, atheism, and feminism.[1] *See* Plaintiff's Opposition, Dkt No. 40, ¶ 2; *see also* Complaint, Dkt. No. 1, p.6 at ¶¶ 18 and 19. This is a defamation case against Defendants outside of Ohio regarding statements they made about Carrier's boundary-pushing behavior.

---

[1] Plaintiff's counsel agrees that the Plaintiff alleged public figure status, and stipulates to this status. *See* Carrier Dep. at 24, ¶ ¶ 13-17, attached as *See* Dkt. No. 41. As a public figure Plaintiff must demonstrate actual malice, instead of mere negligence, to prevail on a claim of defamation. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964); *Talley v. WHIO TV-7*, 131 Ohio App. 3d 164, 170 (Ohio Ct. App., Montgomery County 1998). Actual malice has nothing to do with "malice," it is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term: rather it is "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990). "Knowing falsity" is easy, while "reckless disregard" is a term of art. To establish reckless disregard, a public figure must prove that the publisher "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The burden is significant, as "the plaintiff must demonstrate, with convincing clarity, that the defendant published the defamatory statement" with actual malice. *Great Lakes Capital, Ltd. v. Plain Dealer Publ'g Co.*, 2008-Ohio-6495, ¶26 (8th Dist.). That is, Plaintiffs must provide "clear and convincing proof," of actual malice. *See Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1236 (6th Cir. 1981).

Although Carrier may wish to censor the fact that he has engaged in multiple acts of sexual misconduct through this lawsuit, he has admitted to instances of inappropriate behavior with young students who attend his lectures.

For example, he admits that he hit on Defendant Amy Skiba, who was a *young student* at the time that he met her.[2] He also admits that he does not think there is much of a difference between asking someone on a date and asking someone for sex.[3] And, he has admitted (by accident) that he hit on other students after his talks,[4] violating the Secular Student Alliance's (SSA) policies regarding engaging with young students, a policy he admits he disregarded.[5]

The Defendants have a right to expect that Carrier would refrain from inappropriate activity with young students at conferences, especially when that is one of the clearly enumerated rules at those conferences. Ultimately, this case never would have come about, had Dr. Carrier followed these simple and reasonable rules.

Carrier lost his membership to the Secular Student Alliance Speakers' Bureau after he admitted that he had broken their explicit policy regarding hitting on young students, yet Carrier refuses to take responsibility for his actions, and wishes instead to blame the Defendants. Each of the individual Defendants have known Dr. Carrier for at several years and all of the Defendants began their relationship with him when he lived in California. All of the Defendants state that they knew him to be a California resident. Dr. Paul Myers admits that he did not often speak to Dr. Carrier about his personal life, but knew that he lived in the San Francisco Bay Area. *See* Dkt. No. 10-2, the Declaration of Paul Myers in Support of Defendants' Motion to Dismiss (hereinafter,

---

[2] *See* Carrier Dep. at 82, ¶ 12-15, where he states that he asked Defendant Amy Skiba if, "you are interested in me, you are welcome to ask me out in the future sometime."

[3] *See* Carrier Dep. at 37 at 8-15, wherein Carrier states: "I would definitely put fucking under a subcategory of dating…in the Venn diagram dating and then fucking is entirely inside the dating margin."

[4] *See* Carrier Dep. at 84-85, wherein he admits that he thought a different student complained about his sexual advances to the SSA.

[5] *See* Carrier Dep. at 96, wherein he admits that he broke SSA's explicit policy against hitting on students. Meanwhile, he claims that the Defendants are the cause of his relationship with SSA souring. See Carrier's Dep. at 70, ¶2-4.

3

"Myers Decl.") at p. 1, ¶ 4.  The other Defendants knew that Carrier lived in the Bay Area for a long time and they had no idea that he had any plans to relocate.  Carrier had once recommended Defendant Lauren Lane for an intern position with the Center of Inquiry.  Carrier's return address on his letter was a Richmond, California address.  *See* Dkt. No. 10-4, Declaration of Lauren Lane in Support of Defendants' Motion to Dismiss (hereinafter, "Lane Decl.") at p. 1, ¶ 4, *Exhibit A*.  All other correspondence between Carrier and Lane also showed that Carrier lived in Northern California.  *Id*. at *Exhibits B-D*.

Rebecca Hammond is the Director and Secretary/Treasurer of Skepticon.[6]  All communications between Skepticon and Carrier place him in California, including invoices to Carrier in California.  *See* Dkt. No. 10-5, Declaration of Rebecca Hammond in Support of Defendants' Motion to Dismiss (hereinafter, "Hammond Decl.") at p. 2, ¶ 8, *Exhibit A,* and ¶ 9, *Exhibit B*.

Defendant Stephanie Zvan knew that Dr. Carrier lived in California because that is what it said on his website.  *See* Dkt. No. 10-6, Declaration of Stephanie Zvan in Support of Defendants' Motion to Dismiss (hereinafter, "Zvan Decl.") at p. 2, ¶ 6, *Exhibit A*, and ¶ 7, *Exhibit B*, and ¶ 8, *Exhibit C*.  Zvan also had communications with others who know the Plaintiff, all of whom understood him to reside in California, (*Id*. at ¶ 9) as well as communications indicating Carrier previously worked with Camp Quest in California.  *Id*. at ¶ 10, *Exhibit D*.

Defendant Frank-Skiba believed Dr. Carrier had lived and was continuing to live in California.  *See* Dkt. No. 10-3, Declaration of Amy Frank-Skiba in Support of Defendants' Motion to Dismiss (hereinafter, "Frank-Skiba Decl.") at p. 1, ¶ 5.

Carrier admits that Defendants Lane and Skepticon did not know that he moved to Ohio until after the Defendants made the alleged defamatory statements.[7]  Carrier states that Zvan and Orbit knew he moved to Ohio before he filed his suit, but he does not have any evidence that they

---

[6] She is expected to be Skepticon's 30(b)(6) witness.
[7] *See* Carrier Dep. at 94 at ¶ 2, wherein Carrier admits that Defendants Lane and Skepticon did not know that he had moved prepublication.

4

knew prepublication.[8] Carrier also admits that he did not tell Defendant Myers (the CEO of Freethought Blogs) that he moved to Ohio until after the publication of the alleged defamatory statements.[9] Carrier does not have a shred of evidence that any of these Defendants knew or could have known that he had moved to Ohio until after they published the alleged defamatory statements. Accordingly, as analyzed below, this Court must dismiss Defendants Zvan, the Orbit, Lane, Skepticon, Myers, and Freethought Blogs.

Carrier alleges that he has evidence that Defendant Amy-Skiba knew he moved to Ohio prepublication, because he states that she, "was searching for events and stuff on (his) Facebook page before." *See* Carrier Dep. at 94, ¶¶ 4-12. It is odd that Carrier expected Defendant Skiba to see everything on his Facebook wall[10] when he admits that he himself does not see everything on his own Facebook wall. However, Carrier ultimately does not reference any of this "evidence" that Skiba saw everything on his Facebook page in his Brief in Opposition to the Motion to Dismiss. Defendant Amy Skiba maintains that she did not see or know that he moved to Ohio, as she stated in her original Declaration, and that she thought he lived in California. *See* Frank-Skiba Dec. at p. 1, ¶5. Accordingly, the Complaint, as to Defendant Skiba, must be dismissed as well.

All the Defendants knew Carrier as a Californian. Carrier regularly made public statements about the fact that he lived there. *See* Myers Decl. at pp. 1-2, ¶¶ 4-5; Frank-Skiba Decl. at p. 1, ¶ 5; Lane Decl. at pp. 1-2, ¶ 4; and Zvan Decl. at pp. 1-2, ¶ 5-10. The Defendants saw no pre-suit private or public statements giving any sign that Dr. Carrier intended to move from California to Ohio.[11] None of the Defendants knew he moved to Ohio until after publishing the articles at issue in this case. *See* Myers Decl. at p. 2, ¶¶ 6-7; Frank-Skiba Decl. at p. 1, ¶ 5; Lane

---

[8] *See* Carrier Dep. at 92, ¶¶ 11-12.
[9] *See* Carrier Dep. at 92, ¶¶ 13-21.
[10] *See* Carrier Dep. at 46, ¶¶ 21-24.
[11] Carrier admits that it is unlikely that Defendants Lane, Skepticon, Myers, Freethought Blogs, Zvan, and the Orbit saw his online posts on Facebook that he was moving to Ohio: "Not that they themselves read it on Facebook (referring to the aforementioned Defendants.) See Carrier Dep at 46, ¶¶ 6-8. Carrier alleges that he thinks only Defendant Amy Skiba read his Facebook posts.

5

Decl. at p. 2, ¶ 5; and Zvan Decl. at p. 2, ¶ 7. Furthermore, even using the Plaintiff's methodology of conducting Google Trends® research, Dr. Carrier's reputation is primarily in his long-time-home of California, as analyzed below.

### 2.2. The Plaintiff's Google Trends "Data" is Unreliable

Plaintiff Carrier creatively, but unsuccessfully, tries to manufacture *Calder*-effects jurisdiction by providing unauthenticated printouts from "Google Trends."

Carrier claims that there were a lot of Google searches for "his name" from Ohio.[12] Dr. Carrier has failed to account for how he came to these results, and could not explain how he came to these results in Discovery. *See* Carrier Dep. at 62-63. Further, Carrier produced several additional Google Trends reports that show conflicting results, and he fails to explain his own conflicting results. *See* **Exhibit 1**, Carrier's additional Google Trends screenshots; *see also* Carrier Dep. at 49-50. Defendants are still completely in the dark as to why Carrier limited this search to July 12, 2016 to August 12, 2016. As Defendants have previously demonstrated,[13] Carrier's specific date range (July 12, 2016 through August 12, 2016) actually shows that the greatest interest in "Richard Carrier" came from San Francisco by using a "Metro area" search. *See* Rothell Decl. at *Exhibit B*. No Ohio metropolitan areas come into play at all. *Id*. In searching by "Metro" area over the past five years it reveals that the greatest interest in "Richard Carrier" over the past five years is in Los Angeles, California, quickly followed by San Francisco/Oakland/San Jose, California. *See* Rothell Decl. at *Exhibit C*. This is consistent with what we already know: that the Plaintiff's reputation is most relevant in California, not Ohio.

---

[12] The Plaintiff is apparently not the only "Richard Carrier" in Ohio, and there are other reasons that such a term would be searched – other than searching for the Plaintiff. This anecdotal evidence is at best "junk science," with no reliability.

[13] For brevity, the Defendant's incorporate the Google Trends analysis in the Motion to Dismiss herein.

Carrier further admits that he knows there are other Richard Carriers in the United States[14] and that there are at least two, but possibly more people, named Richard Carrier, in Ohio.[15] Accordingly, Carrier has no way of knowing how Google Trends has tracked different people named Richard Carrier in Ohio and around the country.[16]

### 2.3. Personal Jurisdiction

The Plaintiff bears the burden of proving personal jurisdiction. *Air Products, Inc. v. Safetech Intl., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). Determining whether personal jurisdiction exists requires two steps. *Id*. at 550; *Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). First, the Court must ask whether the facts fit the state long-arm statute. *Air Products*, 503 F.3d at 550. Then, if necessary, the Court must determine if the exercise of jurisdiction meets due process. *Id*.; *see also Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994), *cert. denied*, 15 U.S. 962 (1994).

#### 2.3.1. Ohio's Long-Arm Statute

Ohio's long-arm statute, Ohio Rev. Code § 2307.382, is narrower than the Due Process Clause. *Fraley v. Estate of Oeding*, 138 Ohio St. 3d 250, 257 (Ohio 2014) ("because Ohio's long-arm statute is not coterminous with due process, even satisfaction of the long-arm statute does not justify the exercise of jurisdiction unless that exercise also comports with the defendant's constitutional right to due process."); *Goldstein v. Christiansen*, 638 N.E.2d 541, 545, n.1 (Ohio 1994). Accordingly, for jurisdiction to be proper, the Court must first apply Ohio Re. Code § 2307.382 (A) (6), as analyzed in more detail in the Defendants' Motion to Dismiss, and incorporated herein by reference, and analyzed below.

---

[14] *See* Carrier Dep. at 49, wherein Carrier discussed other Richard Carriers in the United States.
[15] *See* Carrier Dep at 62, wherein Carrier admits that he knows there are other Richard Carriers in Ohio (at least two) but he does not know exactly how many.
[16] Carrier admits he had no formal training using Google Trends. *See* Carrier Dep. at 63.

**2.3.2. § 2307.382(A)(6) Analysis**

Under Ohio Re. Code § 2307.382(A)(6), the only section of the long arm statute that could apply, the Defendants must have (1) caused a tortious injury in this state, (2) by doing something out of state with the purpose of injuring someone, (3) with the reasonable expectation that someone would be injured in Ohio. None of these elements are met.

**2.3.2.1. The First Two Elements Are Not Met**

Although the Plaintiff need not prove his entire case at this time, he must show that the Defendants *caused a tortious injury in this state.* He cannot.[17] In the first instance, there was no tortious injury[18] because Defendants were reporting on facts that they reasonably believed (and continue to believe) are true.[19] To show injury, Plaintiff will need to prove by clear and convincing evidence that the Defendants published their statements with actual malice. *See* Fn. 3, *supra*; *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 487 (1984) ("The burden of proving actual malice requires the plaintiff to demonstrate with clear and convincing evidence that the defendant

---

[17] We still have no idea when Carrier actually moved to Ohio, or if anyone else would know that he moved to Ohio in 2016 since Carrier works remotely and travels constantly for work, "Throughout 2017, Plaintiff's travels included both business and vacation destinations in Tennessee, Arkansas, Missouri, Illinois, Georgia, Indiana, California, Virginia, Washington D.C., Pennsylvania, and others." See Plaintiff's Response to Defendants' Interrogatory No. 11 at 12, attached as **Exhibit 2**.

[18] Further, Carrier will not be able to show that any "injury" is not self-caused (and self-created) by filing this lawsuit, since he notes that people in the atheist community have commented *on his lawsuit*, and he effectively admits that he purposefully reaches out to people immediately after they negatively comment on his lawsuit (knowing it will prompt a rejection). See Plaintiff's Response to Defendants' Request for Production of Documents, Dkt.. No. 177 (Monette Richard's Jan. 18th 2:13 pm Facebook post) and Dkt.. No. 178 (Carrier's 3:32 pm email to Ms. Richard wherein he feigns to introduce himself and ask for work."), attached as **Exhibit 3** and **Exhibit 4**.

[19] Even if Carrier were able to completely exonerate himself and show that he never engaged in sexual misconduct with young students at his talks, it would still be legally irrelevant, because the question is whether the Defendants knew, for a fact, that Carrier always acted appropriately around young students and never engaged in sexual banter or touching with young students, or whether the Defendants entertained serious doubts as to the accusations against Carrier. Once there, we have only partially answered the question. The Court must then, by extension, find that the Defendants entertained serious doubts as to the accounts of at least *five* sources, when those sources shared stories that were consistent with each other, and with a story (and a sixth possible source) that Carrier himself shared on his blog. *See* Carrier Dep. at 89-94, and Carrier's article, "How to Do Wrong Right", *supra*.

realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.").

Freethoughtblogs, the Secular Student Alliance, and Skepticon, have strict conduct and harassment policies, which govern their writers, speakers, and participants. For example, Skepticon's conduct policy includes an eminently reasonable prohibition on "inappropriate physical contact, unwelcome sexual attention, and any other act that may cause harm to oneself or others." *See* Lane Decl. at ¶ 6.

Carrier was familiar with these standards. In his own words, "*Dr. Carrier has for many years been an outspoken advocate for ethical conduct in the treatment of women and men…he has himself always respected anyone's stated boundaries, and would never subject anyone to harassment of any kind.*" Complaint, Dkt. No. 1, p. 7 at ¶ 25.

Nonetheless, by his own admission, Carrier violated the Secular Student Alliances prohibition on speakers making advances on students. In May of 2015, in response to a complaint filed concerning Dr. Carrier's behavior, the Secular Student Alliance removed Dr. Carrier from their Speaker Bureau. Complaint, Dkt. No. 1, p. 17 at ¶ 52.

Even if Carrier were able to show that he suffered an injury in Ohio, all evidence points to the injury being self-inflicted. First, Carrier admittedly violated the SSA's prohibition on making advances on students. See Carrier Dep. at 89-94, and Carrier's article, "How to Do Wrong Right", Dkt. No. 10-1. He told the SSA that he violated their policy, so Carrier could not have had a reasonable expectation that the SSA would continue to work with him. Second, Carrier had not done any work for Camp Quest since 2009 and never had a direct affiliation with them,[20] and Carrier offers little evidence that he had an expectation to do work for them in the future.

Last, Carrier neglects to mention in the fact that the Executive Director of Camp Quest (Amanda Metskas) and the Executive Director of the SSA (August Brunsman) are a married couple, and that Carrier engaged in an extramarital sexual affair with Amanda Metskas for several

---

[20] *See* Carrier Dep. at 199, ¶ 1.

years. *See* Carrier Dep. at 58. *Yes, that's correct – Carrier was having sex with a married woman, and an organization led by her husband now has a chilly relationship with him – but somehow, that is the Defendants' fault.* The narcissism in this position is simply mind-boggling. Carrier does not speculate in his Complaint as to why after he cuckolded a husband, that husband may not want to hire him for future work; or why his former lover may not want to hire him after he admitted to her that he had made a sexual advance toward a younger female student at one of her organization's events. For Carrier to speculate that the Defendants' statements caused him to lose potential work from organizations run by his lover and her husband, well it simply boggles the mind.

Additionally, Carrier's reliance on *Keeton v. Hustler*[21] is misplaced. Carrier argues that even if the statements were not made within the territorial boundaries of Ohio, Defendants' false statements were received in Ohio. However, this argument fails to recognize the logic in *Keeton*. *Keeton* is a decision from the days of newspaper and magazine circulation, and specifically held that the regular circulation of physical magazines in the forum state is sufficient to support jurisdiction. Posting an article online is not the same as circulating physical magazines. For example, if an Ohio resident purchased a local newspaper in Indiana, and brought it back to Ohio to read, the *Keeton* analysis would not be extended to the content of the Indiana newspaper by virtue of the fact that an Ohio resident read the newspaper in Ohio: the Court would look to whether the newspaper was circulated in Ohio. Similarly, the mere fact that Carrier allegedly read an article posted on the internet from Ohio does not create circulation in Ohio. Plaintiff's reading of *Keeton* is twisted, and does not consider the implications of modern technology.

Further, Defendants reasonably believe the facts they reported on were true. They reported on those facts, with no intent to harm Carrier or his reputation, but to protect his possible future victims. These are matters of public concern and are about a public figure. Therefore, even if the facts are negligently incorrect, Defendants would only be liable if Plaintiff could establish Defendants published the statements with knowledge of their falsity or a reckless disregard for the

---

[21] *Keeton v. Hustler Magazine*, Inc., 465 U.S. 770, 777 (1984).

truth. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *St. Amant v. Thompson*, 390 U.S. 727 (1968); *and see* cases cited in Fn. 3, *supra*.

The facts Plaintiff alleged in his Complaint simply do not meet that standard. Carrier himself published facts that support the articles. See Richard Carrier, "How to Do Wrong Right," June 5, 2015, *supra*. There simply is no tortious injury in this state.

### 2.3.2.2. Reasonable Expectation of Injury in Ohio

This element is lacking. Defendants did not know *at all* that Carrier moved to Ohio. Therefore, there could be no **reasonable expectation** that he would be injured here. Carrier's reliance on *Kauffman Racing* is misplaced because actual *knowledge* that the Plaintiff resides in Ohio is necessary to establish a reasonable expectation of injury in the state. *See, e.g., Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St. 3d 81, 2010 Ohio 2551, 930 N.E.2d 784, 792 (Ohio 2010) ("When defamatory statements regarding an Ohio plaintiff are made outside the state yet with the purpose of causing injury to the Ohio resident and there is a reasonable expectation that the purposefully inflicted injury will occur in Ohio, the requirements of R.C. 2307.382(A)(6) are satisfied."); *Herbruck v. LaJolla Capital*, No. 19586, 2000 Ohio App. LEXIS 4668, 2000 WL 1420282, at *3 (Ohio App. Sept. 27, 2000) ("A fair reading of the complaint and documentary materials shows that Gallison committed tortious acts (alleged as conversion, fraud, and civil conspiracy) outside Ohio, while knowing full well that the stock involved was of an Ohio corporation."). For example, in *Thompson v. Moore*, 2009 U.S. Dist. LEXIS 95896, *5 (N.D. Ohio Oct. 15, 2009) the Defendant sent an allegedly libelous letter to Ohio's Attorney General – thus rendering ineffective any argument that the defendant did not actually target Ohio. *See also Specialized Mach. Hauling & Rigging, LLC v. D&L Transp., LLC*, 2009 U.S. Dist. LEXIS 37234, *27 (S.D. Ohio Apr. 20, 2009). Mailing a letter to Ohio would give rise to a reasonable inference that harm could occur here. But, in this case, these Defendants published about someone they knew to be a *Californian*. Ohio was simply never on any Defendant's radar.

To rely on Section (A)(6), the Plaintiff must show more than minimum contacts for jurisdiction to attach in a defamation case. *Reynolds v. International Amateur Athletic Federation*,

23 F.3d 1110, 1119 (6th Cir. 1994). They must show affirmative knowledge that Carrier resided here at the time of publication. Where a defendant engaged in tortious activity, "while knowing full well that the stock involved was of an Ohio corporation," this was satisfied. *Herbruck v. Capital*, 2000 Ohio App. LEXIS 4668, *9, 2000 WL 1420282 (Ohio Ct. App., Summit County Sept. 27, 2000); *see also Heffernan v. Options Assocs.*, 2001 Ohio App. LEXIS 2522, *5, 2001 WL 627615 (Ohio Ct. App., Hamilton County 2001) (court acknowledged that defendant's knowledge that a person lived in Ohio, might be evidence that a defendant might reasonably know that his fraudulent activity might cause the Plaintiff harm in Ohio). However, if this element is lacking, the long arm statute is unsatisfied. *See Kauffman Racing Equip., L.L.C. v. Roberts*, 2008-Ohio-4911, 119 Ohio St. 3d 1471, 894 N.E.2d 331.

Defendants had no knowledge that Carrier moved to Ohio.[22] At the time of publication, the Defendants all knew Carrier as a Californian. *See* § 2.1 *supra*. In fact, his identity with California was so long-standing and universally known that not a single one of the Defendants knew he moved to Ohio until served with the complaint. Even the demand letters Plaintiff's attorney sent did not mention that Carrier had moved to Ohio. The Defendants presumed that Carrier shopped around for a quality lawyer who happened to be in Ohio. In any event the letters were sent *after* the statements had been published. Complaint, Dkt. No. 1 at Exhibits 6-9. Further, Carrier's assertions that the Defendants did not retract the statements after he sent his demand letters is unavailing, because Courts have noted that there is a lack of authority for supporting liability for failure to retract in defamation cases. *See D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1287 (C.D. Cal. 2000) (There is no authority to support Plaintiffs' argument

---

[22] Even if one of the corporate defendants happened to have provable institutional knowledge of Carrier's whereabouts, this could not be imputed to any members or employees of the corporate defendants. *Mohme v. Deaton*, 2006 Ohio 7042, 2006 WL 3833923, at *3 (Ohio App. 12 Dist. 2006) ("A corporate officer may not be held liable merely by virtue of his status as a corporate officer; however, the OCSPA does create a tort that imposes personal liability upon corporate officers for violations of the act performed by them in their corporate capacities."); *Ferron v. Search Cactus, L.L.C.*, No. 2:06-cv-327, 2007 U.S. Dist. LEXIS 44473, 2007 WL 1792332, at *2 (S.D. Ohio June 19, 2007) (acknowledging rule).

that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication.), citing to *McFarlane v. Sheridan Square Press*, 320 U.S. App. D.C. 40, 91 F.3d 1501, 1515 (1996) (McFarlane presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication.) Defendants maintain and believe that the statements they posted are true. Defendants could not have reasonably expected that Carrier would be harmed in the state of Ohio, and jurisdiction fails under the long-arm statute.

### 2.3.3. Due Process

In addition to satisfying the forum state's long-arm statute, the Plaintiff must show that exercising personal jurisdiction would not offend due process. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). General jurisdiction is present only when a defendant's contacts with the forum state are substantial, continuous, and systematic. *Id*. at 418; *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445-47 (1952). Specific jurisdiction exists when a plaintiff's cause of action arises from the defendant's contacts with the forum state. *Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 981 (6th Cir. 1992)

#### 2.3.3.1. General Jurisdiction

The Court cannot exercise general jurisdiction over Defendants. As Plaintiff alleged: "Defendant freethoughtblogs' principal place of business is in the State of Minnesota" (*Id*. at p. 3, ¶ 5); "Defendant Myers lives in Minnesota" (*Id*. at p. 4, ¶ 7); Defendant the Orbit's principle place of business is in Minnesota (*Id*. at p. 4., ¶ 8); "Defendant Zvan resides in Minnesota" (*Id*. at p. 5, ¶ 11); "Defendant Lane resides in the State of Missouri" (*Id*. at p. 5, ¶ 13); Defendant Skepticon is "incorporated in the State of Missouri with its principal place of business in the city of Springfield" (*Id*. at p. 5, ¶ 11); and "Defendant Frank-Skiba resides in Arizona" (*Id*. at p. 6, ¶ 15).

None of the individual Defendants has ever resided in Ohio. Myers Decl. at p. 1, ¶ 2; Lane Decl. at p. 1, ¶ 3; Zvan Decl. at p. 1, ¶ 4; and Frank-Skiba Decl. at p. 1, ¶ 4. Nor have any of them ever worked or operated a business, paid taxes, filed a lawsuit, entered a contract, or registered to

vote in Ohio. Each of them have only rarely visited Ohio. Lane Decl. at ¶ 3; Meyer Decl. at p. 1, ¶ 3; Zvan Decl. at ¶ 3; and Frank-Skiba's Decl. at p. 1, ¶ 4. Since none of the Defendants reside in Ohio or has any systematic contacts with the state, Defendants are not subject to general personal jurisdiction of this Court.

### 2.3.3.2. Specific Jurisdiction

When it comes to due process and personal jurisdiction in a defamation case, the analysis must begin with *Calder v. Jones*, 465 U.S. 783 (1984). In that case, the Supreme Court said there was jurisdiction because:

> the allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm . . . was suffered in California. In sum, California is the focal point both of the story and the harm suffered.

*Id*. at 788-89.

In *Calder*, the article was published in Florida, but focused on the California entertainment industry and actress Shirley Jones who lived in California, and whom the National Enquirer knew resided in California. The article was based on California sources and the newspaper had its highest circulation by far in California. *Calder*, 465 U.S. at 789. In *Calder*, the authors aimed their intentional actions at California. They focused on a Californian and discussed events that took place in California. It was, by all measures, as if they looked through a long-range viewfinder at California, and fired a long-range bullet into California, striking an object in California. This made it reasonable that the defendant would reasonably anticipate being haled into court in California. *Id*. at 789.

This case is not *Calder*. First, the articles in question discuss Carrier's actions at conferences in locations other than Ohio. Secular Student Alliance conferences take place in various locations around the country. *See* **Exhibit 5** regarding Past Secular Student Alliance Conferences.[23] Skepticon occurs in Missouri. Hammond Decl. at p. 1, ¶ 6. None of the events

---

[23] Available at <https://secularstudents.org/conference/past> (last accessed Dec. 1, 2016).

14

discussed in any of the allegedly defamatory statements occurred in Ohio. *See* Zvan Decl. at ¶ 17; Frank-Skiba Decl. at ¶ 7. Second, the plaintiff's reputation in *Calder* was in the forum state since she lived there, and her industry (Hollywood acting) was centered in Los Angeles. In this case, Ohio is hardly known as the nerve center of atheistic speaking and publishing. Carrier tries to paint Ohio as the "Hollywood for feminist-atheists,"[24] but Carrier has no evidence that his he is in high demand in Ohio other than mere speculation. Carrier claims that he had significant earnings in Ohio in 2015, but he cannot show a pattern of high earnings in Ohio for any other year. Carrier admits that 2015 is the year that he received a significant payout from his high-income ex-wife as part of his divorce,[25] and he states that one of the reasons he wanted to move to Ohio was because he had several girlfriends there.[26] Carrier alleges that he had more income in Ohio in one single year, 2015, the same year he got divorced and spent time with several girlfriends in Ohio. Dating new people in a different state may bring someone to that state more often, but it does not transform the state into a Hollywood for feminist-atheism. The year 2015 was an anomaly for Carrier.

To the extent Carrier has any reputation in Ohio, it is new – given that he moved to Ohio almost immediately before he filed his Complaint. He cannot claim that his decades-old California reputation was transformed into an Ohio interest overnight. Third, the focal point of the articles is not Ohio, but events in many different places – none of which are in Ohio. Meanwhile, in *Calder*, the focal point was clearly the forum state of California where the entertainment industry is centered. Although Carrier alleges that Defendant Skiba directed her messages to Ohio by discussing an organization in her post that is based in Ohio: this is a red herring, because Carrier admits that both Camp Quest and the SSA are nationwide organizations with locations in many states, including many in California. *See* Carrier Dep. at 38, ¶¶ 12-25 and at 66, ¶ 13. Carrier has

---

[24] Carrier speculates that his teachings on feminism and atheism are more popular in religious places like Ohio, but he offers no evidence to support this speculation. *See* Carrier Dep. at 22, ¶¶ 1-8,
[25] *See* Carrier Dep. at 88, wherein Carrier notes that his ex-wife paid him several thousand dollars as part of the divorce.
[26] *See* Carrier Dep. at 20: "I had more girlfriends in or near Ohio".

15

provided no evidence that anyone would automatically associate these organizations with Ohio given the variety of locations and nationwide influence these organizations have in the secular community.

Fourth, Carrier has a national reputation that is not centered in Ohio. At the time of the alleged statements, Dr. Carrier had only been living in Ohio for a matter of days. Meanwhile, each of the Defendants believed Dr. Carrier remained in California. Lane Decl. at p. 1, ¶¶ 4-5; Myers Decl. at pp. 1-2, ¶¶ 5-7; Zvan at pp. 1-2, ¶¶ 5-11; and Frank-Skiba Decl. at p. 1, ¶¶ 5-6.

Accordingly, nobody could have reasonably known that the brunt of any harm (to the extent there is any) might be felt in Ohio. Even if there was foreseeability that there could be some circulation or effect in Ohio, that is not enough to create jurisdiction. *See Reynolds v. International Amateur Ath. Fed'n*, 23 F.3d 1110, 1120 (6th Cir. 1994) (Finding that even if a publisher could foresee that its report would be disseminated in Ohio, it would not be enough to subject the publisher to personal jurisdiction in Ohio.)

As in *Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000), these Defendants' only contact with Ohio is this suit, because "plaintiff chose to reside there." 228 F.3d at 722-23. However, it is more egregious in this case because the Plaintiff chose to reside here very recently and *long after* the parties entered any kind of relationship. To establish a constitutionally supportable nexus with the forum state, the Plaintiff cannot simply move to a new state and then choose to bring suit there against out of state defendants. *See Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97 (1978) (no jurisdiction when case brought in new state after the parties' relationship began in another); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1420 (10th Cir. 1988) (contacts with forum state were the result of plaintiffs moving to a new state after the legal relationship began); *Zenergy, Inc. v. Coleman*, No. 09-cv-00381-CVE-FHM, 2009 U.S. Dist. LEXIS 99617, 2009 WL 3571314, at *8 (N.D. Ok. Oct. 26, 2009) (noting that "[c]ourts have found no nexus between the defendants' contacts with the forum and the litigation where the plaintiff moved to the forum state after the relationship began"); *Sando v. Sando*, 1985 Ohio App. LEXIS 9606, (Ohio Ct. App. 1985) (parties entered into relationship, then plaintiff moved to Ohio).

16

None of these Defendants knew that this long-standing California resident had moved to Ohio at the time of publication. "And, without such knowledge, there can be no personal jurisdiction under the "effects" test, as "[k]nowledge of the plaintiff's residence is the crucial element" of express-aiming." *Pritz v. S. Cal. Edison Co.*, 2013 U.S. Dist. LEXIS 104802, *11 (E.D. Mich. July 26, 2013) (dismissing claim where plaintiff moved to Michigan unbeknownst to the defendant).

### 2.3.3.2.1. Reasonableness

Even if the Court finds that a defendant purposefully directed actions at the forum state and that plaintiff's claims arose out of the defendants' activities in the forum, exercising jurisdiction still must be reasonable under the circumstances.

The Court examines several factors making this determination. They include: (1) the burden on the defendant to litigate in the forum state; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) the interest of other states in securing the most efficient resolution of the case. *CompuServe*, 89 F.3d at 1268.

Where there is no showing of express aiming, it is unreasonable to expect a party to defend himself in a state with which he has no contacts. Ohio has little interest in being the forum to resolve a dispute that arose prior to or shortly after Plaintiff moved to the state, dealing with events that took place outside of Ohio, where there are no witnesses in Ohio, and where the only connection to Ohio is that the Plaintiff chose to move here.

Nothing prohibits Plaintiff from obtaining relief by suing the Defendants in their home states. At least three other states have a greater interest than Ohio in resolving these claims, as analyzed in the Defendant's Motion to Dismiss: (1) California, where Defendants believed Carrier lived at the time they published their allegedly defamatory statements, and where the anticipated 30(b)(6) witness for Skepticon, Inc. is physically located; (2) Minnesota, where Zvan and Myers reside, and Freethoughtblog, LLC and The Orbit have their principal places of business; and (3) Missouri, Lauren Lane resides there and Skepticon, Inc. is registered and has its principal place of

business there. Even if Defendants had expressly aimed activities toward Ohio and Plaintiff's claims arose from those contacts, it would still be unreasonable to sue these Defendants in Ohio.[27]

Assuming *arguendo*, that Carrier can show that he suffered an injury in Ohio, the Sixth Circuit recently affirmed that it is unreasonable to assert jurisdiction where the Plaintiff is the only link to the State: "mere injury to a forum resident is not a sufficient connection to the forum to establish jurisdiction" and that "[t]here can be no doubt that the plaintiff cannot be the only link between the defendant and the forum." *Bulso v. O'Shea*, No. 17-5271, 2018 U.S. App. LEXIS 9809, at 1 (6th Cir. Apr. 19, 2018), citing to *Walden v. Fiore*, 134 S. Ct. 1115, 1117 (2014) (The Calder effects test makes clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state.)

In *Bulso*, a lawyer at a Tennessee law firm represented a client in real-estate disputes all over the country. The lawyer and the client had a falling out, and the client sued the lawyer in California and Alabama. When one of the claims was dismissed, the lawyer sued the client in Tennessee (his home state) for malicious prosecution. The district court dismissed for lack of personal jurisdiction, even though the client had met with the lawyer at least once in Tennessee, communicated with the lawyer in Tennessee, and served the lawyer a summons (regarding the California litigation) in Tennessee. The Sixth Circuit, as noted above, affirmed the dismissal:

> Defendants' contacts with Tennessee came from the attorney's law firm being located there and not because they sought to invoke the benefits and protections of Tennessee law, the operative facts all occurred outside Tennessee, and there was not a sufficiently substantial connection with Tennessee to make the exercise of jurisdiction reasonable…The personal-jurisdiction analysis of the malicious-prosecution claim hinges on whether the defendants' conduct connects *them* to Tennessee, not on where Bulso experienced those consequences.

*See Bulso*, *supra* at 1 and 9 (emphasis in original). Similarly, Defendants have done nothing to invoke Ohio's benefits and protections; Defendants made statements outside Ohio about conduct

---

[27] If Jurisdiction is found, the Defendants also intend to raise the argument that these parties are improperly joined.

that occurred outside Ohio; the operative facts all occurred elsewhere, thus, there is not a sufficiently substantial connection with Tennessee to make the exercise of jurisdiction reasonable. None of Plaintiff's claims connect *them* to Ohio, thus it matters not where Carrier alleges that he now experiences the effects of the Defendants' statements. On balance, these factors demonstrate that exercising personal jurisdiction over the Defendants would be unreasonable.

### 2.4. The Court Should Dismiss based on Improper Venue

Plaintiff alleges venue based on 28 U.S.C. § 1391(a)(2), stating "all or a substantial portion of the events that gave rise to Plaintiff's claims accrued within the State of Ohio, including Defendants' express targeting of the Plaintiff in the State of Ohio, Defendants' publication and republication of the defamatory falsehoods in the district, the damage to Plaintiff's reputation suffered in the district, and Defendants' tortious interference with Plaintiff's business expectancies in the district." Complaint, Dkt. No. 1 at ¶ 3.

Plaintiff's reference to subsection (a)(2) is apparently a typographical error since the standard plaintiff refers to is from subsection (b)(2). Nonetheless, the facts do not support a proper finding of venue, as analyzed in Defendants' Motion to Dismiss. Venue fails under subsection (b)(1), because none of the Defendants reside in this district. Venue fails under subsection (b)(2), because despite Plaintiffs' unsupported allegations to the contrary, none of the events or omissions giving rise to Dr. Carrier's claims occurred in Ohio. *See* Zvan Decl. at ¶ 17; Frank-Skiba Decl. at ¶ 7. Nor is any property that is the subject of the litigation situated in Ohio. For the same reasons Plaintiffs' unsupported allegations of express targeting do not support personal jurisdiction, they can neither support venue. Venue cannot be established under subsection (b)(3) because, as discussed in detail *supra*, none of the Defendants is subject to the personal jurisdiction of the Court. The Court should dismiss this action for improper venue.

### 3.0 Conclusion

Plaintiff failed to establish that this Court has personal jurisdiction over any of the named Defendants and therefore the Court must dismiss them from this action. Because Plaintiff cannot cure this deficiency, the Court should make the dismissal *with* prejudice. Because the Court has

no personal jurisdiction over Defendants it must also (or alternatively) dismiss the Complaint based on improper venue.

Dated this 30th day of May, 2018.   Respectfully submitted,

/s/ Jeffrey M. Nye
Jeffrey M. Nye (0082247)
STAGNARO, SABA & PATTERSON CO. L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-6714

Marc J. Randazza (*Pro Hac Vice*)
D. Gill Sperlein (*Pro Hac Vice* Pending)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
(402) 420-2001

*Attorney for Freethoughtblogs Network, Paul Z. Myers, Ph.D., The Orbit, Stephanie Zvan, Skepticon, Inc., Lauren Lane, and Amy Frank-Skiba*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing was served upon all parties via CM/ECF on May 30, 2018.

/s/ Jeffrey M. Nye
Jeffrey M. Nye (0082247)